| | |
|---|---|
| UNITED STATES BANKRUPTCY COURT<br>DISTRICT OF NEW JERSEY | |
| Caption in Compliance with D.N.J. LBR 9004-1(b)<br>HELLRING LINDEMAN GOLDSTEIN<br>& SIEGAL LLP<br>Patricia A. Staiano, Esq.<br>Attorneys for Benjamin A. Stanziale, Jr.,<br>Chapter 11 Trustee<br>103 Eisenhower Parkway, Suite 403<br>Roseland, New Jersey 07068-1031<br>973.621.9020<br>pstaiano@hlgslaw.com | |
| In Re:<br><br>AVRUMI LUBIN a/k/a Josh Lubin,<br><br>Debtor. | Case No. 26-17342 (EJO)<br><br>Judge: Hon. Eamonn James O'Hagan, U.S.B.J.<br><br>Chapter 11 |
| BENJAMIN A. STANZIALE, JR., CHAPTER 11 TRUSTEE FOR AVRUMI LUBIN a/k/a Josh Lubin,<br><br>Plaintiff,<br><br>vs.<br><br>AVRUMI LUBIN, SPIN CAPITAL, LLC, TETON LIFE, LLC, TETON FUNDING, LLC, TETON FUNDING GROUP, LLC, and JL SPECIAL INVESTMENTS, LLC,<br><br>Defendants. | Adv. Pro. No. 26-_________(EJO) |

CERTIFICATION OF BENJAMIN A. STANZIALE, JR., CHAPTER 11 TRUSTEE FOR AVRUMI LUBIN A/K/A JOSH LUBIN IN SUPPORT OF APPLICATION FOR ORDER TO SHOW CAUSE AND TEMPORARY RESTRAINTS

Benjamin A. Stanziale, Jr., of full age, certifies as follows pursuant to 28 U.S.C. §1746 based upon information received in this case to date:

1. On June 25, 2026, Avrumi Lubin, a/k/a Josh Lubin, the Debtor herein (the "Debtor") filed a Petition under Chapter 11 of the Bankruptcy Code, 11 U.S.C. §101 et seq.

2. I was appointed as Chapter 11 Trustee for the Debtor on September 18, 2026, which appointment was approved by the Court by Order dated September 28, 2026.

3. I have filed an adversary proceeding against the Debtor and the following entities (hereinafter the "Subject Entities" and collectively, with the Debtor, the "Defendants") for the purpose of extending the Debtor's bankruptcy case to include the Subject Entities:

- SPIN CAPITAL, LLC ("Spin");
- TETON LIFE, LLC ("Teton Life");
- TETON FUNDING, LLC ("Teton Funding");
- TETON FUNDING GROUP, LLC ("Teton Funding Group"); and
- JL SPECIAL INVESTMENTS, LLC ("JL")

4. The Debtor filed Schedules on July 22, 2026 in which:

a. The Debtor listed Subject Entities Spin, Teton Funding, Teton Funding Group, and JL as entities wholly-owned by the Debtor; and

b. The Debtor listed Subject Entity Teton Life as owned 50% by the Debtor and 50% by another individual named Gavriel Yitzchakov, a/k/a Gabe Isaacov. Upon information and belief, whether de jure or de facto, the Debtor is in managerial control of Teton Life.

5. Pre-petition, the Debtor operated a non-bank finance business providing what was styled as "revenue financing" or "merchant cash advances" (colloquially referred to collectively as "MCAs") to cash-strapped businesses and individuals in numerous states ("Spin's Counterparties").

6. On May 15, 2026, in contested judgment enforcement proceedings against the Debtor and Subject Entities Spin and Teton Funding in the Circuit Court of the 17th Judicial Circuit in and for Broward County, Florida, the court issued a Charging Order against the Debtor's interest in Subject Entities Spin and Teton Funding based on a finding that Spin and

Teton Funding are "under the complete domination and control of the Judgment Debtor [Lubin, the Debtor in bankruptcy case] [and] the corporate form is used to shield assets from [his] creditors." Exhibit A, Charging Order, at p. 2, finding #6.

7. I intend to use my strongarm and avoidance powers to invalidate the Charging Order so that the Debtor's interest in Spin and Teton Funding will be available to all creditors of the Debtor's Estate. However, it is the lien which is void, not the findings, which were made in contested proceedings.

8. The Florida Court's findings demonstrate legitimate concern that the Debtor's affairs cannot be fully resolved without also subjecting the activities of the Subject Entities to the bankruptcy stay and including their assets in the resolution of creditor claims in this action. (Conversely, to the extent that creditors of the Subject Entities assert competing claims or interests to assets of the Subject Entities, resolution of those matters should occur in the Debtor's bankruptcy proceedings and the Debtor's bankruptcy estate, and in one forum; northing short would be chaos.)

