# EXHIBIT B

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| SPIN CAPITAL, LLC,<br><br>*Plaintiff,*<br><br>*-against-*<br><br>GOLDEN FOOTHILL INSURANCE SERVICES LLC, et. al.<br>*Defendants.* | Index No.: 650582/2022<br><br>**LUBIN DECLARATION IN SUPPORT OF OPPOSITION TO TETON'S MOTION TO INTERVENE** |

**LUBIN DECLARATION IN SUPPORT OF OPPOSITION TO TETON'S MOTION TO INTERVENE**

I, Avrumi Lubin, a/k/a Josh Lubin, declare as follows:

1. I am an authorized Member of Spin Capital LLC, the Plaintiff in the above-captioned action. This declaration stems from Gavriel Yitzchakov, a/k/a Gabe Isaacov, attempting to benefit from settlement discussions in the above-captioned action (the "Underlying Litigation"), through its Motion to Intervene. I submit this declaration in support of Spin's Opposition to Teton's Motion to Intervene, based on my personal knowledge of the facts set forth herein.

2. In early 2023, I was approached by Isaacov, who expressed interest in funding the Underlying Litigation in exchange for a share of any potential recovery. Isaacov claims to have made certain advances toward litigation expenses beginning around February 7, 2023. In or around June 2024, he sought to formalize those advances, and on June 20, 2024, we executed the Teton Life LLC Operating Agreement, under which, Isaacov and I were each designated as 50% members

of Teton, and the Underlying Litigation was expressly identified as an asset of the company. The agreement was made effective as of February 7, 2023.

3. Prior to executing the Operating Agreement and the Spin Assignment Agreement (the "Agreements"), Spin relied on Isaacov's express representations that he would fund the Underlying Litigation and cover associated expenses. In reliance on these promises, Spin agreed to transfer its entire interest in the Underlying Litigation and grant Isaacov a 50% membership interest in Teton. In return, Isaacov was obligated to contribute $500,000 in funding—secured by a 10% membership interest in Teton—to pay legal fees and maintain a litigation reserve.

4. In truth, Isaacov failed to make the promised $500,000 contribution, did not pay legal fees or insurance premiums, and otherwise failed to perform his obligations under the Agreements. Following execution of the Agreements, Isaacov admitted to a mutual business associate that he never intended to fulfill these commitments and had made the promises solely to induce Spin to transfer its interest in the Underlying Litigation.

5. Isaacov has materially breached the parties' Agreements and now attempts to insert himself into the Underlying Litigation by asserting rights based on his claimed 50% membership interest in Teton. That claim, however, lacks legal merit, as it is predicated on financial contributions he never made. Despite not providing the agreed-upon consideration, Isaacov now seeks to claim entitlement to 50% of any recovery from the Underlying Litigation. His conduct has imposed an ongoing substantial financial burden on Spin and has frustrated the core purpose of the Agreements.

Dated: New York, New York
May 21, 2025

By: */s/ Avrumi Lubin*
**AVRUMI LUBIN A/K/A JOSH LUBIN**
*Authorized Member of Plaintiff Spin Capital LLC*

# EXHIBIT C

# CONTRIBUTION AGREEMENT

# CONTRIBUTION AGREEMENT

This Contribution Agreement (this "**Agreement**"), made effective as of the 7th day of February, 2023 is entered into between Spin Capital, LLC, a New Jersey limited liability company and its member, Avrumi (Josh) Lubin (collectively and jointly and severally liable, "**Transferor**"), and Teton Life LLC, a Delaware limited liability company ("**Transferee**").

## RECITALS

WHEREAS, Transferor wishes to transfer and assign to Transferee, and Transferee wishes to accept from Transferor, the rights of Transferor in and to the Contributed Assets (as defined herein) in exchange for an equity interest in Transferee, as further described and subject to the terms and conditions set forth herein and in the Limited Liability Company Operating Agreement of Transferee dated as of the date hereof (as amended, modified, or supplemented, the "**Primary Agreement**"); and

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
## CONTRIBUTIONS

**Section 1.01 Contribution of Assets.** Subject to the terms and conditions set forth herein, Transferor hereby contributes, transfers, assigns, conveys, and delivers to Transferee, and Transferee does hereby accept and acquire from Transferor, all of Transferor's right, title, and interest in and to the assets set forth on Section 1.01 of the Disclosure Schedules (collectively, the "**Contributed Assets**"), which is free and clear of any security interest, pledge, lien, charge, mortgage, claim, or other encumbrance (each, an "**Encumbrance**"), excepting, however, the right of Hi-Bar Capital LLC to receive the first $1,000,000.00 in recovery from the Lawsuit (as defined in the Primary Agreement) (the "**Hi-Bar Right**"); provided, however that the Hi-Bar Right is only from the net proceeds of the Lawsuit, and shall only be paid after expenses and premiums are reimbursed to Spin under the Hi-Bar Right agreement, which shall be immediately turned over to the Transferee and Transferee shall first pay the BMF Loan and Redstone Loan with such "first out" funds.

