# EXHIBIT D

Execution Version

**AMENDED AND RESTATED**

**LIMITED LIABILITY COMPANY OPERATING AGREEMENT**

among

**TETON LIFE LLC**

and

**THE MEMBERS NAMED HEREIN**

## TABLE OF CONTENTS

ARTICLE I Organizational Matters ........ 3
ARTICLE II Members ........ 4
ARTICLE III Management ........ 9
ARTICLE IV Allocations ........ 10
ARTICLE V Distributions ........ 10
ARTICLE VI Transfers ........ 11
ARTICLE VII No Personal Liability, Exculpation, and Indemnification ........ 13
ARTICLE VIII Compliance and Tax Matters ........ 14
ARTICLE IX Dissolution and Liquidation ........ 17
ARTICLE X Definitions ........ 18
ARTICLE XI Miscellaneous ........ 21

Unique Code : CAA-FAA-BCABB-JICBHGCD-BGABIFJ-J Page 3 of 31

## AMENDED AND RESTATED LIMITED LIABILITY COMPANY OPERATING AGREEMENT

This Limited Liability Company Operating Agreement (this "**Agreement**") of TETON LIFE LLC, a Delaware limited liability company (the "**Company**"), is entered into this 13th day of August, 2025 by and among the Company, each Person executing this Agreement as a member on the date hereof (collectively, the "**Initial Members**"), and any other Person who, after the date hereof, becomes a Member in accordance with the terms of this Agreement (collectively, the "**Members**"). Unless otherwise noted or defined elsewhere in this Agreement, capitalized terms used in this Agreement have the meanings set forth in ARTICLE X.

## RECITALS

WHEREAS, the Company was formed under the laws of the State of Delaware by the filing of a Certificate of Formation with the Secretary of State of Delaware (the "**Secretary of State**") on February 7, 2023 (the "**Certificate of Formation**") for the purpose set forth in this Agreement;

WHEREAS, pursuant to a Contribution Agreement, dated February 7, 2023 by and among Avrumi (a/k/a Josh) Lubin ("**Member A**" which term includes Permitted Transferees), Gavriel Yitzchakov (a/k/a Gabe Isaacov) ("**Member B**" which term includes Permitted Transferees), and the Company (the "**Contribution Agreement**"), Member A and Member B each agreed to contribute, or cause to be contributed, to the Company at the Closing (as defined in the Contribution Agreement) certain assets in exchange for Membership Interests; and

WHEREAS, the Members wish to enter into this Agreement setting forth the terms and conditions governing the operation and management of the Company.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

### Article I. Organizational Matters

**Section 1.01 Name.** The name of the Company is TETON LIFE LLC.

**Section 1.02 Principal Office.** The principal office of the Company is located at 605 Lincoln Road, Suite 501, Miami Beach, Florida 33139 or such other location as may from time to time be determined by the Members.

**Section 1.03 Registered Office; Registered Agent.** The registered office of the Company and the registered agent for service of process on the Company in the State of Delaware shall be that office and Person named in the Certificate of Formation or such other office (which need not be a place of business of the Company) or such other Person or Persons as the Members may designate from time to time in the manner provided by the Delaware Act and Applicable Law.

**Section 1.04 Purpose; Powers.**

Case 20-17342-EJO Doc 62-3 Filed 01/28/20 Entered 01/29/20 18:49:17 Desc
Exhibits A - L Page 118 of 186

(a) The purpose of the Company is to engage in any lawful act or activity for which limited liability companies may be formed under the Delaware Act and to engage in any and all lawful activities necessary or incidental thereto.

(b) The Company shall have all the powers necessary or convenient to carry out the purposes for which it is formed, including the powers granted by the Delaware Act.

**Section 1.05 Term.** The term of the Company commenced on the date and time the Certificate of Formation was filed with the Secretary of State of the State of Delaware and shall continue in existence perpetually or until any earlier date when the Company is terminated in accordance with the provisions of this Agreement or as provided by Applicable Law.

## Article II. Members

**Section 2.01 Members.** The names, mailing addresses, and Membership Interests of each Initial Member, each of whom is hereby admitted as a Member, are set out in **Schedule I** attached hereto (the "**Members Schedule**"). The Members shall update the Members Schedule or cause it to be updated upon the issuance or Transfer of any Membership Interest to any new or existing Member in accordance with this Agreement.

**Section 2.02 Capital Contributions; Capital Accounts; No Withdrawals.**

(a) The Initial Members have contributed to the Company the amounts, in the form of cash or property (the "**Initial Capital Contributions**"; and as such amounts may be amended from time to time in connection with any other contributions made in accordance with this Agreement, the "**Capital Contributions**"), as described in the Contribution Agreement. Upon the Receiver's distribution of an amount less than or equal to $1.6 million, and the distribution of 50% to Member A and to Member B as referenced in the Note annexed to the accompanying Letter Agreement as Exhibit D (the "**Redstone-Lubin Note**") and to be executed by Lubin, and further conditioned upon Lubin's execution of the Redstone-Lubin Note, Member A and Member B shall each contribute amounts totaling $100,000 (as further detailed on Schedule I) in the form of cash (the "**Lawsuit Reserve Contributions**"), which Lawsuit Reserve Contributions shall be allocated to the Lawsuit Reserve. Except for the Initial Capital Contributions and Lawsuit Reserve Contributions, no Member is required to make further Capital Contributions to the Company unless agreed to in writing by such Member.



Unique Code : CAA-FAA-BCABB-JICBHGCD-BGABIFJ-J Page 5 of 31

Case 26-17342-EJO Doc 62-3 Filed 07/29/26 Entered 07/29/26 18:49:17 Desc
Exhibits A - L Page 119 of 186

(b) The Company shall establish and maintain for each Holder a separate capital account (each, a "**Capital Account**") on its books and records in accordance with the provisions of Section 704(b) of the Code and Treasury Regulations Section 1.704- 1(b)(2)(iv). Each Capital Account shall be: (i) credited by such Holder's Capital Contributions to the Company and any profits allocated to such Holder in accordance with Section 4.01 and (ii) debited by any distributions to such Holder pursuant to Article V and any losses allocated to such Holder in accordance with Section 4.01. For purposes of maintaining the Holders' Capital Accounts, profits and losses shall be determined in accordance with Treasury Regulations Section 1.704-1(b). The Capital Accounts shall be adjusted by the Members upon the occurrence of an event described in Treasury Regulations Section 1.704-1(b)(2)(iv)(f)(5) in the manner described in Treasury Regulations Section 1.704-1(b)(2)(iv)(f) and (g) if the Members determine that such adjustments are necessary or appropriate to reflect the relative economic interests of the Holders. In the event of a Transfer of any Interest in accordance with the terms of this Agreement, the Transferee shall succeed to the Capital Account of the Transferor to the extent it relates to the transferred Interest.

(c) No Holder shall be entitled to withdraw any portion of such Holder's Capital Account or to receive any distribution from the Company, except as otherwise provided in this Agreement. No Holder shall be entitled to receive any interest on such Holder's Capital Contributions or Capital Account.

(d) If any Holder shall have a deficit balance in such Holder's Capital Account, such Holder shall have no obligation, during the term of the Company or upon dissolution or liquidation thereof, to restore such negative balance or make any Capital Contributions to the Company by reason thereof, except as may be required by Applicable Law or in respect of any negative balance resulting from a withdrawal of capital or dissolution in contravention of this Agreement.

