# EXHIBIT F

**Matthew E. Moloshok**

| | |
|---|---|
| **From:** | Josh Lubin <josh@tetonfunding.com> |
| **Sent:** | Wednesday, October 7, 2026 5:04 PM |
| **To:** | ben; Patricia A. Staiano; Matthew E. Moloshok |
| **Subject:** | Lubin - amendment to Schedule E/F (Zagelbaum agreement) |
| **Attachments:** | Abe Zagelbaum - Spin 2.0 - MCA Funding Agreement - Execution Copy.pdf |
| **Importance:** | High |

Pat,

I need to amend my Schedule E/F to add a claim I left off.

Under a January 12, 2022 agreement, Avrahom (Abe) Zagelbaum put money into Spin Capital's merchant cash advance deals as a "participant." Under section 8.2, if the agreement ends and Abe has not recovered his contributions, I agreed to repay 50% of the shortfall, up to $2.5 million.

I will file an amendment listing Abe's claim as contingent, unliquidated and disputed. I reserve all defenses.

Abe is also an investor in Spin's deals, so I will include him on the Spin creditor list Matt asked for on October 1.

A copy of the agreement is attached.

Thank you,

Josh Lubin
(732) 608-4905
josh@tetonfunding.com

# MCA FUNDING AGREEMENT

THIS MCA FUNDING AGREEMENT (this "**Agreement**") is entered into as of January 12, 2022, by and between SPIN CAPITAL LLC, a New Jersey limited liability company ("**Lead**") and AVRAHOM ZAGELBAUM ("**Participant**").

## RECITALS

**A.** Lead intends to enter into merchant cash advance agreements or revenue-based financing agreements ("**Funding Agreements**") with Clients (as defined below) pursuant to which Lead purchases ("**Purchases**") future credit card, bank card, debit card and/or other charge card, checks and cash receivables from Clients (collectively, "**Purchased Receivable**").

**B.** Participant shall provide funds ("**Contributions**") to Lead from time-to-time, in amounts to be determined by Participant, for use by Lead to fund Participation Costs (as defined below).

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth, it is hereby agreed as follows:

## 1. DEFINITIONS.

As used herein the following terms shall have the respective meanings set forth below:

1.1. "**Administration**" means the performance of accounting, reporting and treasury functions in administering Transactions, including the maintenance of all Bank Accounts.

1.2. "**Affiliate**" means any person or entity that controls, is controlled by, or is under common control with, the person or entity in question.

1.3. "**Bank Accounts**" shall mean any and all deposit accounts (which may be book-entry subaccounts) maintained in connection with all Transactions covered by this Agreement.

1.4. "**Client**" means an individual or entity seller of Purchased Receivables who enters into a Transaction with Lead.

1.5. "**Client Obligation**" means any obligation of a Client under any Funding Agreement.

1.6. "**Collateral**" means all collateral and guarantees received by, or granted to, Lead as part of a Transaction to secure a Client Obligation.

1.7. "**Collections**" means the payments actually received by Lead in cash (including, cash proceeds from the sale of any Collateral) from a Transaction.

1.8. "**Extraordinary Expenses**" means attorneys' fees and disbursements, court costs, and fees incurred (i) subsequent to the Lead declaring a Transaction to be In Liquidation, or (ii) in connection with the enforcement of any of the Lead's rights and remedies under a Funding

Agreement. The term "Extraordinary Expenses" shall not include cost and expenses of ordinary overhead of the Lead.

1.9. "**Funds Available for Purchases**" means the amount of cash available for Purchases contained in one or more accounts maintained by Lead (which may be a book-entry subaccount) for the benefit of Participant but have not been remitted to the Participant or used to make Purchases.

1.10. "**In Liquidation**" shall have the meaning set forth in Section 6.1.

1.11. "**Losses**" means, as to any individual Transaction, the net loss, if any, resulting from the calculation of (x) Collections minus (y) the sum of the Purchase Price, Transaction Expenses and Extraordinary Expenses for such Transaction.