9. Teton Life may stand in a somewhat different posture, but it should nonetheless be part of the extension of proceedings. As noted, the co-owners of Teton Life are the Debtor and Yitzchakov. Yitzchakov, among other business interests, operates another MCA business called BMF. BMF had entered into transactions with individuals and businesses, which I will refer to collectively as "Leer," secured by various collateral[1]. Spin acquired the Leer transactions and collateral from BMF. Shortly after Spin sued Leer in the New York State Supreme Court, New York County, in the action now styled Teton Life LLC as assignee of the

[1] Stephan Joseph Leer is a Chapter 7 debtor, whose case is pending in the United States Bankruptcy Court for the Middle District of Tennessee, Nashville Division under Case No. 3:26-bk-00149. Mr. Leer owned interests in certain LLCs which purchased life insurance policies and which were pledged as collateral for loans that BMF had made. Counsel has been in contact with the Trustee's counsel in the case.

rights of Spin Capital, LLC v. Golden Foothill Insurance Services, LLC et al., Index No. 65058212022 (the "New York State Action"), Spin sought to enforce the obligations and to foreclose the collateral, consisting of numerous policies of life insurance, some of which required ongoing payments of premiums to maintain in force. The Leer parties defended and counterclaimed, asserting the obligations were usurious and otherwise unenforceable.

10. Leer was not paying the premiums on the life insurance, and Spin secured an order appointing a receiver to hold the life insurance policies and continue the payments, funded (initially) by Leer and subsequently by Spin. Spin appears to have expended large amounts of money on paying the premiums to preserve the life insurance policies and on paying professional fees to enforce the Leer obligations. Upon information and belief, Yitzchakov or his entities (the "BMF entities") provided certain portions of this funding[2].

11. Early in 2023, Teton Life was formed as a limited liability company owned half by the Debtor personally and half by Yitzchakov personally into which Spin assigned its interest in the collateral.

12. Notwithstanding that the assignment/contribution to Teton Life took place in or about February 2023, Teton Life did not appear in the New York State Supreme Court Action to enforce the Leer obligations until 2025, and has never appeared in the related federal RICO suit brought by the Leer parties, Golden Foothill Insurance Services, LLC et al v. Spin Capital, LLC et al, Case No. 1:24-cv-08515-AS, pertaining to the same MCA transactions.

13. Each of the Debtor and Mr. Yitzchakov seem to have taken actions to the prejudice of the creditors of the Debtor and Spin:

---

[2] One of the Yitzchakov/BMF entities, Redstone, claims to have made a loan to Spin or Teton Life in the approximate aggregate amount of anywhere between $3.6 million and $4.0 million. See below.

a. In 2025, the Debtor purported to assign all of the rights and collateral owned by Teton to his wholly owned entity, Subject Entity JL, for "$10" consideration. Upon information and belief this would have been a fraudulent transfer; the Debtor alleges the assignment to JL has been undone. See Exhibit B, Lubin Declaration dated May 21, 2025, with its exhibits C and D, NYSCEF document no. 887; and Exhibit C, Yitzchakov Affirmation dated April 21, 2025, NYSCEF document no.845 [without exhibits]. However, unless the case is extended to JL, JL could potentially do mischief.

b. On information and belief, in or about June 2026, Yitzchakov and his principal business, BMF, reached a settlement with the Leer parties which essentially divies up the "State Action Proceeds," defined to include any value attributable to cash, insurance proceeds, death benefits, litigation recoveries, judgments or settlements in the New York State Action, without any payments to Teton Life, Spin or the Debtor – even though Yitzchakov acknowledges that under the Teton Life Operating Agreement receipts would first be applied to repaying a $ 4 million promissory note that Teton Life executed in favor of the Yitzchakov/BMF affiliate Redstone, and the balance split with the Debtor -- instead, the Leer Parties, Yitzchakov and BMF agreed to seek to install a receiver over Teton Life.

c. Owing to the distrust of the parties, any actions taken by the Debtor in the management of Teton Life would likely be challenged by Yitzchakov, and Yitzchakov could not himself manage Teton Life without the consent of the Debtor or a court order[3].

14. As this history makes clear, neither the Debtor nor Yitzchakov can administer Teton Life, or protect the interests of the Debtor's creditors in their administration of Teton Life

[3] Under the Teton Life Operating Agreement, management is by the members. However, a specific provision provides that prosecution of the Leer obligations is vested solely in the Debtor, subject to advice of Yitzchakov. A copy of the Teton Life Operating Agreement is attached hereto as Exhibit D, and id. Article 2.08.

and the Debtor's interest in Teton Life, and if Yitzchakov, BMF and the Leer Parties are content to have Teton Life in receivership, they cannot complain if it is instead entrusted to a bankruptcy trustee under the supervision of this Court.