**Section 1.02 No Liabilities.** Transferee shall not assume any liabilities or obligations of Transferor or its affiliates of any kind, whether known or unknown, contingent, matured, or otherwise, whether currently existing or hereafter created.

**Section 1.03 Consideration.** In consideration for the Contributed Assets, Transferee agrees to issue to Transferor 50% membership interest in Transferee (the "**Interest**"), free and clear of all Encumbrances other than as imposed by the Primary Agreement or applicable laws. Upon issuance by Transferee of the Interest to Transferor, the Interest shall be duly authorized and validly issued.

## ARTICLE II
## CLOSING

**Section 2.01 Closing.** The closing of the transactions contemplated by this Agreement (the "**Closing**") shall take place simultaneously with the execution of this Agreement on the date hereof (the "**Closing Date**") remotely by exchange of documents and signatures (or their electronic counterparts).

**Section 2.02 Closing Deliverables.** At the Closing:

(a) Transferor shall deliver to Transferee (i) fully executed documents of conveyance to effect the contribution of the Contributed Assets to Transferee, each in a form that is reasonably acceptable to Transferee, including all necessary assignments, and (ii) an executed counterpart of its signature page to the Primary Agreement.

(b) Transferee shall deliver to Transferor a fully executed copy of the Primary Agreement.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF TRANSFEROR

Transferor represents and warrants to Transferee that the statements contained in this ARTICLE III are true and correct as of the date hereof.

**Section 3.01 Organization and Qualification of Transferor.** Transferor is a limited liability company duly organized, validly existing, and in good standing under the laws of the state of New Jersey and has full company power and authority to own, operate, or lease the assets now owned, operated, or leased by it, including the Contributed Assets, and to carry on its business as currently conducted. Transferor is duly licensed or qualified to do business and is in good standing in each jurisdiction in which the ownership or use of the Contributed Assets or the conduct of its business as currently conducted makes such licensing or qualification necessary, except where the failure to be so licensed, qualified, or in good standing would not, individually or in the aggregate, have a material adverse effect on the Contributed Assets or Transferor's ability to consummate the transactions contemplated under this Agreement, the Primary Agreement, and the other documents and agreements being executed by Transferor in connection with the consummation of the transactions contemplated by this Agreement (collectively, including this Agreement, the "**Transaction Agreements**").

**Section 3.02 Authority of Transferor; Enforceability.** Transferor has full company power and authority to enter into the Transaction Agreements, to carry out its obligations thereunder, and to consummate the transactions contemplated thereby. The execution, delivery, and performance by Transferor of the Transaction Agreements and the consummation of the transactions contemplated thereby have been duly authorized by all requisite entity action on the part of Transferor and, if required, its affiliates. The Transaction Agreements have been duly executed and delivered by Transferor, and (assuming due authorization, execution, and delivery by any other parties thereto) constitute legal, valid, and binding obligations of Transferor, enforceable against it in accordance with their respective terms. Avrumi (a/k/a Josh) Lubin owns

100% of the issued and outstanding membership interests in Spin Capital, LLC, and has sole authority to direct its management and operations.

**Section 3.03 No Conflicts; Consents.** The execution, delivery, and performance by Transferor of the Transaction Agreements, and the consummation of the transactions contemplated thereby, do not and will not: (a) violate or conflict with the certification of formation, operating agreement or other governing or organizational documents of Transferor or its affiliates; (b) violate or conflict with any judgment, order, decree, or law applicable to Transferor, any of its affiliates, or the Contributed Assets; (c) conflict with, or result in (with or without notice or lapse of time or both) any violation of, or default under, or give rise to a right of termination, acceleration, or modification of any obligation or loss of any benefit under any contract or other instrument to which Transferor or its affiliates is a party or otherwise bound or to which any of the Contributed Assets are subject; or (d) result in the creation or imposition of any Encumbrance on the Contributed Assets. No consent, approval, waiver, or authorization is required to be obtained by Transferor or its affiliates from any person in connection with the execution, delivery, and performance by Transferor of the Transaction Agreements or the consummation of the transactions contemplated thereby that have not been obtained.