**Section 2.03 Admission of New Members.**

(a) Subject to compliance with the provisions of Section 2.03(b) and Section 2.08(b)(ii), new Members may be admitted from time to time in connection with (i) the issuance of Membership Interests by the Company in accordance with this Agreement or a Transfer of Membership Interests in accordance with the provisions of ARTICLE VI.

(b) In order for any Person not already a Member of the Company to be admitted as a Member, whether pursuant to an issuance or a Transfer (including a Permitted Transfer) of a Membership Interest or otherwise, such Person shall have (i) executed and delivered to the Company a written undertaking substantially in the form of the Joinder Agreement attached at **Exhibit A** ("**Joinder Agreement**") and, if such Person is an individual who has a Spouse, an executed written undertaking from such Spouse substantially in the form of the Spousal Consent (as defined herein) and (ii) provided to the Company any information required from such Person under Section 8.06. Upon the amendment of the Members Schedule and the satisfaction of any other applicable conditions, including, if applicable, the receipt by the Company of payment for the issuance of the applicable Membership Interest, such Person shall be admitted as a Member, shall become a party hereto, shall be deemed listed as such on the books and records of the Company, and, in the case of an issuance, thereupon shall be issued their Membership Interest. Further, (A) the Capital Accounts shall be adjusted as necessary in accordance with Section 2.02 and (B) the Interests of the Members and any Assignees shall be adjusted pro rata so that the aggregate Percentage Interests of all Holders equals 100%.

(c) No transfer, sale or assignment of an existing Membership Interest shall be permitted without the express written consent of the Members holding, in the aggregate, 100% of the membership interests existing as of the date of this Agreement as set forth above.

**Section 2.04 Withdrawal; Expulsion; Bankruptcy.**

(a) So long as a Member continues to hold a Membership Interest, such Member shall not have the ability to withdraw or resign as a Member prior to the dissolution and winding up of the Company and any such withdrawal or resignation or attempted withdrawal or resignation by a Member prior to the dissolution and winding up of the Company shall be null and void.

(b) No Member may be expelled from the Company.

(c) A Member that suffers an Event of Bankruptcy shall cease to be a Member and thereafter have only the rights of an Assignee with respect to their Economic Interest.

(d) As soon as any Person who is a Member ceases to hold any Membership Interest, such Person shall no longer be a Member.

**Section 2.05 Death of Member.** The death of a Member shall not cause the dissolution of the Company, except as otherwise provided by Section 9.01(d). In such event, the Company and its business shall be continued by the remaining Member or Members and the Interest owned by the deceased Member shall be automatically Transferred to such Member's executors, administrators, testamentary trustees, legatees, surviving Spouse, beneficiaries, or other legal representative, as applicable, as Permitted Transferees, *provided*, that any such Permitted Transferee shall only be an Assignee of such deceased Member's Economic Interest unless such Permitted Transferee is (a) a Member or (b) admitted as a Member in accordance with the provisions of this Agreement, including Section 2.03(b) and Section 2.08(b)(ii).



Unique Code : CAA-FAA-BCABB-JICBHGCD-BGABIFJ-J Page 7 of 31

**Section 2.06 Certification of Interests.**

(a) The Company may, but shall not be required to, issue certificates evidencing Interests in the Company.

(b) If certificates representing Interests are issued in accordance with Section 2.06(a), then in addition to any other legend required by Applicable Law, all certificates representing issued and outstanding Interests in the Company shall bear a legend substantially in the following form:

THE LIMITED LIABILITY COMPANY INTERESTS REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO A LIMITED LIABILITY COMPANY AGREEMENT AMONG THE COMPANY AND ITS MEMBERS, A COPY OF WHICH IS ON FILE AT THE PRINCIPAL EXECUTIVE OFFICE OF THE COMPANY. NO TRANSFER, SALE, ASSIGNMENT, GIFT, PLEDGE, ENCUMBRANCE, HYPOTHECATION, OR OTHER DISPOSITION OF THE LIMITED LIABILITY COMPANY INTERESTS REPRESENTED BY THIS CERTIFICATE MAY BE MADE EXCEPT IN ACCORDANCE WITH THE PROVISIONS OF SUCH LIMITED LIABILITY COMPANY AGREEMENT.

THE LIMITED LIABILITY COMPANY INTERESTS REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY OTHER APPLICABLE SECURITIES LAWS AND MAY NOT BE TRANSFERRED, SOLD, ASSIGNED, PLEDGED, HYPOTHECATED, OR OTHERWISE DISPOSED EXCEPT PURSUANT TO (A) A REGISTRATION STATEMENTEFFECTIVE UNDER SUCH ACT AND LAWS OR (B) AN EXEMPTION FROM REGISTRATION THEREUNDER.

**Section 2.07 Meetings.**

(a) Meetings of the Members may be called by any Member.

(b) Written notice stating the place, date, and time of the meeting, and, in the case of a meeting of the Members not regularly scheduled, describing the purpose(s) for which the meeting is called, shall be delivered not fewer than five (5) days before the date of the meeting to each Member, by or at the direction of the Member(s) calling the meeting, as the case may be. The Members may hold meetings at the Company's principal office or at such other place as the Member(s) calling the meeting may designate in the notice for such meeting, including via electronic meetings such as Zoom.

(c) Any Member may participate in a meeting of the Members by means of conference telephone or other communications equipment by means of which all Persons participating in the meeting can hear each other, and participation in a meeting by such means shall constitute presence in person at such meeting.

(d) On any matter that is to be voted on by the Members, a Member may vote in person or by proxy, and such proxy may be granted in writing, by means of Electronic Transmission, or as otherwise permitted by Applicable Law. Every proxy shall be revocable in the discretion of the Member executing it unless otherwise provided in such proxy; *provided*, that such right to revocation shall not invalidate or otherwise affect actions taken under such proxy prior to such revocation.

(e) The business to be conducted at such meeting need not be limited to the purpose described in the notice and can include other business to be conducted by the Members; provided, that the Members shall have been notified of the meeting in accordance with Section 2.07(b). Attendance of a Member at any meeting shall constitute a waiver of notice of such meeting, except where a Member attends a meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

(f) A quorum of any meeting of the Members shall require the presence of the Members holding 100% of the Membership Interests required to vote at such meeting. Subject to Section 2.08, no action may be taken by the Members unless the appropriate quorum is present at a meeting.

**Section 2.08 Action by Members.**

(a) Subject to Section 2.08(b), Section 11.11, and any other provision of this Agreement or the Delaware Act requiring the vote, consent, or approval of a different percentage of the Membership Interests, no action may be taken by the Members at any meeting at which a quorum is present without the affirmative vote of the Members holding at least a majority of the Membership Interests entitled to vote thereon. The Company shall maintain for Member inspection records of any action taken on the Company's behalf at any such meeting.