1.12. "**Net Cash Available for Distribution**" for any calculation period means (x) Participant's Share, multiplied by, (y) the total Profits on all of the individual Transactions during such period, if any, after reduction for: (i) Losses on all of the individual Transactions during such period, (ii) Losses on all of the individual Transactions during all prior calculation periods to the extent that such Losses from prior calculation periods have not been offset by Profits in any prior calculation period, (iii) Transaction Expenses and Extraordinary Expenses attributable to such period but not yet paid, and (iv) any amounts set aside by Lead for commercially reasonable reserves not to exceed $25,000. For the avoidance of doubt, the term "Net Cash Available for Distributions" shall not, directly or indirectly, include the amount of any Contributions received by Lead.

1.13. "**Participation Costs**" means, for any individual Transaction, the sum of the following incurred with respect to such Transaction:

1.13.1. Purchase Price,

1.13.2. Transaction Expenses, and

1.13.3. Extraordinary Expenses.

1.14. "**Participant's Share**" means Participant's share of Participation Costs for any individual Transaction, calculated as the ratio of (x) funds contributed toward the Participation Costs for such Transaction from Participant's Funds Available for Purchases, divided by (y) all Participation Costs for such Transaction.

1.15. "**Parties**" means, collectively, Lead and Participant.

1.16. "**Preferred Return**" means, with respect to each individual Transaction, the period of time from the Purchase date for such Transaction until the Collection date for such Transaction (or, if earlier, the date that such Transaction is declared by Lead to be In Liquidation), a cumulative, but non-compounded preferred return to Participant, equal to six percent (6%) per annum of the Unreturned Contributions that have been used by Lead to make such Purchase from Clients.

1.17. "**Profits**" means, as to any individual Transaction, the net profit, if any, resulting from the calculation of (x) Collections minus (y) the sum of the Purchase Price, Transaction Expenses and Extraordinary Expenses for such Transaction.

1.18. "**Purchase Price**" means, as to any individual Transaction, the price paid for Purchased Receivables.

1.19. "**Standard of Care**" means Lead will manage each Transaction (i) in accordance with the obligations of Lead, if any, pursuant to the express terms of the applicable Funding Agreement, and (ii) as to all other aspects of each such Transaction, with the same degree of care that the Lead follows in similar transactions with its non-syndicated advances.

1.20. "**Transaction**" means a merchant cash advance or revenue-based financing transaction with the Lead, as evidenced by a Funding Agreement, and the collection and enforcement thereof.

1.21. "**Transaction Expenses**" means all out-of-pocket expenses incurred by the Lead in connection any given Transaction, including, but not limited to, the commissions or referral fees paid or payable to Lead or any outside broker and any Extraordinary Expenses. Participant acknowledges and agrees that every Transaction shall have commissions or referral fees associated with them, whether to Lead (or its affiliates) or to third-parties. Participant further acknowledges and agrees that the commission or referral fees paid to Lead (or its affiliates) are in the range of five percent (5%) to eight and 50/100 percent (8.5%) of each Purchase Price, as determined by Lead in its sole discretion, and that such fees are fully earned and nonrefundable as of the date of the applicable Purchase, even if Lead elects to defer payment of such amounts until a later date (e.g., until the date that Collections on any Transaction equal 50% of the Purchase Price) and even if the applicable Purchase ultimately results in a Loss on the applicable Transaction.

1.22. "**Unreturned Contribution**" means, at any date, the aggregate Contributions as reduced from time to time by (x) any distribution pursuant to Section 2.2.2 hereof, and (y) any Contributions, Funds Available for Purchase or other funds maintained by Lead for the benefit of Participant are repaid to Participant in connection with a termination of this Agreement or otherwise.

## 2. RETURN ON FUNDS PROVIDED BY PARTICIPANT FOR FUNDING

2.1. Distributions shall not be made more frequently than on a quarterly basis. Upon request by Participant made no more often than quarterly, distributions shall be made to each Party from Net Cash Available for Distribution by wire to an account designated by such Party. When distributions are to be made, Lead shall tally the Profits and Losses on all of the individual Transactions during the period from (x) the date of last calculation of Profits and Losses upon which distributions were made until (y) the then present date.