REQUESTS FOR TEMPORARY RELIEF

15. The reason for seeking temporary relief pending determination of the extension complaint is:

a. To stay litigation or enforcement of judgments against the Subject Entities;

b. To enjoin the Debtor and all persons and entities acting in concert with him, from taking actions in the name of the Subject Entities to collect judgments in favor of the Subject Entities, and to confirm that the sole authority to act in the stead of the Debtor as to any management and litigation decision regarding the Subject Entities;

c. To enjoin the Defendants and any person or entity acting in concert with him from transferring assets of the Subject Entities; and

d. To direct Defendants to turn over books and records of the Debtor and the Subject Entities to the Trustee or his professionals whose retention is approved by the Court.

**Stay pending resolution of the Complaint to Extend Proceedings**

16. Extension of the stay pending resolution of the Complaint to Extend Proceedings would prevent prejudice to the Estate and the interest of creditors.

17. Courts in underlying litigation have not (to date) extended the stay against any of the Subject Entities. Some of the cases are in advanced stages such as post-trial (but prejudgment) or pending briefed summary judgment motions, making time of the essence. Furthermore, extension of the proceedings would provide clarity to all courts in which the Debtor and the Subject Entities are litigating as to the authority of the Debtor and the Subject

Entities to act and stay proceedings or actions adverse to property of this bankruptcy estate. This would obviate court-by-court determinations, which is in the interest of judicial economy and prevents inconsistent rulings

18. It would involve significant cost and burden to make stay applications as to each individual case to which the Subject Entities are parties, and may yield inconsistent results, to the detriment of creditors not only of the Debtor but also the Subject Entities. (For example, if creditor A has sued only Spin but it turns out would later need recourse to the assets of other Subject Entities to collect a judgment because Spin transferred assets to other Subject Entities without adequate consideration and in fraud of Spin's creditors, then adverse results in cases against those other Subject Entities could impair collectability.)[4]

19. The proposed interim stay should present no significant prejudice to anyone. The proposed stay of litigation involving the Subject Entities pending resolution of the Complaint to Extend Proceedings would hopefully be short. If the stay is granted, coupled with the related relief sought restraining the disposition of assets of Subject Entities, it will preserve assets for creditors while imposing only relatively short delay to actions which have (unfortunately) already dragged on for years. In short, without obtaining the requested relief, any Court, in any jurisdiction can rule (even inadvertently) adverse to assets of this estate and its creditors.

20. If the Court grants the extension requested in the Complaint to the Subject Entities, the automatic stay would apply to each of the Subject Entities uniformly in litigations across the country; obviating motion practice in multiple jurisdictions and providing uniformity.

---

[4] This is not purely hypothetical. The FVP partes, as seen, secured the Charging Order against the Debtor's interest in Spin and Teton Funding and had turned its attention to seeking a charging order against his interest in Teton Life shortly before the Debtor filed his Chapter 11 petition. Meanwhile, the Claims Register in this matter, Exhibit E hereto, lists $24 million of claims against the Debtor, including $23 million involving claims or judgments by asserted creditors seeking relief not only against the Debtor but also against the Subject Entities.

The stay will have preserved assets that may need to be shared among creditors of not only the Debtor but all of the Subject Entities.

21. Administration in one court will also be most efficient because various claimants and creditors have asserted claims against or sought to lien the same assets, dispersed among the Debtor and the Subject Entities. In that case, mediation or other ADR proceedings may promote a consensual resolution under which a plan may be proposed. And even if it were ultimately prove to be the case that it becomes necessary to lift stays to allow ongoing litigation to proceed in the existing courts, this Court could impose appropriate protective conditions, such as allowing the case to proceed only to determine issues or liquidate claims, and not to permit a race to grab assets outside the bankruptcy case.

22. If the Complaint to extend proceedings is denied, then the restraints would no longer apply, there would be no stay, and litigation involving the Subject Entities could proceed.

**Injunction against the Debtor continuing to incur costs or otherwise operating the Subject Entities and confirming the Trustee's Authority to Manage All Subject Entities**

23. While the Debtor served as Debtor-in-Possession, the Debtor understandably sought to preserve the value of his entities, which has included litigating on their behalf. The Debtor continues to do so as it has not yet been judicially determined that I am authorized to act on behalf of the Subject Entities. Further, the Debtor has been expending (or at least incurring) tens to hundreds of thousands of dollars to prosecute claims on behalf of Spin or to defend Spin in various litigation. The Debtor claims to have only used assets of the Subject Entities to do so, rather than personal assets. However, those expenditures – just as conduct by creditors to grab assets of such entities in satisfaction of claims or judgments – impacts the value of the entities, and thus impacts the Debtor's estate and its creditors. Whether those are wise and appropriate expenditures is a question for another day. What is important now is that I, as Trustee, need to

have control of decisions of this type so that fees incurred or paid for professional services and other purposes are expended prudently and in the interests of creditors. And as previously noted in the situation of Teton Life, it is essential that the management clearly be vested in the Trustee, so that neither the Debtor nor Mr. Yitzchakov can claim to speak for or control Teton Life or use estate assets to pay for actions directed by them.