**Section 3.04 Title to Contributed Assets.** Transferor has good and valid title to all of the Contributed Assets, free and clear of Encumbrances, excepting only the Hi-Bar Right. By virtue of the Transaction Agreements delivered at the Closing by Transferor, Transferee will obtain good and valid title to the Contributed Assets, free and clear of all Encumbrances, excepting only the Hi-Bar Right as described and limited above.

**Section 3.05 Compliance with Laws.** Transferor has complied, and is now complying, in all material respects with all federal, state, and local laws and regulations applicable to Transferor's conduct of business and as it relates to ownership and use of the Contributed Assets.

**Section 3.06 Legal Proceedings.** There is no claim, action, suit, proceeding, or governmental investigation ("**Action**") of any nature pending or, to Transferor's knowledge, threatened against or by Transferor or any of its affiliates (a) relating to or affecting the Contributed Assets; or (b) that challenges or seeks to prevent, enjoin, or otherwise delay the transactions contemplated by the Transaction Agreements. To Transferor's knowledge, no event has occurred, or circumstances exist that could reasonably be expected to give rise to, or serve as a basis for, any such Action. Notwithstanding the foregoing, the parties acknowledge that the Contributed Assets includes the Lawsuit and that Transferor has claims against it in the Lawsuit.

**Section 3.07 Securities Matters.** Transferor is acquiring the Interest solely for its own account for investment purposes and not with a view to, or for offer or sale in connection with, any distribution thereof. Transferor acknowledges that the JV Interest is not registered under the Securities Act of 1933 (the "**Securities Act**"), or any state securities laws, and that the JV Interest may not be transferred or sold except pursuant to the registration provisions of the Securities Act or pursuant to an applicable exemption therefrom, and subject to state securities laws and regulations, as applicable. Transferor is able to bear the economic risk of holding the JV Interest for an indefinite period (including total loss of its investment) and has sufficient knowledge and experience in financial and business matters so as to be capable of evaluating the merits and risk of its investment.

## ARTICLE IV
## COVENANTS

**Section 4.01 Bulk Sales Laws.** The parties hereby waive compliance with the provisions of any bulk sales, bulk transfer, or similar laws of any jurisdiction that may otherwise be applicable with respect to the transfer of any or all of the Contributed Assets to Transferee; *provided, however*, that Transferor agrees to (a) pay and discharge when due or to contest or litigate all claims of creditors which are asserted against Transferee or the Contributed Assets by reason of such noncompliance; and (b) indemnify, defend, and hold harmless Transferee from and against any and all such claims.

**Section 4.02 Transfer Taxes.** All transfer, documentary, sales, use, stamp, registration, value added, and other such taxes and fees (including any penalties and interest) incurred in connection with this Agreement and the documents to be delivered hereunder shall be borne and paid by Transferor, when due. Transferor shall, at its own expense, timely file any tax return or other document with respect to such taxes or fees (and Transferee shall cooperate with respect thereto as necessary).

**Section 4.03 Further Assurances.** Following the Closing, each of the parties hereto shall execute and deliver such additional documents, instruments, conveyances, and assurances and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement and the other Transaction Agreements.

## ARTICLE V
## MISCELLANEOUS

**Section 5.01 Notices.** All notices, requests, consents, claims, demands, waivers, and other communications hereunder shall be given as stated in the Primary Agreement.

**Section 5.02 Survival.** The parties agree that the representations and warranties and other covenants contained herein shall survive the Closing.

**Section 5.03 Headings; Interpretation.** The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement. For purposes of this Agreement, (a) the words "include," "includes," and "including" shall be deemed to be followed by the words "without limitation;" (b) the word "or" is not exclusive; and (c) the words "herein," "hereof," "hereby," "hereto," and "hereunder" refer to this Agreement as a whole. Unless the context otherwise requires, references herein: (x) to Articles, Sections, and Disclosure Schedules mean the Articles and Sections of, and Disclosure Schedules attached to, this Agreement; (y) to an agreement, instrument, or other document means such agreement, instrument, or other document as amended, supplemented, and modified from time to time to the extent permitted by the provisions thereof, and (z) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder. This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted. The Disclosure Schedules referred to herein shall be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein.

**Section 5.04 Severability.** If any term or provision of this Agreement is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.