(b) Notwithstanding anything herein to the contrary, without the approval of all Members, the Company shall not, and shall not enter into any commitment to:

(i) Amend, modify, or waive any provisions of the Certificate of Formation or this Agreement; *provided* that an amendment to the Members Schedule in accordance with the last sentence of Section 11.11 following any new issuance, redemption, repurchase, or Transfer of Membership Interests in accordance with this Agreement shall not require approval under this Section 2.08(b)(i); provided further, that an amendment to the Members Schedule in accordance with the Letter Agreement or the Redstone-Lubin Note shall not require approval under this Section 2.08(b)(i);

(ii) Issue any Equity Securities, accept any Capital Contributions (other than the Initial Capital Contributions), or admit any Person (other than the Initial Members) as a Member of the Company;

(iii) Authorize or pay any distribution, or purchase or redeem any Interest, other than distributions payable in cash in accordance with Section 5.01(a), Section 5.02 or pursuant to Section 9.03;

(iv) Incur any indebtedness, pledge or grant Liens on any assets, or guarantee, assume, endorse, or otherwise become responsible for the obligations of any other Person, in each case in excess of $50,000.00;

(v) Make any loan, advance, or capital contribution in or to any Person in excess of $50,000.00;



Unique Code : CAA-FAA-BCABB-JICBHGCD-BGABIFJ-J Page 9 of 31

(vi) Enter into or effect any transaction or series of related transactions involving the purchase, lease, license, exchange, or other acquisition (including by merger, consolidation, sale of stock, or acquisition of assets) by the Company of any assets and/or equity interests of any Person other than in the ordinary course of business consistent with past practice;

(vii) Enter into or effect any transaction or series of related transactions involving the sale, lease, license, exchange, or other disposition (including by merger, consolidation, sale of stock, or sale of assets) by the Company of any assets other than in the ordinary course of business consistent with past practice;

(viii) Except as described in Section 2.08(d) below, initiate or settle any lawsuit, legal action, dispute, arbitration, or other similar judicial or administrative proceeding, other than in the ordinary course of business consistent with past practice, or agree to the provision of any equitable relief by the Company;

(ix) Initiate a bankruptcy or consent to any involuntary bankruptcy proceeding involving the Company or, except as provided in ARTICLE IX, dissolve, wind up, or liquidate the Company.

(c) The Percentage Interest of an Assignee shall not be considered in the voting requirements of the Company.

(d) The Members acknowledge that an asset of the Company is the matter Spin Capital, LLC vs. Golden Foothill Insurance Services, LLC et al, pending in the New York Supreme Court at Index No. 650582/2022 and all related matters (the "**Lawsuit**"). Member Josh Lubin is the sole owner and authorized member of Spin Capital, LLC and, as and for his contribution (as more fully described in the Contribution Agreement) has assigned, or caused Spin Capital, LLC to assign, all of its rights to any recovery, including all proceeds from any source, arising out of or relating to the Lawsuit (or the insurance policies described therein) which rights and proceeds are now the property of the Company, provided that all decisions related to the Lawsuit will be considered to be made in the ordinary course of business and shall not require the approval of Member B. Notwithstanding anything to the contrary in this Agreement, the Members agree to confer in good faith with regard to any settlement opportunity in the Lawsuit.

**Section 2.09 Action Without Meeting.** Notwithstanding the provisions of Section 2.07 and Section 2.08, any matter that is to be voted on, consented to, or approved by Members may be taken without a meeting, without prior notice, and without a vote if consented to, in writing or by Electronic Transmission, by Member or Members holding not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which each Member entitled to vote on the action is present and votes. A record shall be maintained by the Company of each such action taken by written consent of a Member or Members.



Unique Code : CAA-FAA-DCABB-JICDI IDCD-DCABIF JJ Page 10 of 31

Case 20-17342-EJO Doc 62-5 Filed 07/29/20 Entered 07/29/20 18:49:17 Desc
Exhibits A - L Page 124 of 186

Unique Code : CAA-FAA-BCABB-JICBHGCD-BGABIFJ-J Page 11 of 31

**Section 2.10 Other Activities; Business Opportunities.** Each Member may, subject to performing any of such Member's obligations set out in this Agreement or in any other agreement to which such Member is a party with the Company, engage in any other activities, ventures, or businesses, regardless of whether those activities, ventures, or businesses are similar to or competitive with the business of the Company; *provided* that such Member does not engage in such activity, venture, or business as a result of or using Confidential Information. None of the Members shall be obligated to account to the Company or to any other Holder for any profits or income earned or derived from such other activities, ventures, or businesses. None of the Members shall be obligated to inform the Company or the other Holders of any investment or business opportunity of any type or description.

## Article III. Management

**Section 3.01 Management of the Company.** Subject to the provisions of this Agreement, including Section 2.08(b), and except as otherwise provided by the Delaware Act, the business, property, and affairs of the Company shall be managed by the Members. The actions of any Member taken in accordance with the provisions of this Agreement shall bind the Company.

**Section 3.02 Compensation of the Members.** The Members shall not be entitled to any salaries, fees, or other compensation for any services rendered to or on behalf of the Company or otherwise in connection with the Company's business, affairs, operations, or assets; *provided, however,* that the Company shall pay or reimburse the Members for any reasonable out-of-pocket expenses incurred by them on behalf of the Company in connection with conducting the Company's business in accordance with this Agreement.

**Section 3.03 Officers.** The Members may appoint one or more individuals as officers of the Company (the "**Officers**") as the Members deem necessary or desirable to carry on the business of the Company and may delegate to such Officers such power and authority as the Members deem advisable. An Officer is not required to be a Member of the Company. Any individual may hold two or more offices of the Company. Each Officer shall hold office until such Officer's successor is designated by the Members or until such Officer's earlier death, resignation, or removal. Any Officer may resign at any time upon written notice to the Company. Any Officer may be removed by the Members at any time, with or without cause. A vacancy in any office occurring because of death, resignation, removal, or otherwise may, but need not, be filled by the Members.

## Article IV. Allocations

**Section 4.01 Allocation of Profits and Losses.**

(a) Subject to the terms hereof, and Notes executed on same date, the Company's profits and losses for each Fiscal Year will be allocated among the Holders pro rata in accordance with their Percentage Interests.

(b) Notwithstanding any other provision of this Agreement, (i) "partner nonrecourse deductions" (as defined in Treasury Regulations Section 1.704-2(i)), if any, of the Company shall be allocated for each Fiscal Year to the Holder that bears the economic risk of loss within the meaning of Treasury Regulations Section 1.704-2(i) and "nonrecourse deductions" (as defined in Treasury Regulations Section 1.704-2(b)) and "excess nonrecourse liabilities" (as defined in Treasury Regulations Section 1.752-3(a)), if any, shall be allocated to and among the Holders in accordance with their Percentage Interests.

(c) This Agreement shall be deemed to include "qualified income offset," "minimum gain chargeback," and "partner nonrecourse debt minimum gain chargeback" provisions within the meaning of Treasury Regulations under Section 704(b) of the Code.

(d) All items of income, gain, loss, deduction, and credit of the Company shall be allocated among the Holders for federal, state, and local income tax purposes consistent with the manner that the corresponding items are allocated among the Holders pursuant to this section, except as may otherwise be provided herein or under the Code.

## Article V. Distributions

**Section 5.01 Distributions.**

(a) Except for distributions being made in accordance with Section 5.02 below, all distributions of available cash shall be made to the Holders at the times and in the aggregate amounts determined by the Members holding a majority of the Membership Interests. Such distributions shall be paid: *first,* to the holders of the Redstone Loan, as repayment, and *second* to the Holders pro rata in accordance with their respective Percentage Interests.

(b) Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make any distribution: if such distribution would violate Section 18-607 of the Delaware Act or other Applicable Law.

(c) The Members further agree that the Company shall pay all reasonable and necessary expenses, including legal fees, associated with the Lawsuit and shall maintain a reserve (the "**Lawsuit Reserve**") in the Company's bank account of no less than $200,000.00 for such purpose.