2.2. Subject to Section 2.1, distribution of Net Cash Available for Distribution shall be made in the following order of priority:

2.2.1. First, one hundred percent (100%) to Participant until Participant has received an aggregate amount under this Section 2.2.1 equal to its accrued Preferred Return for all prior and current fiscal years during the term of this Agreement;

2.2.2. Second, to Participant as a return of its Unreturned Contribution, until such time that its Unreturned Contribution is reduced to zero;

2.2.3. Third, thereafter, fifty percent (50%) to Lead and fifty percent (50%) to Participant.

**3. PARTICIPATIONS.**

3.1. Upon request of Participant, Lead shall advise Participant of potential Purchases, and, in such case, Participant may evaluate the opportunity and elect whether or not to participate in such Purchase.

**4. WARRANTIES AND REPRESENTATIONS BY PARTICIPANT.**

As of the date of this Agreement, Participant warrants, represents, and acknowledges that:

4.1. There is no agreement to which Participant is a party or, to the knowledge of Participant, is binding on Participant that is in conflict with this Agreement.

4.2. No recommendations have been made as to the suitability of any Client for a Transaction and Lead has not offered an opinion as to the creditworthiness of any Client. The willingness of the Lead to fund any Client should not be considered a validation of the Client's creditworthiness or attractiveness of the Client.

4.3. PARTICIPANT IS A SOPHISTICATED HIGH NET WORTH INDIVIDUAL AND ACCREDITED INVESTOR (AS THAT TERM IS DEFINED IN RULE 501(A) PROMULGATED BY THE SECURITIES AND EXCHANGE COMMISSION), IS FULLY FAMILIAR WITH FUNDING AGREEMENTS, PURCHASES AND TRANSACTIONS AND HAS MADE AND WILL CONTINUE TO MAKE ITS OWN BUSINESS EVALUATION RELATING TO ANY PARTICIPATION OPPORTUNITY AND IS NOT RELYING ON ANY REPRESENTATIONS MADE BY LEAD OR ANY ASSOCIATES OF LEAD, INCLUDING ANY UNDERWRITERS EMPLOYED BY LEAD, WITH RESPECT TO SUCH EVALUATION. PARTICIPANT ACKNOWLEDGES THAT THE TRANSACTIONS ARE INHERENTLY HIGH-RISK TRANSACTIONS AND THAT PARTICIPANT MAY LOSE ALL OR A PORTION OF ITS CONTRIBUTIONS.

4.4. Participant is not relying in any way on the credit advice or judgment of the Lead in determining whether or not to participate hereunder, and the Participant waives any claim that it now or hereafter has based upon the Participant's reliance on any statement from the Lead, its officers, employees or agents concerning a Client, or anyone else obligated under any Funding Agreement.

4.5. Participant may request a copy of any specific Funding Agreement in which is offered to participate as to which Participant is contemplating participation along with all related documents.

4.6. It understands that the Lead is not a bank and that the Participant's funded amount for Purchases do not qualify for protection from the Federal Deposit Insurance Corporation.

4.7. The Participant acknowledges that it has legal representation and has had this Agreement and all agreements and documents reviewed by independent counsel prior to execution.

4.8. It is understood by Lead that Participant may use borrowed funds and/or leverage for his Contributions, but Participant may not grant any third party a security interest in any of Participant's rights under this Agreement, including, without limitation, any right to receive any distributions of Net Available for Contributions or the right to receive a return of Unrecovered Contributions. The grant of any such rights shall be null and void ab initio. The provisions of this Agreement and of the documents to be executed and delivered herewith are and will be for the benefit of the Parties only and are not for the benefit of any third party, and accordingly, no third party shall have the right to enforce the provisions of this Agreement or any of the documents to be executed and delivered in connection with this Agreement.