**Injunction against asset dispositions by Subject Entities**

24. While an extension of a stay would prevent actions being taken against Subject Entities, for the reasons already noted, the Debtor and the Subject Entities must similarly be prevented from transferring assets for any reason. In this regard, Teton Life seems to hold the largest known quantity of assets of any of the Subject Entities, and disputes between the co-owners, Yitzchakov and the Debtor, have previously (it appears) led the Debtor purportedly to "assign" all of the Teton assets to JL, see Exhibit B (Lubin Declaration attaching Assignment Agreement), and, upon information and belief, for Yitzchakov to seek to wrest control of Teton Life for the purpose of funding in part his personal settlement of claims against him by other persons. The Teton Life assets consist of claims in, and the collateral interests in life insurance policies held by the receiver, in the New York State Action.

**Turnover of Books and Records of the Debtor and the Subject Entities**

25. The Debtor has provided information to me as he sees fit, some information in response to requests by me and my counsel, and some not. For the most part, the information has been directed at why the Debtor believes that judgments against him in favor of FVP and Franklin should be overturned, or why Teton Life or Spin may have the ability to collect money. However, other than a document dump called "Deals-Documents," which reflect transactions in which the Debtor asserts Spin is owed money, I have not received the vast majority of books and records of the Subject Entities. The Debtor has not identified to me any accountant for either

himself or the Subject Entities to whom I can look for this information. The Debtor has not filed tax returns (so far as I can determine) for the last two years. The Debtor, whether because of acknowledged personal issues or less benign reasons, has not been a consistent recordkeeper.

26. The Debtor, as noted, has been able to hire (and often fire) and pay retainer fees and ongoing legal fees to attorneys representing the Debtor and Subject Entities both before and after he filed the Chapter 11 proceeding, which he asserts exceeds $6 million. The Debtor asserts these amounts were not paid by him personally, but where this money came from is obscure. The Debtor's bankruptcy schedules showed $67.78 (sixty-seven dollars and seventy eight cents) in his personal bank accounts. He has not provided bank account statements, checks, wire transfers or other information to show the affairs of the Subject Entities, from which he claims to be obtaining the money to have continued the prosecution and defense of those matters.

27. Illustrative of the Debtor's poor record keeping and the scramble of the Subject Entities and his personal affairs is his notification to me on Wednesday October 7, 2026 that he will be amending Schedule E/F to include a potential claim against him, personally, by an individual named Avrahom (Abe) Zagelbaum. See Exhibit F (email with attachment). According to the Debtor, Mr. Zagelbaum "put money into Spin Capital's merchant cash advance deals as a 'participant.' Under section 8.2 [of the MCA Funding Agreement], if the agreement ends and Abe has not recovered his contributions, I agreed to repay 50% of the shortfall, up to $2.5 million.'" Id. So here is another potential $2.5 million claim not only not (previously) reflected in the Debtor's existing Schedules, but only ascertainable by recourse to the financing side of Spin's books and records, which the Debtor has not provided to me or my professionals. And it is likely that there are other "participants" in other "participation deals" with Spin or other of the Subject Entities, similarly subject to agreements by the Debtor to repay them in whole or

in part. This will be ascertainable only through the records of Subject Entities, which the Debtor has apparently cross-guaranteed in some (informal) fashion in the Subject Entities' records rather than in his own. As the Debtor signed this agreement in his capacity as the "member" in Spin, and did not give a separate guaranty signed in his personal capacity, it tends to indicate that creditors of Spin relied on the identity of Spin and the Debtor in determining to advance funds to Spin. In all events, the Debtor's financial situation and the Subject Entities' financial situation are so significantly scrambled and entangled that extension and consolidation is essential for a fair resolution of creditor claims.

28. For these reasons, the Court should direct a turnover of the financial books and records of the Debtor and each of the Subject Entities to me or my retained professionals, so they can conduct an audit and review of the Debtor's and Subject Entities' books and records of account, post-haste.

WHEREFORE, I respectfully request that, pending disposition of the Complaint in the Adversary Proceeding to Extend Proceedings to the Subject Entities, the Court enter the requested relief.

I certify under penalty of perjury that the foregoing information is true and correct.

/s/ Benjamin A. Stanziale, Jr.
BENJAMIN A. STANZIALE, JR.

Dated: October 14, 2026



510088