**Section 5.05 Entire Agreement.** This Agreement and the other Transaction Agreements constitute the sole and entire agreement of the parties hereto with respect to the subject matter contained herein and therein, and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter. In the event of any inconsistency between the statements in the body of this Agreement and any other Transaction Agreement or the Disclosure Schedules (other than an exception expressly set forth as such in the Disclosure Schedules), the statements in the body of this Agreement and its Schedules will control.

**Section 5.06 Successors and Assigns.** This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. This Agreement and the rights and obligations hereunder may not be assigned by a party hereto without the written consent of the other party hereto.

**Section 5.07 Waiver.** No waiver by a party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No waiver by a party shall operate or be construed as a waiver in respect of any failure, breach, or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power, or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege.

**Section 5.08 Governing Law.** Except as expressly set forth in any other Transaction Agreement (and then only with respect to matters specified therein as to which the laws of another jurisdiction are stated to apply), this Agreement and each other Transaction Agreement (and any claims, causes of action, or disputes that may be based upon, arise out of, or relate to the transactions contemplated hereby or thereby, to the negotiation, execution, or performance hereof or thereof, or to the inducement of any party to enter herein or therein, whether for breach of contract, tortious conduct, or otherwise and whether predicated on common law, statute, or otherwise) shall in all respects be governed by and construed in accordance with the internal laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule.

**Section 5.09 Submission to Jurisdiction.** Any legal suit, action, or proceeding arising out of or based upon this Agreement, any other Transaction Agreement, or the transactions contemplated hereby may be instituted in the federal courts of the United States of America or the courts of the State of Delaware, and each party irrevocably submits to the jurisdiction of such courts in any such suit, action, or proceeding.

**Section 5.10 Specific Performance.** The parties agree that irreparable damage would occur if any provision of this Agreement or any Transaction Agreement were not performed in accordance with the terms hereof or thereof, and that the parties shall be entitled to specific

performance of the terms hereof and thereof, in addition to any other remedy to which they are entitled at law or in equity.

**Section 5.11 Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, email, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

**TRANSFEROR**
SPIN CAPITAL, LLC

By: Josh Lubin
Name: Josh Lubin
Title: President

Josh Lubin
AVRUMI (a/k/a JOSH) LUBIN

**TRANSFEREE**

TETON LIFE LLC

By: Josh Lubin
Avrumi (a/k/a Josh) Lubin, Member

By: ________________
Gavriel Yitzchakov (a/k/a Gabe Isaacov), Member

*The foregoing Members holding collectively 100% of the issued and outstanding Membership Interests in Payor.*

## Schedule 1.01

## SCHEDULE OF CONTRIBUTED ASSETS

All of Assignor's rights in, under, and to all benefits and privileges hereafter accruing to Assignor, in the Lawsuit and Assigned Collateral (as defined in the Assignment from Transferor dated of even dated herewith (the "Assignment") including:

(a) All claims, demands, and cause or causes of action of any kind whatsoever which Assignor has, may have, may have, or may have had, or may in the future have, as described in and alleged, or that could have been alleged, or may be alleged, in the Lawsuit;

(b) The Assigned Contracts;

(c) All property (including intellectual property) relating to, arising from, or used in connection with the Lawsuit or the Assigned Collateral;

(d) all rights of any kind whatsoever of Assignor accruing under any of the foregoing provided by applicable law of any jurisdiction;

(e) fees, income, distributions, payments, and other proceeds now or hereafter due or payable with respect to any and all of the foregoing, including without limitation by way of judgment or settlement of the Lawsuit or payment or proceeds under any of the Assigned Collateral; and

(f) any and all claims and causes of action with respect to any of the foregoing, whether accruing before or on the date hereof, including all rights to and claims for damages, restitution, and injunctive and other legal and equitable relief for past, present, and future infringement, dilution, misappropriation, violation, misuse, breach, or default, with the right but no obligation to sue for such legal and equitable relief and to collect, or otherwise recover, any such damages.

All of the foregoing being referred to herein as the "Assigned Assets" and assigned pursuant to the Assignment.

# EXHIBIT D

# SPIN ASSIGNMENT TO TETON

# ASSIGNMENT

This Assignment (this "Assignment"), dated effective the 7th day of February, 2023 (the "Effective Date") is by Spin Capital LLC, a New Jersey limited liability company and Avrumi (a/k/a Josh) Lubin (hereinafter collectively, "Assignor") to Teton Life, LLC, a Delaware limited liability company (hereinafter, "Assignee").