**Section 5.02** Special Distributions. If and when the Receiver pays the Company (as successor to Spin Capital LLC, a New Jersey limited liability company) an amount equal to or approaching $1.6 million, such that the Members reasonably agree that the Interim Receiver Obligation has been substantially satisfied, Member A shall immediately (i) cause the Company to book those funds as having been paid to Redstone Advance Inc. in partial satisfaction of the Redstone Loan and (ii) deliver the fund as follows: (a) 50% to Member B, who shall immediately recontribute $100,000 to the Company to be allocated to the Lawsuit Reserve, and (b) 50% to Member A, who shall immediately recontribute $100,000 to the Company to be allocated to the Lawsuit Reserve. Member A's 50% shall be evidenced by the Redstone-Lubin Note. Lubin's execution of the Redstone-Lubin Note in an amount equal to 50% of the Receiver's payment to the Company is a precondition to any remittances made to Member A under this Section.

## Article VI. Transfers

**Section 6.01 General Restrictions on Transfer.**

(a) Except as permitted pursuant to Section 6.02, no Holder shall Transfer all or any portion of such Holder's Interest, except with the written consent of all Members.

(b) Notwithstanding any other provision of this Agreement (including Section 6.02), each Holder agrees that such Holder will not Transfer all or any portion of such Holder's Interest, and the Company agrees that it shall not issue any Membership Interests:

(i) except as permitted under the Securities Act and other applicable federal or state securities or blue sky laws; *provided* that, if requested by the Company's counsel, the Transferor shall have delivered to the Company an opinion of counsel in form and substance satisfactory to the Company to the effect that such Transfer may be effected without registration under the Securities Act;

(ii) if such Transfer or issuance would cause the Company to be considered a "publicly traded partnership" under Section 7704(b) of the Code within the meaning of Treasury Regulations Section 1.7704-1(h)(1)(ii), including the look-through rule in Treasury Regulations Section 1.7704-1(h)(3);

(iii) if such Transfer or issuance would affect the Company's existence or qualification as a limited liability company under the Delaware Act;

(iv) if such Transfer or issuance would cause the Company to lose its status as a partnership for federal income tax purposes;

(v) if such Transfer or issuance would cause the Company to be required to register as an investment company under the Investment Company Act of 1940; or



Unique Code : CAA-FAA-BCABB-JICBHGCD-BGABIFJ-J Page 13 of 31

(vi) if such Transfer or issuance would cause the assets of the Company to be deemed "Plan Assets" as defined under the Employee Retirement Income Security Act of 1974 or its accompanying regulations or result in any "prohibited transaction" thereunder involving the Company.

(c) Any Transfer or attempted Transfer of any Interest in violation of this Agreement shall be null and void, no such Transfer shall be recorded on the Company's books, and the purported Transferee in any such Transfer shall not be treated (and the purported Transferor shall continue to be treated) as the owner of such Interest for all purposes of this Agreement.

(d) In the event of a Transfer (including a Permitted Transfer) by a Member of an Interest to a Person not already a Member, such Transferee shall only be an Assignee with respect to such Interest unless or until such Transferee is admitted as a Member of the Company in accordance with the terms hereof, including Section 2.03(b) and Section 2.08(b)(ii). If a Transferee is a Member immediately prior to such Member's purchase or other acquisition of an Interest in accordance with the terms of this Agreement, such Transferee shall have all of the rights of a Member with respect to such purchased or otherwise acquired Interest. For the avoidance of doubt and subject to the foregoing, any Transfer of a Membership Interest to a Member permitted or authorized by this Agreement shall be deemed a sale, transfer, assignment, or other disposal of such Membership Interest in its entirety as and to the extent intended by the parties to such Transfer, and shall not be deemed a sale, transfer, assignment, or other disposal of any less than all of the rights and benefits described in the definition of the term "Membership Interest" unless otherwise explicitly agreed to by the parties to such Transfer.

**Section 6.02 Permitted Transfers.** The provisions of Section 6.01(a) shall not apply to any Transfer by any Member of all or any portion of such Member's Membership Interest to any of the following (each, a "**Permitted Transferee**" and, any such Transfer to a Permitted Transferee, a "**Permitted Transfer**"):

(a) Any Affiliate of such Member and where such Affiliate is an individual, any Person set forth under Section 6.02(b) of such Affiliate; or

(b) With respect to a Member that is an individual: (i) such Member's Spouse, parent, sibling, descendant (including adoptive relationships and stepchildren), and the Spouses of each such Person (collectively, "**Family Members**"); (ii) a trust under which the distribution of such Membership Interest may be made only to such Member and/or any Family Member of such Member; (iii) a charitable remainder trust, the income from which will be paid to such Member during such Member's life; (iv) a corporation, partnership, or limited liability company, the shareholders, partners, or members of which are only such Member and/or Family Members of such Member; or (v) such Member's executors, administrators, testamentary trustees, legatees, distributees, or beneficiaries, by will or the laws of intestate succession.

## Article VII. No Personal Liability

**Section 7.01 No Personal Liability.** Except as otherwise provided in the Delaware Act, by Applicable Law, or expressly in this Agreement, no Member will be obligated personally for any debt, obligation, or liability of the Company or another Member, whether arising in contract, tort, or otherwise, solely by reason of being a Member.

**Section 7.02 Exculpation.** No Covered Person shall be liable to the Company, the Members, or any Assignee for any loss, damage, or claim incurred by reason of any action taken or omitted to be taken by such Covered Person in their capacity as a Covered Person, so long as such action or omission does not constitute fraud, gross negligence, willful misconduct, or a material breach of this Agreement.

**Section 7.03 Indemnification and Advancement.**

(a) To the fullest extent permitted under the Delaware Act, the Company shall indemnify and hold harmless any Covered Person from and against any loss, damage, claim, or expense (including reasonable attorneys' fees) (collectively, "**Losses**") whatsoever incurred by such Covered Person relating to or arising out of any act or omission or alleged acts or omissions (whether or not constituting negligence) performed or omitted by any Covered Person on behalf of the Company; *provided, however,* that (i) such Covered Person acted in good faith and in a manner believed by such Covered Person to be in, or not opposed to, the best interests of the Company and, with respect to any criminal proceeding, had no reasonable cause to believe their conduct was unlawful; and (ii) such Covered Person's conduct did not constitute fraud, gross negligence, willful misconduct, or a material breach of this Agreement.

(b) Upon receipt by the Company of a written undertaking by or on behalf of the Covered Person to repay such amounts if it is finally determined that the Covered Person is not entitled to indemnification under this Section 7.03, the Company shall advance the reasonable legal fees or other expenses (as incurred) of such Covered Person in connection with defending any claim, lawsuit, or other proceeding relating to any Losses for which such Covered Person may be indemnified pursuant to this Section 7.03; *provided, however,* that the Company shall not be required to provide any advances with respect to any claim asserted against a Covered Person by the Company or a Member.

(c) The right to indemnification and advancement of expenses provided in this Section 7.03 shall not be exclusive of any other right which a Covered Person may have or hereafter acquire by any law (common or statutory), a provision of the Company's governing documents, a vote of disinterested Members, or otherwise. Any indemnity under this Section 7.03 shall be provided out of and to the extent of the Company's assets only, and neither any Member or any other Person shall have any personal liability to contribute to such indemnity by the Company.

(d) The provisions of this Section 7.03 shall continue to afford protection to each Covered Person with respect to actions taken or omissions while such Person was acting in the position or capacity of a Covered Person regardless of whether such Covered Person remains in the position or capacity pursuant to which such Covered Person became entitled to indemnification or advancement under this Section 7.03 and shall inure to the benefit of the executors, administrators, legatees, and distributees of such Covered Person.