**5. WARRANTIES AND REPRESENTATIONS BY LEAD.**

As of the date of this Agreement, Lead warrants, represents, and acknowledges that:

5.1. Lead has the full capacity, power and authority to execute, deliver and perform this Agreement. This Agreement is valid, binding and enforceable against Lead in accordance with its terms. There is no agreement to which Participant is a party or, to the knowledge of Participant, is binding on Participant that is in conflict with this Agreement.

5.2. Lead is duly organized under the laws of the state of its organization.

**6. PAYMENTS.**

6.1. Any outstanding payment obligations of Lead under this Agreement that have accrued prior to the expiration or termination of this Agreement shall survive any expiration or termination of this Agreement.

**7. ADMINISTRATION.**

7.1. Lead shall perform Administration of all Transactions funded by Participant in accordance with the Standard of Care.

7.2. Lead shall approve all transfers out of Bank Accounts to any Client relating to a Transaction. The consent of Participant shall not be required for any transfers to Lead, Client or Participant from any Bank Account or for the payment from any Bank Account of any Transaction Expenses or Extraordinary Expenses. Upon request, Participant shall have the right to confirm Bank Account balances.

**8. TERMINATION.**

8.1. This Agreement may be terminated by either Party upon thirty days written notice to the other party.

8.2. Upon any termination of this Agreement, Lead shall make a final accounting whereby the Net Cash Available for Distribution calculated from the last distribution through the effective date of the termination shall be distributed in accordance with Section 2.2 of this Agreement and Funds Available for Purchases shall be remitted to Participant. If such final accounting, after taking into account any distributions and remittances made by Lead in connection with such termination, are insufficient to repay Unrecovered Contributions, then Josh "Avrumi" Lubin agrees to be obligated to repay fifty (50%) of the lesser of (x) such Unrecovered Contributions, and (y) the initial Contribution amount funded by Participant, up to a maximum amount of Two Million Five Hundred Thousand Dollars ($2,500,000). The final distribution to Participant in accordance with this provision shall be made within thirty (30) days after the effective date of the termination of this Agreement.

**9. ENTIRE AGREEMENT.**

9.1. The Agreement supersedes all other agreements and understandings between the Parties, verbal or written, express or implied, relating to the subject matter hereof. No course of dealing. course of performance or trade usage, and no parole evidence of any nature, shall be used to supplement or modify any terms of the Agreement.

**10. GENERAL.**

10.1. **Confidentiality.** The Participant shall keep confidential, except as the Lead may otherwise consent in writing, in Lead's sole and absolute discretion, and not disclose or make any use of any trade secrets, knowledge, data or other confidential, secret or proprietary information of Lead relating to the Transaction as well as any of the Lead's products, processes, knowledge, know how, or other subject matter pertaining to the Lead's business that the Participant may come across during the course of the Transaction (collectively "**Confidential Information**"), provided that the term "Confidential Information" shall not include information, technical data or know-how that is or becomes part of the public domain not as a result of any action of the Participant. The Participant shall not deliver or in any way allow any Confidential Information under the Participant's control to be delivered to or used by any third parties without the specific direction or consent of a duly authorized representative of Lead. The terms of this paragraph shall survive termination of this Agreement.

10.2. **Amendment.** Neither this Agreement nor any provisions hereof may be changed, waived, discharged, or terminated, nor may any consent to the departure from the terms hereof be given (even if supported by new consideration), in any manner other than by an instrument in writing signed by each of the Parties. Any waiver or consent so given shall be effective only in the specific instance and for the specific purpose for which given.

10.3. **Governing Law.** All questions concerning the construction, interpretation and validity of this Agreement, and all matters relating hereto, shall be governed by and construed and enforced in accordance with the laws of the State of New York. without giving effect to any choice

or conflict of law provision or rule (whether in the State of New York or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of New York

10.4. **Arbitration and Attorneys' Fees.** It is hereby agreed among the Parties that: Any controversy or claim arising out of or relating to this contract, or the breach thereof, shall be settled by arbitration administered by the American Arbitration Association in accordance with its Commercial (and/or other) Arbitration Rules, and a judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof. If any Party finds it necessary to retain counsel in connection with the interpretation, defense, or enforcement of this Agreement, the prevailing Party shall recover its reasonable attorneys• fees and expenses from the unsuccessful Party. It shall be presumed (subject to rebuttal only by the introduction of competent evidence to the contrary) that the amount recoverable is the amount billed to the prevailing Party by its counsel and that such amount will be reasonable if based on the billing rates charged to the prevailing Party by its counsel in similar matters.