WHEREAS, Assignor (Lubin) has executed a Contribution Agreement in favor of Assignee whereby Assignor contributes certain assets to Assignee (the "Agreement") dated and effective of even date herewith,

WHEREAS, pursuant to the terms of the Agreement, Assignor shall sell, assign, transfer and convey unto Assignee all rights and interest in that certain lawsuit styled Spin Capital LLC v. Golden Foothill Insurance Services, LLC, et al., Supreme Court of the State of New York, County of New York, Index No. 650582/2022 (the "Lawsuit"), a copy of the most recently filed complaint in which is attached hereto as Exhibit A; and

WHEREAS, the Agreement obligates Assignor to assign to Assignee the Lawsuit and related rights and assets.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor agrees as follows:

1. Assignment. Effective as of the Effective Date, Assignor HEREBY ASSIGNS AND TRANSFERS to Assignee all of Assignor's rights in, under, and to all benefits and privileges hereafter accruing to Assignor, in the Lawsuit, including all collateral and policies identified at any time in the Lawsuit, including those listed on Exhibit B hereto ("Assigned Collateral"), including:

(a) All claims, demands, and cause or causes of action of any kind whatsoever which Assignor has, may have, may have, or may have had, or may in the future have, as described in and alleged, or that could have been alleged, or may be alleged, in the Lawsuit;

(b) The Assigned Contracts;

(c) All property (including intellectual property) relating to, arising from, or used in connection with the Lawsuit or the Assigned Collateral;

(d) all rights of any kind whatsoever of Assignor accruing under any of the foregoing provided by applicable law of any jurisdiction;

(e) fees, income, distributions, payments, and other proceeds now or hereafter due or payable with respect to any and all of the foregoing, including without limitation by way of judgment or settlement of the Lawsuit or payment or proceeds under any of the Assigned Collateral; and

(f) any and all claims and causes of action with respect to any of the foregoing, whether accruing before or on the date hereof, including all rights to and claims for damages,

restitution, and injunctive and other legal and equitable relief for past, present, and future infringement, dilution, misappropriation, violation, misuse, breach, or default, with the right but no obligation to sue for such legal and equitable relief and to collect, or otherwise recover, any such damages.

All of the foregoing being referred to herein as the "Assigned Assets".

2. Incorporation of Agreement. The parties hereto acknowledge and agree that this Assignment is entered into pursuant to the Agreement, to which reference is made for a further statement of the rights and obligations of the parties with reference to the Assigned Assets. The representations, warranties, covenants, agreements, and indemnities contained in the Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein. In the event of any conflict or inconsistency between the terms of the Agreement and the terms hereof, the terms of the Agreement shall govern.

3. Miscellaneous.

(a) All notices and other communications required or permitted under this Assignment shall be given in the same manner as in the Agreement.

(b) This Assignment may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original for all purposes, and all such counterparts shall together constitute but one and the same instrument. A signed copy of this Assignment delivered by either facsimile or e-mail shall be deemed to have the same legal effect as delivery of an original signed copy of this Assignment. Notwithstanding the foregoing, each party hereto shall deliver original counterpart signatures to the other parties on or before the date hereof.

(c) This Assignment shall be governed by and construed in accordance with the laws of the State of Delaware, and Assignor agrees that any lawsuit arising out of or related to this Assignment may be brought in the State and federal courts located in the State of Delaware and Assignee consents thereto, though Assignor further agrees that Assignee may enforce this Assignment in any court having jurisdiction over Assignor or the Assigned Assets, or located where the Assigned Assets are located.

(d) Assignor shall promptly execute and deliver to Assignee any additional instrument or other document which Assignee reasonably requests to evidence or better effect the assignment contained herein and Assignee's rights to the Assigned Assets. Assignee specifically agrees that any such request may be made by Gabe Isaacov, as a Member of Assignee, and that such member shall have authority to make such request.

(e) This Assignment and the obligations of the parties hereunder shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the Assignor has executed this Assignment effective as of the Effective Date.

**ASSIGNOR:**

SPIN CAPITAL, LLC

By: Josh Lubin
Name: Josh Lubin
Title: President

Josh Lubin
AVRUMI (a/k/a JOSH) LUBIN

**EXHIBIT A**
**AMENDED COMPLAINT FILE JULY 14, 2022**
**ATTACHED**

**EXHIBIT B**
**ASSIGNED COLLATERAL**
**SECURITY AGREEMENT ATTACHED**