Unique Code : CAA-FAA-BCABB-JICBHGCD-BGABIFJ-J Page 15 of 31

## Article VIII. Compliance and Tax Matters

**Section 8.01 Financial Statements.** As soon as reasonably practicable after the end of each Fiscal Year of the Company, the Members shall, at the expense of the Company, cause to be prepared and furnished to each Member a balance sheet of the Company (dated as of the end of the Fiscal Year then ended), and a related statement of income, loss, and change in financial position of the Company for such year. Such financial information, which may be unaudited, shall reflect the beginning balance in each Holder's Capital Account as of the first day of such Fiscal Year, all distributions made to the Holders during such year, and the ending balance in each Holder's Capital Account as of the last day of such year.

**Section 8.02 Inspection Rights.** The Company shall afford each Member and such Member's representatives access during normal business hours to the organizational, financial, and similar records, reports, and documents of the Company and shall permit such Member and such Member's representatives to examine such documents and make copies thereof at such Member's cost and expense.

**Section 8.03 Income Tax Status.** The Company shall be treated as a partnership for federal, state, and local income tax purposes. Neither the Company nor any Holder shall make an election for the Company to be classified as other than a partnership pursuant to Treasury Regulations Section 301.7701-3.

**Section 8.04 Tax Matters Representative.**

(a) **Appointment; Resignation.** The Members hereby appoint Avrumi (a/k/a Josh) Lubin as the "partnership representative" as provided in Section 6223(a) of the Code (the "**Tax Matters Representative**").

(b) **Tax Examinations and Audits.** The Tax Matters Representative is authorized and required to represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by any federal, state, local, or foreign taxing authority, including resulting administrative and judicial proceedings, and to expend Company funds for professional services and costs associated therewith. The Tax Matters Representative shall promptly notify the Members in writing of the commencement of any tax audit of the Company, upon receipt of a tax assessment, and upon receipt of a notice of final partnership adjustment, and shall keep the Members reasonably informed of the status of any tax audit and resulting administrative and judicial proceedings. Without the consent of the Members, the Tax Matters Representative shall not extend the statute of limitations, file a request for administrative adjustment, file suit relating to any Company tax refund or deficiency, or enter into any settlement agreement relating to items of income, gain, loss, or deduction of the Company with any federal, state, local, or foreign taxing authority.

Unique Code : CAA-FAA-BCABB-JICBHGCD-BGABIFJ-J Page 17 of 31

(c) **US Federal Tax Proceedings.** Unless otherwise approved by the Members, the Tax Matters Representative shall cause the Company to annually elect out of the partnership audit procedures set forth in Subchapter C of Chapter 63 of the Code (the "**Revised Partnership Audit Rules**") to the extent permitted by Applicable Law. For any year in which Applicable Law does not permit the Company to elect out of the Revised Partnership Audit Rules, then within forty-five (45) days of any notice of final partnership adjustment, the Tax Matters Representative shall cause the Company to elect the alternative procedure under Section 6226 of the Code, and furnish to the Internal Revenue Service and each Holder (including former Holders) during the year or years to which the notice of final partnership adjustment relates a statement of the Holder's share of any adjustment set forth in the notice of final partnership adjustment.

(d) **Section 754 Election.** The Tax Matters Representative shall make an election under Section 754 of the Code, if requested in writing by the Members.

(e) **Expenses**. Notwithstanding anything herein to the contrary, any reasonable out-of-pocket expenses incurred by the Tax Matters Representative in carrying out their responsibilities and duties in such capacity under this Agreement shall be an expense of the Company for which the Tax Matters Representative shall be reimbursed by the Company.

(f) **Survival.** The provisions of this Section 8.04 and the obligations of a Holder or former Holder pursuant to Section 8.04 shall survive the termination, dissolution, liquidation, and winding up of the Company and any Transfer of such Holder's Interest.

**Section 8.05 Tax Returns.**

(a) At the expense of the Company, the Members shall cause the preparation and timely filing (including extensions) of all tax returns required to be filed by the Company pursuant to the Code as well as all other required tax returns in each jurisdiction in which the Company owns property or does business. As soon as reasonably possible after the end of each Fiscal Year, the Company shall deliver to each Holder such information as the Company deems reasonably necessary for the preparation of such Holder's federal, state, and local income tax returns for such Fiscal Year.

(b) Each Holder agrees that such Holder shall not treat any Company item on such Holder's federal, state, foreign, or other income tax return inconsistently with the treatment of the item on the Company's return.

**Section 8.06** Corporate Transparency Act Compliance.

(a) Capitalized terms used in this Section 8.06 have the meanings set forth below:

**"Acceptable Identification Document"** means, with respect to a natural Person, one of the following documents validly issued to such Person: (i) a nonexpired U.S. passport issued by the U.S. government; (ii) a nonexpired U.S. state, local government, or Indian tribal identification document issued for the purpose of identifying such Person; (iii) a nonexpired U.S. state-issued driver's license; or (iv) if such Person does not have any of the documents listed in clauses (i) to (iii), a nonexpired passport issued to such Person by a foreign government.

**"Beneficial Owner"** has the meaning set forth in the CTA.

**"CTA"** means the Corporate Transparency Act (31 U.S.C. § 5336), enacted as part of the National Defense Authorization Act for Fiscal Year 2021.

**"CTA Information"** means, with respect to a natural Person: (i) the full legal name of such Person, including any suffix; (ii) their date of birth; (iii) their complete current residential street address, including any apartment or suite number; (iv) a unique identifying number from an Acceptable Identification Document issued to such Person; and (v) an image of such Acceptable Identification Document of sufficient quality that includes: (A) a legible image of such unique identifying number; and (B) a recognizable photograph of such Person.

**"Indirect Owner"** means, with respect to any Entity Holder (as defined herein), any natural Person who from time to time, directly or indirectly, owns or controls any Ownership Interest (as defined under the CTA) in the Company through such Entity Holder.

(b) Each Holder shall promptly:

(i) provide to the Company any information that the Company deems necessary or advisable to obtain from such Holder in order for the Company to comply with the CTA, including: (A) such Holder's, or with respect to a Holder that is not a natural Person (an **"Entity Holder"**), each of such Entity Holder's Indirect Owners', true and correct CTA Information or the true and correct FinCEN Identifier (as defined under the CTA) assigned to them by the Financial Crimes Enforcement Network of the U.S. Department of the Treasury (**"FinCEN"**); and (B) such information or documents as may be necessary in order for the Company to determine whether such Holder or any of such Holder's Indirect Owners or controllers are Beneficial Owners of the Company (collectively, **"Beneficial Ownership Information"**);

(ii) notify the Company of any change or inaccuracy in or to any of such Holder's, or in the case of an Entity Holder, any of such Entity Holder's Indirect Owners', CTA Information most recently provided to the Company, including: (A) a change in such Holder's or Indirect Owner's legal name, date of birth, or residential street address; (B) a change in the name, date of birth, address, or unique identifying number on such Holder's or Indirect Owner's Acceptable Identification Document; or (C) in the case of an Entity Holder, as may result from a change in the direct or indirect ownership or control of such Entity Holder; and



Unique Code : CAA-FAA-DCAAD-JADIACCC-CCAH-3-3 Page 16 of 31

(iii) notify the Company of any amendment, modification, supplement, or other change (other than an immaterial change that could not reasonably be expected to affect who may be a Beneficial Owner of the Company) in or to any Beneficial Ownership Information previously provided by such Holder to the Company.

**Article IX. Dissolution and Liquidation.**

**Section 9.01 Events of Dissolution.** The Company shall be dissolved and its affairs wound up only upon the occurrence of any of the following events:

(a) An election to dissolve the Company made by all of the Members;

(b) The sale, exchange, involuntary conversion, or other disposition or transfer of all or substantially all the assets of the Company;

(c) The entry of a decree of judicial dissolution under Section 18-802 of the Delaware Act; or

(d) At any time there are no Members, unless the Company is continued in accordance with the Delaware Act.