10.5. **Jury Trial Waiver**. THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANYCOURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THIS AGREEMENT, ANY FUNDING AGREEMENT, ANY GUARANTY OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY. THE PARTIES HERETO ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY, VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH ITS ATTORNEYS.

10.6. **Class Action Waiver**. THE PARTIES HERETO WAIVE ANY RIGHT TO ASSERTANY CLAIMS AGAINST ANY OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW. TO THE EXTENT ANY PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST ANOTHER PARTY, THE PARTIES HERETO AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOTWITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT OR ANY FUNDING AGREEMENT OR GUARANTY); AND (2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS ACTION WILL NOT SUBMIT A CLAIM OROTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

10.7. **No Waiver.** No failure to exercise and no delay in exercising any right, power, or remedy hereunder shall impair any right, power, or remedy which any Party may have, nor shall any such failure or delay be construed to be a waiver of any of such rights, powers, or remedies, or any acquiescence in any breach or default hereunder; nor shall any waiver of any breach or default be deemed a waiver of any default or breach subsequently occurring. All rights and remedies granted to any Party hereunder shall remain in full force and effect notwithstanding any single or partial exercise of, or any discontinuance of action begun to enforce, any such right or remedy. The rights and remedies specified herein are cumulative and not exclusive of each other or of any rights or remedies that any Party would otherwise have. Any waiver, permit, consent, or

approval by any Party of any breach or default hereunder by another Party must be in writing and shall be effective only to the extent set forth in such writing and only as to that specific instance.

10.8. **Further Acts**. Each Party agrees to do such further acts and things and to execute and deliver such additional agreements, powers and instruments as another Party hereto may reasonably request to carry into effect the terms, provisions and purposes of this Agreement or to better assure and confirm unto such other Party hereto its respective rights, powers and remedies hereunder.

10.9. **Counterparts**. This Agreement may be executed in any number of counterparts, all of which taken together shall constitute one and the same instrument, and any Party may execute this Agreement by signing any such counterpart. An electronic signature of any Party on any counterpart shall be effective as the signature of the Party executing such counterpart for purposes of effectiveness of this Agreement.

10.10. **Notice.** All notices required to be given to any Party hereunder shall be deemed given upon the first to occur of: (a) three days after deposit thereof in a receptacle under the control of the United States Postal Service; properly addressed and first class postage prepaid; (b) transmittal by electronic means to a receiver under the control of the party to whom notice is being given; or (c) actual receipt by the party to whom notice is being given, or an employee or agent of thereof authorized to receive notice on such Party's behalf. For purposes hereof, the addresses of the Parties are as set forth below or as may otherwise be specified from time to time in a writing sent by one Party to another Party in accordance with the provisions hereof:

If to Lead:

Spin Capital LLC
1460 Arboretum Parkway
Lakewood, New Jersey 08701
Attn: Josh Lubin

If to the Participant:

Avrahom Zagelbaum
4255 Meridian Avenue
Miami Beach, Florida 33140

[Signature Pages Follow]

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed the day and year first above-written.

LEAD:

**SPIN CAPITAL LLC**

DocuSigned by:

By: Josh Lubin
8C1F4BC2DA904D5...
Avrumi Lubin
Member

PARTICIPANT:

DocuSigned by:

AVRAHOM ZAGELBAUM
11BC70562954407...
AVRAHOM ZAGELBAUM

ACKNOWLEDGED AND AGREED AS TO SECTION 6.2 ONLY:

DocuSigned by:
Josh Lubin
8C1F4BC2DA904D5...
JOSH "AVRUMI" LUBIN