**Section 9.02 Effectiveness of Dissolution.** Dissolution of the Company shall be effective on the day on which the event described in Section 9.01 occurs, but the Company shall not terminate until the winding up of the Company has been completed, the assets of the Company have been distributed as provided in Section 9.03, and the Certificate of Formation shall have been cancelled as provided in Section 9.04.

**Section 9.03 Liquidation.** If the Company is dissolved pursuant to Section 9.01, the Company shall be liquidated and its business and affairs wound up in accordance with the Delaware Act and the following provisions:

(a) The Members shall designate a Person to act as liquidator to wind up the Company (the "**Liquidator**"). The Liquidator shall have full power and authority to sell, assign, and encumber any or all of the Company's assets (including the discretion to defer the liquidation of any asset if the immediate sale of the asset would be impractical or cause undue loss to the Members) and to wind up and liquidate the affairs of the Company in an orderly and business-like manner.

(b) As promptly as possible after dissolution and again after final liquidation, the Liquidator shall cause a proper accounting to be made by a recognized firm of certified public accountants of the Company's assets, liabilities, and operations through the last day of the calendar month in which the dissolution occurs or the final liquidation is completed, as applicable.

(c) The Liquidator shall liquidate the assets of the Company and distribute the proceeds of such liquidation in the following order of priority, unless otherwise required by mandatory provisions of Applicable Law:



Unique Code : CAA-FAA-BCABB-JICBHGCD-BGABIFJ-J Page 19 of 31

Docusign Envelope ID: Case 26-17342-EJO Doc 62-3 Filed 07/29/26 Entered 07/29/26 18:49:17 Desc
Exhibits A - L Page 133 of 186

(i) First, to the payment of the Company's debts and liabilities to its creditors (including Members, if applicable, but excluding liabilities for distributions) and the expenses of liquidation (including sales commissions incident to any sales of assets of the Company);

(ii) Second, to the establishment of and additions to reserves that are determined by the Liquidator to be reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company;

(iii) Third, to Holders and former Holders in satisfaction of liabilities for distributions; and

(iv) Fourth, to the Holders, on a pro rata basis, in accordance with the positive balances in their respective Capital Accounts, as determined after taking into account all Capital Account adjustments for the taxable year of the Company during which the liquidation of the Company occurs.

**Section 9.04 Required Filings.** Upon completion of the winding up of the Company, the Liquidator shall make all necessary filings required by the Delaware Act.

## Article X. Definitions

**Section 10.01 Definitions.** Capitalized terms used herein and not otherwise defined shall have the meanings set forth in this Section 10.01:

"**Affiliate**" means, with respect to any Person, any other Person who, directly or indirectly, controls, is controlled by, or is under common control with such Person. For purposes of this definition, "**control**" when used with respect to any specified Person, shall mean the power, direct or indirect, to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities or partnership or other ownership interests, by contract, or otherwise; and the terms "**controlling**" and "**controlled**" shall have correlative meanings. Notwithstanding the foregoing, the term "Affiliate," when used with respect to a Member, shall not include the Company.

"**Applicable Law**" means all applicable provisions of (a) constitutions, treaties, statutes, laws (including the common law), rules, regulations, decrees, ordinances, codes, proclamations, declarations, or orders of any Governmental Authority; (b) any consents or approvals of any Governmental Authority; and (c) any orders, decisions, advisory, or interpretative opinions, injunctions, judgments, awards, decrees of, or agreements with, any Governmental Authority.

"**Assignee**" means the holder of an Economic Interest who is not a Member and has no right to (a) vote; (b) participate in the management and affairs of the Company or exercise any management powers or responsibilities; (c) bind the Company; (d) inspect the Company's books and records; or (e) exercise any other rights or powers of a Member. An Assignee shall not be deemed a "member" (as that term is used in the Delaware Act) of the Company.

Case 26-17342-EJO Doc 62-3 Filed 07/29/26 Entered 07/29/26 16:49:17 Desc
Exhibits A - L Page 134 of 186

Unique Code : CAA-FAA-BCABB-JICBHGCD-BGABIFJ-J Page 21 of 31

**"Certificate of Formation"** means the certificate of formation of the Company filed with the Secretary of State of the State of Delaware on February 7, 2023, as it may be amended or restated from time to time.

**"Code"** means the Internal Revenue Code of 1986.

**"Confidential Information"** means any and all information pertaining to the Company and its business that is not generally available to the public, including: (a) all information concerning its finances, current and prospective customers and suppliers, products, services, organizational structure and internal practices, forecasts, sales and other financial results, records and budgets, and business, marketing, development, sales, and other commercial strategies; (b) unpatented inventions, ideas, methods, and discoveries, trade secrets, know-how, unpublished patent applications, and other confidential intellectual property; (c) all designs, specifications, documentation, components, source code, object code, images, icons, audiovisual components and objects, schematics, drawings, protocols, processes, and other visual depictions, in whole or in part, of any of the foregoing; and (d) all notes, analyses, compilations, reports, forecasts, studies, samples, data, statistics, summaries, interpretations, and other materials that contain, are based on, or otherwise reflect or are derived from, in whole or in part, any of the foregoing.

**"Covered Person"** means each (a) Member; (b) Officer; (c) Tax Matters Representative; and (d) officer, director, shareholder, partner, manager, member, Affiliate, employee, agent, or representative of each Member.

**"Delaware Act"** means the Delaware Limited Liability Company Act.

**"Divorce"** means any legal proceeding to terminate, dissolve, or separate the Marital Relationship of a Member, and includes an action for annulment, legal separation, or similar proceeding that involves a judicial division of joint, community, or marital property of the Member and the Member's Spouse.

**"Economic Interest"** means a Holder's right to receive a distributive share of the Company assets and items of Company income, gain, loss, deduction, and credit under this Agreement and the Delaware Act.

**"Electronic Transmission"** means any form of communication not directly involving the physical transmission of paper, including the use of, or participation in, one or more electronic networks or databases (including one or more distributed electronic networks or databases), that creates a record that may be retained, retrieved, and reviewed by a recipient thereof and that may be directly reproduced in paper form by such a recipient through an automated process.

**"Equity Securities"** means any and all Membership Interests of the Company and any securities of the Company convertible into, exchangeable for, or exercisable for, such Membership Interests, including any warrants or other rights to acquire such Membership Interests.

**"Event of Bankruptcy"** means an event of the type described in Section 18-304 of the Delaware Act.

"**Fiscal Year**" means the calendar year, unless the Company is required or elects to have a taxable year other than the calendar year, in which case Fiscal Year shall be the period that conforms to its taxable year.

"**Governmental Authority**" means any federal, state, local, or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations, or orders of such organization or authority have the force of law), or any arbitrator, court, or tribunal of competent jurisdiction.

"**Holder**" means any Person who holds an Interest, whether as a Member or an Assignee. "**Interest**" means (a) in the case of a Member, such Member's Membership Interest and (b) in the case of an Assignee, such Assignee's Economic Interest.

"**Interim Receiver Obligation**" the $1,600,000 repayment owed by the Receiver in the Lawsuit (out of a total of approximately $4,000,000 owed by the Receiver to Spin Capital, LLC as the predecessor to the Company).

"**Letter Agreement**" means the agreement between the Company, Member A, Member B, Spin Capital LLC, BMF Advance LLC and Redstone Advance Inc. dated August 13, 2025.

"**Lien**" means any mortgage, pledge, security interest, option, right of first offer, encumbrance, or other restriction or limitation of any nature whatsoever.

"**Marital Relationship**" means a civil union, domestic partnership, marriage, or any other similar relationship that is legally recognized in any jurisdiction.

"**Members**" means the Initial Members and each Person who may hereafter become a Member in accordance with the terms of this Agreement and the Delaware Act, in each case for so long as such Person is shown on the Company's books and records as the owner of a Membership Interest. The Members shall constitute the "members" (as that term is defined in the Delaware Act) of the Company.

"**Membership Interest**" means a Member's interest in the Company, including such Member's (a) Economic Interest and (b) rights to (i) vote, consent, or participate in any Member decisions and (ii) receive any and all other benefits due to a Member, in each case to the extent expressly provided in this Agreement or otherwise required by the Delaware Act. The Membership Interest of each Member will be stated as a Percentage Interest and, with respect to the Initial Members on the date hereof, are as set out in the Members Schedule.

"Note" means that certain loan in the original principal amount of 50% of the amount received from the Receiver to be executed as referenced in Section 2.02 hereof and in Letter Agreement executed herewith.

"**Percentage Interest**" means, with respect to any Holder, a fraction (expressed as a percentage) equal to the amount of the unreturned Capital Contributions of such Holder divided by the total unreturned Capital Contributions of all Holders.

**"Person"** means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association, or other entity.

**"Receiver"** the Court-appointed receiver in the Lawsuit.

**"Redstone Loan"** means that certain loan in the original principal amount of $ 4,100,000.00 from Redstone Advance Inc. to the Company evidenced by the Amended and Restated Promissory Note executed by the Company dated August 13, 2025 and any and all amounts and obligations (including further advances) due thereunder.

**"Securities Act"** means the Securities Act of 1933.

**"Spouse"** means a spouse, a party to a civil union, a domestic partner, a same-sex spouse or partner, or any individual in a Marital Relationship with a Member.

**"Transfer"** means to sell, transfer, assign, gift, pledge, encumber, hypothecate, or similarly dispose of, directly or indirectly, voluntarily or involuntarily, by operation of law or otherwise, or to enter into any contract, option, or other arrangement or understanding with respect to the sale, transfer, assignment, gift, pledge, encumbrance, hypothecation, or similar disposition of, any Interest or any interest (including a beneficial interest) therein. **"Transfer"** when used as a noun shall have a correlative meaning.

**"Transferor"** and **"Transferee"** mean a Person who makes or receives a Transfer, respectively.

**"Treasury Regulations"** means the final or temporary regulations issued by the United States Department of Treasury pursuant to its authority under the Code, and any successor regulations.

**"Unaffiliated Purchaser"** means, with respect to any Holder, any Person other than the Company that is not a Permitted Transferee of such Holder.

## Article XI. Miscellaneous

**Section 11.01 Governing Law.** This Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware, without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction).

**Section 11.02 Indemnification by Members.** Each Member hereby agrees to indemnify and hold harmless the Company and each of the other Members from and against any Losses incurred by them relating to or arising out of any material breach or knowing violation of this Agreement by such Member.



Unique Code : CAA-FAA-BCABB-JICBHGCD-BGABIFJ-J Page 23 of 31

Case 26-17842-EJO Doc 62-3 Filed 07/29/26 Entered 07/29/26 18:49:17 Desc
Exhibits A - L Page 137 of 186

**Section 11.03 Confidentiality.** Each Holder shall take all appropriate steps to safeguard any Confidential Information of which such Holder is or becomes aware and to protect it against disclosure, including as a result of any misuse, misappropriation, loss, or theft; *provided, however,* a Member may disclose Confidential Information to the extent such disclosure is (a) necessary for such Member and/or the Company's other Members, Officers, employees, agents, or representatives to perform their responsibilities to the Company in accordance with this Agreement or any other written agreements that they are a party to or (b) required by Applicable Law or a valid legal order.

**Section 11.04 Submission to Jurisdiction.** The parties hereby agree that any suit, action, or proceeding based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby, shall be brought in the United States District Court for the District of Delaware or in the Court of Chancery of the State of Delaware (or, if such court lacks subject matter jurisdiction, in the Superior Court of the State of Delaware). Each of the parties hereby irrevocably consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action, or proceeding; provided that nothing in this Agreement will prevent the Members from seeking judicial relief or enforcing the rights and obligations arising out of or related to the Lawsuit in the Supreme Court of the State of New York, County of New York. Notwithstanding anything to the contrary in this Agreement, in connection with any dispute arising under 2.08(d)(ix), the Members submit to the exclusive jurisdiction of the Supreme Court of the State of New York, County of New York.

**Section 11.05 Waiver of Jury Trial.** EACH PARTY HERETO HEREBY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY THAT MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND, THEREFORE, EACH SUCH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

**Section 11.06 Waiver.** No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No failure to exercise, or delay in exercising, any right, remedy, power, or privilege arising from this Agreement shall operate or be construed as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege. Nothing contained in this Section 11.06 shall diminish the waiver described in Section 11.05.

**Section 11.07 Notices.** All notices, requests, consents, claims, demands, waivers, and other communications hereunder shall be in writing and shall be deemed to have been given:

(a) when delivered by hand;

(b) when received by the addressee if sent by a nationally recognized overnight courier;

(c) on the date sent by facsimile or email of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next business day if sent after normal business hours of the recipient; or

Unique Code : CAA-FAA-BCABB-JICBHGCD-BGABIFJ-J Page 25 of 31

(d) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid.

Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 11.07):

If to the Company: To the Company's principal address stated above.

If to a Member: To the Member's respective mailing address or email address, as set forth on the Members Schedule.

**Section 11.08 Remedies.** In the event of any actual or prospective breach or default by any party, the other parties shall be entitled to equitable relief, including remedies in the nature of injunction and specific performance, awarded by a court of competent jurisdiction (without being required to post a bond or other security or to establish any actual damages). In this regard, the parties acknowledge and agree that they will be irreparably damaged in the event this Agreement is not specifically enforced, since (among other things) the Membership Interests are not readily marketable. All remedies hereunder are cumulative and not exclusive, may be exercised concurrently, and nothing herein shall be deemed to prohibit or limit any party from pursuing any other remedy or relief available at law or in equity for any actual or prospective breach or default, including recovery of damages. In addition, the parties hereby waive and renounce any defense to such equitable relief that an adequate remedy at law may exist.

**Section 11.09 Severability.** If any term or provision of this Agreement is held to be invalid, illegal, or unenforceable under Applicable Law in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.

**Section 11.10 Successors and Assigns.** Subject to the restrictions on Transfers set forth herein, this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors, and permitted assigns.

**Section 11.11 Amendment.** No provision of this Agreement may be amended or modified except by an instrument in writing executed by all Members. Any such written amendment or modification will be binding upon the Company and each Member. Notwithstanding the foregoing, the Company may amend the Members Schedule to accurately reflect any new issuance, redemption, repurchase, or Transfer of a Membership Interest in accordance with this Agreement, which amendment shall not require separate approval under this Section 11.11 and shall occur at the time of such issuance, redemption, repurchase, or Transfer, or as soon as practicable thereafter.

**Section 11.12 Headings; Interpretation.** The headings in this Agreement are inserted for convenience or reference only and are in no way intended to describe, interpret, define, or limit the scope, extent, or intent of this Agreement or any provision of this Agreement. For purposes of this Agreement, (a) the words "include," "includes," and "including" shall be deemed to be followed by the words "without limitation;" (b) the word "or" is not exclusive; and (c) the words "herein," "hereof," "hereby," "hereto," and "hereunder" refer to this Agreement as a whole. Unless the context otherwise requires, references herein to: (i) Articles, Sections, Exhibits, and Schedules mean the Articles and Sections of, and Exhibits and Schedules attached to, this Agreement; (ii) an agreement, instrument, or other document means such agreement, instrument, or other document as amended, supplemented, and modified from time to time to the extent permitted by the provisions thereof; and (iii) a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder. This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted.

**Section 11.13 Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.

**Section 11.14 Entire Agreement.** This Agreement, together with the Certificate of Formation and all related Exhibits and Schedules, constitutes the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein and therein, and supersedes all prior and contemporaneous understandings, agreements, representations, and warranties, both written and oral, with respect to such subject matter.

**Section 11.15 No Third-Party Beneficiaries.** Except as provided in ARTICLE VII, this Agreement is for the sole benefit of the parties hereto (and their respective heirs, executors, administrators, legal representatives, successors, and permitted assigns) and nothing herein, express or implied, is intended to or shall confer upon any other Person, including any creditor of the Company, any legal or equitable right, benefit, or remedy of any nature whatsoever under or by reason of this Agreement.

**Section 11.16 Spousal Consent.** Each Initial Member who has a Spouse on the date of this Agreement shall cause their Spouse to execute and deliver to the Company a spousal consent in the form of **Exhibit B** hereto (a **"Spousal Consent"**), pursuant to which such Spouse acknowledges that they have read and understood the Agreement and agree to be bound by its terms and conditions. If any Member should marry or engage in a Marital Relationship following the date of this Agreement, such Member shall cause their Spouse to execute and deliver to the Company a Spousal Consent within thirty (30) days thereof.

**Section 11.17 Independent Counsel.** Each Member has read this Agreement and acknowledges that:

(a) Counsel for the Members collectively prepared this Agreement on behalf of the Company and each Member. The parties acknowledge and agree that (x) this Agreement has been freely negotiated by the parties, (y) in any controversy, dispute or contest over the meaning, interpretation, validity, or enforcement of this Agreement, or any of its terms and conditions, there shall be no inference, presumption or conclusion drawn whatsoever against any party by virtue of that party having drafted or participating in the drafting of this Agreement or any portion thereof, and (z) they hereby knowingly, intelligently and voluntarily waive the benefit of any law, court decision, or rule of contract construction that would otherwise permit a court to construe any perceived ambiguity in this Agreement against the drafter of this Agreement;

(b) Each Member has been advised that a conflict may exist between such Members' interests, the interests of the other Members, and/or the interests of the Company;

(c) This Agreement may have significant legal, financial, and/or tax consequences on each Member;

(d) Each Member has been represented by counsel.

Unique Code : CAA-FAA-BCABB-JICBHGCD-BGABIFJ-J Page 27 of 31

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date first written above.

The Company:

Teton Life LLC, a Delaware limited liability company

DocuSigned by:
By: Josh Lubin
8C1F4BC2DA004D5...
Name: Avrumi (Josh) Lubin
Title: Member

The Members:

DocuSigned by:
Josh Lubin
8C1F4BC2DA004D5...
Name: Avrumi (Josh) Lubin

Signed by:
[signature]
00139DF0C7A848A...
Name: Gavriel Yitzchakov

Unique Code : CAA-FAA-BCABB-JICBHGCD-BGABIFJ-J Page 29 of 31

**EXHIBIT A**

**FORM OF JOINDER AGREEMENT**

Reference is hereby made to the Amended and Restated Limited Liability Company Agreement, dated [DATE] as amended from time to time (the "**LLC Agreement**"), among Lubin, Isaacov and Teton Life LLC, a company organized under the laws of the State of Delaware (the "**Company**"). Pursuant to and in accordance with the LLC Agreement, the undersigned hereby acknowledges that it has received and reviewed a complete copy of the LLC Agreement and agrees that upon execution of this Joinder, such Person shall become a party to the LLC Agreement and shall be fully bound by, and subject to, all of the covenants, terms, and conditions of the LLC Agreement as though an original party thereto and shall be deemed, and is hereby admitted as, a Member for all purposes thereof and entitled to all the rights incidental thereto.

Capitalized terms used herein without definition shall have the meanings ascribed thereto in the LLC Agreement.

**EXHIBIT B**
**FORM OF SPOUSAL CONSENT**

I, [SIGNING SPOUSE NAME], spouse of [MEMBER NAME], acknowledge that I have read the Amended and Restated Limited Liability Operating Agreement, dated as of [DATE] by and among Isaacov, Lubin and Teton Life LLC, a Delaware limited liability company (the "Company") to which this Consent is attached as Exhibit B (as the same may be amended or amended and restated from time to time, the "Agreement"), and that I understand the contents of the Agreement. I am aware that my spouse is a party to the Agreement and the Agreement contains provisions regarding the voting and transfer of shares of Capital Stock (as defined in the Agreement) of the Company which my spouse may own, including any interest I might have therein.

I hereby agree that I and any interest, including any community property interest, that I may have in any shares of Membership Interest of the Company subject to the Agreement shall be irrevocably bound by the Agreement, including any restrictions on the transfer or other disposition of any Membership Interest or voting or other obligations as set forth in the Agreement. I hereby appoint [NAME OF MEMBER SPOUSE] as my attorney-in-fact with respect to the exercise of any rights and obligations under the Agreement.

I agree that, in the event of divorce or the dissolution of my marriage to my present spouse or other legal division of property, I will transfer and sell, at the fair market value, to my spouse any and all interest I have or may acquire in the Company, if any, and I further agree that a court may award such entire interest to my spouse as part of any such legal division of property. The foregoing agreement is not intended as a waiver of any community property or other ownership interest I may have in the Membership Interests, but only as an agreement to accept other property or assets of substantially equivalent value as part of any property settlement agreement or other legal division of property upon divorce or the dissolution of my marriage.

I agree not to bequeath my interest, if any, in the Membership Interests by will, trust, or any other testamentary disposition to any person other than my current spouse. Further, the residuary clause in my will shall not include my interest, if any, in the Membership Interests. I agree not to pledge or encumber any interest I may have in the Membership Interests.

This Consent shall be binding on my executors, administrators, heirs, and assigns. I agree to execute and deliver such documents as may be necessary to carry out the intent of the Agreement and this Consent.

I am aware that the legal, financial, and related matters contained in the Agreement are complex and that I am free to seek independent professional guidance or counsel with respect to this Consent. I have either sought such guidance or counsel or determined after reviewing the Agreement carefully that I will waive such right. I am under no disability or impairment that affects my decision to sign this Consent and I knowingly and voluntarily intend to be legally bound by this Consent.

**SCHEDULE I**
**MEMBERS SCHEDULE**

| **Member Name, Address and Email** | **Capital Contribution** | **Percentage Interest** |
|---|---|---|
| Avrumi (a/k/a Josh) Lubin<br>[redacted] | Initial Capital Contribution: As described in the Contribution Agreement<br><br>Lawsuit Reserve Contributions: | 50% |
| Gavriel Yitzchakov (a/k/a Gabe Isaacov)<br>[redacted] | Initial Capital Contribution: $1,000<br>Other good and valuable consideration<br><br>Lawsuit Reserve Contributions: | 50% |

Unique Code : CAA-FAA-BCABB-JICBHGCD-BGABIFJ-J Page 31 of 31