**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| Caption in Compliance with D.N.J. LBR 9004-1(b)<br>Avrumi Lubin<br>Defendant and Counterclaim-Plaintiff, pro se, individually<br>605 West 42nd Street<br>New York, New York 10036<br>(718) 570-3796<br>josh@tetonfunding.com | Case No. 26-17342 (EJO)<br>Chapter 11<br><br>Adv. Pro. No. 26-01494 (EJO)<br>Judge: Hon. Eamonn J. O'Hagan, U.S.B.J. |

In re:
**AVRUMI LUBIN** a/k/a Josh Lubin,
Debtor.

BENJAMIN A. STANZIALE, JR., CHAPTER 11 TRUSTEE FOR AVRUMI LUBIN a/k/a Josh Lubin,
Plaintiff,
v.
AVRUMI LUBIN; SPIN CAPITAL, LLC; TETON LIFE, LLC; TETON FUNDING, LLC; TETON FUNDING GROUP, LLC; and JL SPECIAL INVESTMENTS, LLC,
Defendants.

# ANSWER, DEFENSES AND COUNTERCLAIMS OF DEFENDANT AVRUMI LUBIN, INDIVIDUALLY, TO THE VERIFIED COMPLAINT (ECF NO. 1)

## PART ONE — ANSWER AND DEFENSES

Defendant Avrumi Lubin ("Lubin"), appearing pro se in his individual capacity only, answers the Verified Complaint (ECF No. 1) (the "Complaint") of Plaintiff Benjamin A. Stanziale, Jr., Chapter 11 Trustee (the "Trustee"), as follows.

## PRELIMINARY STATEMENT

A. Lubin answers only for himself. He does not appear for, answer for, or bind Spin Capital, LLC, Teton Life, LLC, Teton Funding, LLC, Teton Funding Group, LLC, or JL Special Investments, LLC (the "Subject Entities"). Each must appear through counsel.

B. Lubin understands "Spin" in the Complaint to mean Spin Capital, LLC, a New Jersey limited liability company. See Stipulation of Dismissal as to the Delaware entity (ECF No. 34) ¶¶ 2–3.

C. Headings, definitions and characterizations in the Complaint are not admissions. Any allegation not expressly admitted below is denied. Where Lubin refers to a document, he

admits only that the document exists and says what it says, and denies any characterization inconsistent with it.

D. This Answer is filed subject to the Court's October 23, 2026 Order (ECF No. 21). Lubin has appealed that Order (ECF Nos. 24, 26) and asked the Court to alter or amend it (ECF Nos. 25, 41). He complies with it while those requests are pending. Nothing in this Answer withdraws or waives those requests, his motion for a statement by the Trustee (ECF No. 27), or his motion to extend time (ECF No. 37).

## RESPONSES TO THE NUMBERED PARAGRAPHS

### *Jurisdiction and venue*

1. Paragraph 1 states legal conclusions to which no response is required. To the extent a response is required, Lubin admits that the Complaint invokes the cited provisions and denies that the Trustee is entitled to relief under them.

2. Paragraph 2 states legal conclusions to which no response is required. To the extent a response is required, Lubin admits that this Court has jurisdiction over his Chapter 11 case under 28 U.S.C. § 1334, and denies any implication that the property of the Subject Entities is property of his estate.

3. Paragraph 3 states legal conclusions to which no response is required. To the extent a response is required, Lubin denies that Count Three is a core proceeding under 28 U.S.C. § 157(b)(2)(E) to the extent it seeks turnover of property that is not property of the estate. **Statement under Fed. R. Bankr. P. 7012(b):** Lubin does not consent to the entry of final orders or judgment by the Bankruptcy Court. To the extent any count is determined to be non-core, or one on which the Bankruptcy Court may not constitutionally enter final judgment, Lubin requests that the Court submit proposed findings of fact and conclusions of law to the District Court under 28 U.S.C. § 157(c)(1). Lubin does not consent by implication or conduct.

4. Lubin admits that venue lies in this District under 28 U.S.C. § 1409.

### *Background*

5. Admitted.

6. Lubin admits that on September 18, 2026 the United States Trustee filed a notice appointing Benjamin A. Stanziale, Jr. as Chapter 11 trustee, subject to Court approval, and that the Court approved the appointment by order dated September 28, 2026 (Main Case ECF Nos. 105, 124). Lubin denies any remaining allegations of paragraph 6.

7. Lubin admits that he filed schedules on July 22, 2026 (Main Case ECF No. 48), and refers to them for their contents. (a) Lubin admits that his schedules list Spin, Teton Funding, Teton

Funding Group, and JL as wholly owned by him. He states that persons holding participation interests in particular Spin transactions hold contractual interests in those transactions; they are not members of Spin. (b) Lubin admits that his schedules list Teton Life as owned 50% by him and 50% by Gavriel Yitzchakov. As to the last sentence, Lubin admits that the Court described him in ECF No. 21 (at 2 n.1) as owning "a 50% interest in Teton Life, LLC with contractual rights to manage the company subject to consultation with the co-owner," and otherwise denies the allegations of the last sentence of paragraph 7(b), including the characterization "de facto."

8. Lubin denies that he personally operated a finance business. He admits that before the petition date Spin engaged in revenue-based financing transactions, sometimes called merchant cash advances, with businesses in several states, and that Spin has not entered into new funding transactions since 2022. Lubin denies the remaining allegations of paragraph 8, including the characterization "cash-strapped."

9. Lubin admits that Spin was the principal operating company in which he held a membership interest. He denies any implication that Spin's business was his personal business.

10. Lubin admits that, in its transactions, Spin purchased receivables or took security interests in receivables and other assets, which in some transactions included interests in life insurance policies. He refers to the agreements for each transaction for their actual terms, and denies any characterization inconsistent with them.

11. Lubin admits that Spin acquired, by purchase or assignment, interests in certain transactions originated by other companies, including companies affiliated with Hi Bar and with BMF, and refers to the governing agreements for their terms. Lubin admits that Mr. Yitzchakov is a principal of BMF Advance LLC, a company in the BMF group. Lubin denies any remaining allegations of paragraph 11.

12. Lubin admits that, by an Assignment and a Contribution Agreement made effective February 7, 2023, Spin assigned to Teton Life its rights and interests in the Golden Foothill promissory note, the related insurance policies and the Golden Foothill litigation, and that later agreements dated August 13, 2025 confirmed Teton Life as the sole assignee and holder of those rights (see NYSCEF Doc. No. 905, Index No. 650582/2022). Lubin refers to those documents for what Spin held and what it assigned, and denies any characterization inconsistent with them. Lubin denies the remaining allegations of paragraph 12.

13. Lubin admits that Spin signed a written General Assignment of Claims, Rights and Duties to JL Special Investments, LLC ("JL") dated April 24, 2025, and refers to that document for its terms, without conceding its validity, scope or effect. Lubin also refers to his response to paragraph 31, which describes other documents involving JL. Lubin denies that Spin or Teton

Life assigned or transferred collateral or other assets to Teton Funding or Teton Funding Group; neither company has ever held any assets. As to transfers of money to JL, Lubin states:

(a) The monthly statements located so far for Spin's three Bank of America accounts (ending 0029, 3657 and 3660), for March 2024 through February 2026, show three transfers from Spin to JL: $7,878.00 on October 2, 2025; $344.46 on October 23, 2025; and $3,500.00 on December 18, 2025.

(b) The same statements show eight transfers from JL to Spin between April 25, 2025 and February 3, 2026, totaling $33,906.00.

(c) The statements located so far for Teton Life's account (January 2023 through March 2025, and January and February 2026) show no transfer to JL.

(d) Statements for Spin's OptimumBank account for 2025, for Teton Life's account for April through December 2025, and for all of these accounts after February 2026 have not yet been located.

Lubin therefore lacks knowledge or information sufficient to form a belief about whether Spin or Teton Life made any other transfer to JL, and on that basis denies that allegation. Lubin denies the remaining allegations of paragraph 13.

14. Lubin admits that, before and after the petition date, Spin, and Teton Life as assignee of certain Spin rights, were parties to lawsuits to enforce rights under particular transactions. Lubin denies the remaining allegations of paragraph 14.

15. Lubin lacks knowledge or information sufficient to form a belief about the status of the Trustee's investigation, and therefore denies those allegations. Lubin denies that Spin's receipts are "essentially unaccounted for." He states that, beginning September 24, 2026, he gave the Trustee's counsel access to folders in his OneDrive holding Spin's deal records, and that he has continued to provide records since then. Lubin admits that he has stated that Spin used collections in its business, including to fund new transactions and to pay counsel in Spin's litigation, and denies the remaining allegations of paragraph 15.

16. Lubin admits that counterparties and others have filed suits, claims and counterclaims making the allegations described in paragraph 16. He denies that those allegations are true.

17. Lubin admits that those counterparties sought the relief described in paragraph 17, and denies that they are entitled to it.

18. Admitted.

19. Lubin admits that the actions identified in subparagraphs (a), (b) and (c) are pending. He admits that he and Spin are parties to the actions in subparagraphs (a) and (b). As to

subparagraph (c), he admits that Teton Life, as assignee of certain Spin rights, is the plaintiff, and that the defendants there filed a third-party action (Third-Party Index No. 595367/2022) naming Spin and Lubin as third-party defendants. Lubin denies the remaining allegations of paragraph 19, including any implication about the merits of those actions.

20. Lubin admits that the claims against him in those actions are subject to the automatic stay. He also admits that the Chapter 7 trustee of Excell Auto Group, Inc. moved for stay relief (Main Case ECF No. 119), which the Court has continued under an interim order (Main Case ECF No. 147). As to the Teton Life action, the New York court stayed that action by order dated January 15, 2026 (NYSCEF Doc. No. 999) and modified that order by decision and order filed July 28, 2026 (NYSCEF Doc. No. 1471); Lubin refers to those orders for their terms and denies the allegations of paragraph 20 to the extent they are inconsistent with them. He also refers to paragraph 1 of the relief granted in ECF No. 21 (Oct. 23, 2026), which stayed litigation against the Subject Entities other than Teton Life. Lubin lacks knowledge or information sufficient to form a belief about the remaining allegations of paragraph 20, and therefore denies them.

21. Lubin admits that in Index No. 650582/2022, Teton Life, as assignee of certain Spin rights, seeks to enforce rights in collateral provided under transactions with counterparties who are plaintiffs in the Golden Foothill RICO Case, and refers to the pleadings in that action. Lubin denies the remaining allegations of paragraph 21.

22. Paragraph 22 defines a term, and no response is required. To the extent a response is required, Lubin lacks knowledge or information sufficient to form a belief about the characterization in paragraph 22 of who is insured under, and who owns, each life insurance policy at issue, and on that basis denies it. He refers to the policies and the receivership orders for their terms.

23. Lubin admits that certain of the collateral rights at issue in the New York action arose from transactions originated by companies affiliated with BMF and later acquired by Spin. He also admits that the Leer counterparties assert claims arising from those transactions in both actions. He refers to the transaction and assignment documents for their terms. Lubin denies the remaining allegations of paragraph 23.

24. Lubin admits that the New York court appointed Fred Stevens, Esq. as receiver, and refers to the receiver orders for their scope. Lubin denies any implication that every life insurance policy constituting collateral is held by the receiver or that premiums on every such policy are being paid. See NYSCEF No. 1476 (Aug. 31, 2026) (identifying at least 24 additional policies that may constitute collateral). He lacks knowledge or information sufficient to form a belief about the current premium status of each policy.

25. Lubin admits that creditors of certain Spin counterparties have asserted the claims described in paragraph 25. He also admits that judgments have been entered in two matters arising from Spin's dealings with Excell Auto Group, and that those judgments are on appeal. Lubin denies that he or any Subject Entity participated in a scheme to interfere with any creditor's collateral or collection rights, and denies the remaining allegations of paragraph 25.

26. Lubin admits that the Michigan court entered findings and a judgment against Spin in the Franklin action, and that Spin appealed (Mich. Ct. App. No. 379467). He refers to the findings and judgment for their contents and amounts. Lubin was not a party to that action in his individual capacity, and he denies the remaining allegations of paragraph 26.

27. Lubin admits that, after jury verdicts, the Broward court entered judgments against him in favor of FVP and Franklin entities, and that those judgments and related orders are on appeal to the Fourth District Court of Appeal. He refers to the judgments for their amounts and terms. Lubin denies that he manipulated transactions or converted assets, and denies the remaining allegations of paragraph 27.

28. Lubin admits that on May 15, 2026 the Broward court entered an order imposing charging orders on, and authorizing foreclosure of, his transferable interests in Spin and Teton Funding (Filing No. 248282220), and that finding 6 of the order addresses the subjects described in paragraph 28. He refers to that order for its terms. Before the order was signed, Lubin filed a written objection to the proposed findings of domination, control and use of the corporate form to shield assets (Filing No. 248072766, May 13, 2026). At the May 13, 2026 hearing, in granting foreclosure as to the two companies, the court stated: "the declaration established that he is a sole member of the LLC" (May 13, 2026 Tr. 21:2–6). Lubin moved for rehearing on May 15, 2026 (Filing No. 248289419) and has appealed the order (Fla. 4th DCA No. 4D2026-1512). Lubin denies that the order determined that the assets of Spin or Teton Funding are his assets, denies that the corporate form of either company was used to shield assets from creditors, and denies the remaining allegations of paragraph 28.

***General allegations***

29. Lubin admits that, until October 15, 2026, he was the managing member of Spin, Teton Funding, Teton Funding Group and JL Special Investments, and acted for each in that capacity. As to Teton Life, he refers to ECF No. 21 at 2 n.1. Since October 15, 2026, ECF Nos. 5 and 21 have provided that "the Trustee has the sole authority to act in the stead of the Debtor as to any management or litigation decisions regarding the Subject Entities" (ECF No. 21 at 5 ¶ 2, as to entities other than Teton Life). Lubin disputes that provision and has appealed it, but has complied with it. Lubin denies the remaining allegations of paragraph 29, including "at all relevant times."

30. Lubin admits that, before October 15, 2026, he was an authorized signatory on bank accounts of the Subject Entities. Lubin denies that he had custody or control of all books and records of the Subject Entities at all relevant times. Certain records are held by third parties, including former counsel and the companies' former accountant and administrator. Lubin denies the remaining allegations of paragraph 30.

31. Lubin admits that he signed the documents described below, for Spin, for himself, or for JL Special Investments, LLC, as each document shows. He denies the remaining allegations of paragraph 31, including that he was able to "freely" move assets without regard to the entities' separate rights and obligations. Without conceding the validity, scope or effect of any document, Lubin states:

(a) March 17, 2025. Spin signed an Absolute Assignment to Lubin individually of Spin's rights under the January 28, 2022 Common Interest and Joint Litigation Agreement with Hi Bar Capital, LLC and related claims, "and no other." The document recites $10.00 and other good and valuable consideration. On March 17, 2025, Lubin paid $10.00 to Spin by bank transfer.

(b) March 20, 2025. Spin and Lubin signed an Assignment Agreement concerning Spin's rights in the Golden Foothill litigation and related promissory notes (Index No. 650582/2022, NYSCEF Doc. No. 824). The document recites mutual promises and $10.00 as consideration. Spin's bank statement shows a $10.00 transfer from Lubin's account to Spin's account on March 20, 2025.

(c) April 2, 2025. Lubin signed, individually and for JL Special Investments, LLC, an Assignment Agreement assigning to JL one-half of the rights he received under the March 20 agreement. He filed it, with his supporting affidavit, in the New York action on April 2, 2025 (NYSCEF Doc. Nos. 836–838). The document recites $10.00 as consideration. By a stipulation dated August 15, 2025, filed August 21, 2025 and so-ordered August 22, 2025 (NYSCEF Doc. Nos. 905, 909), Spin, Lubin and JL consented to Teton Life, LLC's substitution as plaintiff in place of Spin. Under a letter agreement dated August 13, 2025, to which Spin, Lubin and Teton Life are parties, any assignment by Spin of its rights in the Golden Foothill note, the related insurance policies and that litigation, other than to Teton Life, is null and void (Letter Agreement ¶ 5).

(d) April 24, 2025. Spin and JL Special Investments, LLC signed a General Assignment of Claims, Rights and Duties. The document recites mutual covenants and promises and other good and valuable consideration, assigns duties as well as rights, and states no cash price.

(e) When these documents were signed, rights Spin asserted were contested in litigation, including Franklin's claim in other courts that Spin's Excell-related claims had been assigned to Franklin, and their value was uncertain. Lubin's purpose was to protect Spin's rights and to

try to enforce them through an assignee. Upon information and belief, Lubin denies that the documents were made without fair consideration. Franklin had asserted that claim in its Broward counterclaims in 2024, before any of these documents was signed (see Part Two, ¶ 43).

(f) Lubin's response to paragraph 12 addresses Spin's earlier assignment to Teton Life, and his response to paragraph 13 describes the transfers between Spin and JL shown in the bank statements located so far. Lubin has described the documents he has identified so far and will supplement this response if he locates others.

32. Lubin admits that some creditors who filed proofs of claim in his case also assert claims against one or more Subject Entities. The largest of those claims (Claim Nos. 5, 6 and 17) rest on judgments that are on appeal or on claims that have not been liquidated, and Lubin disputes them. Lubin lacks knowledge or information sufficient to form a belief about whether a majority of the claimants are creditors of a Subject Entity, and on that basis denies that allegation.

33. Lubin admits that the plaintiffs in the Excell RICO Case and the Golden Foothill RICO Case also named Spin as a defendant. Lubin denies the remaining allegations of paragraph 33.

34. Lubin admits that his membership interests in the Subject Entities are among his significant assets, and that the resolution of claims by and against those companies affects the value of those interests. Lubin denies the remaining allegations of paragraph 34, including that extension of this case to, or substantive consolidation with, the Subject Entities is necessary or appropriate.

35. Denied. Extension and substantive consolidation would prejudice creditors and stakeholders of the Subject Entities, including the other member of Teton Life and persons holding participation interests in particular Spin transactions.

36. Lubin lacks knowledge or information sufficient to form a belief about the allegations of paragraph 36, and therefore denies them.

37. Paragraph 37 states a request to which no response is required. To the extent a response is required, Lubin agrees that notice to all creditors and stakeholders of each Subject Entity, including Teton Life's other member and persons holding participation interests in Spin transactions, must be given before any final adjudication. He denies the remaining allegations of paragraph 37.

***Count One — Extend proceedings***

38. Denied.

***Count Two — Extend stay***

39. Denied. Lubin states that he has not opposed a stay of litigation and enforcement against the Subject Entities like the stay in paragraph 1 of the relief granted in ECF No. 21 (see Oct. 22, 2026 Hr'g Tr. 33:18–22). He denies that the Trustee is entitled to the remaining relief sought in Count Two and prayer (b). That includes any restraint on the prosecution or protection of the Subject Entities' own claims, except on the safeguards requested in ECF Nos. 25 and 41.

***Count Three — Direct turnover***

40. Paragraph 40 states legal conclusions to which no response is required. To the extent a response is required, denied.

41. Lubin denies that he is in possession, custody or control of all assets, books and records of the Subject Entities. He states that he has provided, and will continue to provide, records in his possession as ECF No. 21 ¶ 4 requires. Lubin denies the remaining allegations of paragraph 41.

***Prayer for relief***

Lubin denies that the Trustee is entitled to any of the relief requested in paragraphs (a) through (d) of the Wherefore clause.

**DEFENSES**

Lubin asserts the following defenses. He does not assume any burden of proof that the law places on the Trustee.

**First Defense — No claim to extend the case to, or consolidate, non-debtor entities on the facts alleged.** The Subject Entities have not filed petitions, and no involuntary petition has been filed against them under 11 U.S.C. § 303. The Bankruptcy Court's equitable powers "must and can only be exercised within the confines of" the Bankruptcy Code. *Law v. Siegel*, 571 U.S. 415, 421 (2014) (quoting *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206 (1988)). The Complaint does not allege facts meeting the Third Circuit's standard for substantive consolidation. Courts in this Circuit have refused to use substantive consolidation to bring a non-debtor into bankruptcy, because doing so circumvents the requirements of 11 U.S.C. § 303. See *In re Lease-A-Fleet, Inc.*, 141 B.R. 869 (Bankr. E.D. Pa. 1992); *In re Ira S. Davis, Inc.*, No. 92-14259S, 1993 WL 384501 (Bankr. E.D. Pa. Sept. 22, 1993).

**Second Defense — The standard for substantive consolidation is not met, and narrower remedies exist.** Substantive consolidation "should be rare and, in any event, one of last resort after considering and rejecting other remedies." *In re Owens Corning*, 419 F.3d 195, 211 (3d Cir. 2005). The Complaint does not plead that the entities disregarded their separateness before the petition so significantly that their creditors relied on the breakdown of entity borders and

treated them as one legal entity. Nor does it plead that their assets and liabilities are so scrambled that separating them is prohibitive and would hurt all creditors. *Id.* Narrower remedies are available, including the preservation and reporting safeguards requested in ECF Nos. 25 and 41.

**Third Defense — Rights of persons not before the Court.** The relief sought would directly affect persons who are not parties and have not received notice. They include Teton Life's other member, persons holding participation interests in particular Spin transactions, and creditors of the Subject Entities. The Trustee acknowledges that such notice is needed (Compl. ¶ 37). No final relief may be entered without it. To the extent any of them is a required party under Fed. R. Civ. P. 19 (made applicable by Fed. R. Bankr. P. 7019), the Complaint fails to join them.

**Fourth Defense — Count Three is premature.** Count Three is expressly conditional on extension of this case to the Subject Entities. Absent such relief, their property is not property of Lubin's estate, and 11 U.S.C. § 542(a) does not reach it.

**Fifth Defense — Finding 6 of the May 15, 2026 Broward order does not establish alter ego or a basis for consolidation here.** Finding 6 was not necessary to the relief the Broward court granted. Foreclosure of a sole member's interest under section 605.0503(4), Florida Statutes, turns on whether the company has only one member and whether distributions under a charging order will satisfy the judgment within a reasonable time — matters the order addresses separately in findings 4 and 5. At the hearing, in granting foreclosure as to the two companies, the court stated: "the declaration established that he is a sole member of the LLC" (May 13, 2026 Tr. 21:2–6). Lubin objected in writing to finding 6 before the order was signed (Filing No. 248072766). The order is on appeal (Fla. 4th DCA No. 4D2026-1512). The Broward jury, asked whether "the corporate form of Spin Capital [was] formed or used for a fraudulent or improper purpose," answered "No" (Verdict Form, Oct. 6, 2025, Question 3; Part Two ¶ 67; Lubin Cert. Ex. C-8). Under Florida law, which governs the effect of a Florida order here (28 U.S.C. § 1738), an issue is precluded only if it was "a critical and necessary part of the prior determination," *Provident Life & Accident Ins. Co. v. Genovese*, 138 So. 3d 474, 477 (Fla. 4th DCA 2014); a judgment that is on appeal is not final for preclusion purposes, *Cohn v. City of Stuart*, 702 So. 2d 255, 255 (Fla. 4th DCA 1997); and Florida requires mutuality of parties, *Stogniew v. McQueen*, 656 So. 2d 917, 919 (Fla. 1995). Finding 6 therefore does not establish, in this proceeding, that any Subject Entity is Lubin's alter ego or that the corporate form of any Subject Entity was used for an improper purpose.

**Sixth Defense — Failure to state a claim.** The Complaint fails to state a claim on which relief can be granted.

**Wherefore**, as to Part One, Lubin asks the Court to deny the relief requested in the Complaint. His counterclaims follow as Part Two of this pleading.

Dated: New York, New York, November 9, 2026

Avrumi Lubin
Defendant, pro se, individually
605 West 42nd Street
New York, New York 10036
(718) 570-3796
josh@tetonfunding.com

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| Caption in Compliance with D.N.J. LBR 9004-1(b)<br><br>Avrumi Lubin<br>Defendant and Counterclaim-Plaintiff, pro se, individually<br>605 West 42nd Street<br>New York, New York 10036<br>(718) 570-3796<br>josh@tetonfunding.com | Case No. 26-17342 (EJO)<br>Chapter 11<br><br>Adv. Pro. No. 26-01494 (EJO)<br>Judge: Hon. Eamonn J. O'Hagan, U.S.B.J. |

In re:
**AVRUMI LUBIN** a/k/a Josh Lubin,
Debtor.

BENJAMIN A. STANZIALE, JR., CHAPTER 11 TRUSTEE FOR AVRUMI LUBIN a/k/a Josh Lubin,
Plaintiff,
v.
AVRUMI LUBIN; SPIN CAPITAL, LLC; TETON LIFE, LLC; TETON FUNDING, LLC; TETON FUNDING GROUP, LLC; and JL SPECIAL INVESTMENTS, LLC,
Defendants.

AVRUMI LUBIN,
Counterclaim-Plaintiff,
v.
BENJAMIN A. STANZIALE, JR., in his capacity as Chapter 11 Trustee; PATRICIA A. STAIANO; MATTHEW E. MOLOSHOK; FVP INVESTMENTS LLC; FVP OPPORTUNITY FUND III, LP; FVP SERVICING, LLC; FRANKLIN CAPITAL FUNDING, LLC; and FRANKLIN CAPITAL GROUP, LLC,
Counterclaim-Defendants.

## PART TWO — COUNTERCLAIMS

## COUNTERCLAIMS OF AVRUMI LUBIN, INDIVIDUALLY

Defendant Avrumi Lubin ("Lubin"), appearing pro se in his individual capacity only, asserts these counterclaims in his Answer, as Fed. R. Civ. P. 13 (made applicable by Fed. R. Bankr. P. 7013) provides. As to the counterclaim-defendants who are not yet parties, he files with this Answer a Motion for Leave and Joinder asking the Court to join them under Fed. R. Civ. P. 13(h), 19 and 20 and to direct the Clerk to issue summonses, to the extent leave is required. The facts stated on his personal knowledge are also set out in the Certification of Avrumi

Lubin filed with this Answer (the "Lubin Certification"), with the documents cited below attached to it as Exhibits C-1 through C-32.

## HOW THIS PLEADING MARKS ITS ALLEGATIONS

1. Lubin has made a reasonable inquiry into the facts stated below. Some allegations are made "on information and belief." Each one is identified that way, and each rests on the facts stated in the Part named at the end of that paragraph; Lubin identifies them as contentions that are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery (Fed. R. Bankr. P. 9011(b)(3)), because the facts are mainly in the hands of the Counterclaim-Defendants. Where Lubin has not found a document showing a fact, he says so.

2. Lubin does not speak for, and does not bind, Spin Capital, LLC ("Spin"), Teton Life, LLC ("Teton Life"), Teton Funding, LLC ("Teton Funding"), Teton Funding Group, LLC, or JL Special Investments, LLC (the "Subject Entities"). He asserts claims in his own name, as the Debtor and a party in interest (11 U.S.C. § 1109(b)). He does not assert any claim belonging to a Subject Entity. Where the relief he seeks would benefit the estate (Count II), he seeks it as a party in interest, and any recovery would go to the estate.

3. Where this pleading quotes a court paper, transcript or email, the quotation is word for word from the document, and the document, or the cited pages of it, is attached to the Lubin Certification.

## PARTIES

4. Lubin is the Debtor in this Chapter 11 case and a Defendant in this adversary proceeding.

5. Benjamin A. Stanziale, Jr. (the "Trustee") is the Chapter 11 trustee of Lubin's estate. The Court approved his appointment on September 28, 2026 (Main Case ECF No. 124). He is named in his capacity as Trustee. The only monetary relief sought against him is the surcharge requested in Count II — the remedy for a trustee's breach of fiduciary duty, which by its nature is borne by the trustee rather than by the estate (¶ 96). Lubin asserts no other claim against Mr. Stanziale in his individual capacity in this pleading, and reserves any such claim.

6. Patricia A. Staiano and Matthew E. Moloshok are lawyers at Hellring Lindeman Goldstein & Siegal LLP, counsel to the Trustee in this adversary proceeding ("Trustee's Counsel").

7. FVP Investments LLC, FVP Opportunity Fund III, LP and FVP Servicing, LLC (together, "FVP") are creditors in Lubin's case (FVP filed Claim No. 5) and are plaintiffs against Lubin in Adv. Pro. No. 26-01315.

8. Franklin Capital Group, LLC, a Michigan limited liability company, and Franklin Capital Funding, LLC, a Delaware limited liability company (together, "Franklin"), are the plaintiffs

against Lubin in Adv. Pro. No. 26-01339, and a proof of claim (Claim No. 6) has been filed in Lubin's case on Franklin's behalf. Franklin Capital Group, LLC has also used the name Wing Lake Partners, and appears in other courts as "Wing Lake Partners f/k/a Franklin Capital Group, LLC."

**JURISDICTION, VENUE AND CONSENT**

9. The Court has jurisdiction under 28 U.S.C. §§ 157 and 1334. These counterclaims arise in or relate to Case No. 26-17342 (EJO), a Chapter 11 case pending in the District of New Jersey, and to this adversary proceeding. Venue is proper under 28 U.S.C. § 1409.

10. **Statement under Fed. R. Bankr. P. 7008:** Lubin does not consent to the entry of final orders or judgment by the Bankruptcy Court on these counterclaims. To the extent any counterclaim is determined to be non-core, or one on which the Bankruptcy Court may not constitutionally enter final judgment, Lubin requests that the Court submit proposed findings of fact and conclusions of law to the District Court under 28 U.S.C. § 157(c)(1). Lubin does not consent by implication or conduct.

11. **Leave to the extent required (*Barton* doctrine).** These counterclaims are asserted in the court that appointed the Trustee, in the adversary proceeding the Trustee commenced, and concern his administration of this estate. Lubin submits that no leave is required for that reason. To the extent, if any, the *Barton* doctrine (see *In re VistaCare Group, LLC*, 678 F.3d 218, 232 (3d Cir. 2012)) is held to require leave of this Court before Lubin may assert counterclaims against the Trustee, or against the Trustee's counsel, for acts taken in their official roles, Lubin respectfully requests that leave here and in the Motion for Leave and Joinder filed with this Answer, and submits that the facts stated below show that the counterclaims are not without foundation. Should the Court determine that a separate motion is required, Lubin asks that the time to assert these counterclaims be preserved while it is decided.

11A. **Joinder.** Lubin asks the Court to join Ms. Staiano, Mr. Moloshok, FVP and Franklin as counterclaim-defendants under Fed. R. Civ. P. 13(h), 19 and 20, made applicable by Fed. R. Bankr. P. 7013, 7019 and 7020, and to direct the Clerk to issue summonses, by the Motion for Leave and Joinder filed with this Answer. The claims against them arise from the same series of events as the claims against the Trustee and share common questions of law and fact.

**FACTS**

***Part A — The Trustee's authority, and what he and his counsel said about it***

12. Lubin filed his Chapter 11 petition on June 25, 2026. The Court approved the Trustee's appointment on September 28, 2026.

13. On September 20, 2026, two days after the Trustee's appointment was noticed and before it was approved, Lubin wrote to the Trustee: "I want to put Spin Capital into bankruptcy and I believe you have the authority to do that in the event your appointment is granted." In the same email Lubin told the Trustee that he has dyslexia and asked him to keep emails short. The Trustee answered: "Do not do that. You have no authority to do that now." Lubin replied: "I obviously shouldn't do that (especially if I don't have authority) though should you do that?" and, later that day, "Would be great if my trustee can put spin into bankruptcy as a related case and have it all in one venue and in front of the same judge." (Lubin Cert. ¶ 13A; Ex. C-24.) Before the entry of ECF No. 5 on October 15, 2026, no court order limited Lubin's authority as Spin's sole member and manager. Lubin contends that the Trustee's statement that he had "no authority" was incorrect when made. The Trustee himself later certified that "it has not yet been judicially determined that I am authorized to act on behalf of the Subject Entities" (ECF No. 3-1 ¶ 23). A separate bankruptcy case for Spin, commenced on Spin's own petition by a person with authority, is different from extending Lubin's case to Spin without one. (Basis: Part A; ¶¶ 14–16.)

13A. On telephone calls between late September and early October 2026 — some with the Trustee and Ms. Staiano together, others with Ms. Staiano alone — Ms. Staiano told Lubin, in substance, that the Trustee held the exclusive authority to put Spin into bankruptcy and that Spin could go into bankruptcy only by the Trustee's decision. (Lubin Cert. ¶ 13A.) After the first week of October 2026, the Trustee and his counsel communicated with Lubin mainly in writing; the one further call before the Complaint was filed was a Microsoft Teams conference on the afternoon of October 13, 2026, described in ¶ 15A (id.; Lubin Cert. ¶ 15). Lubin believed what the Trustee had written and what Ms. Staiano said. That is why his emails from September 20 through October 7, 2026 asked the Trustee to act for Spin — on October 5, 2026: "The estate should file a complaint and seek immediate stay relief against SDNY and Michigan appeal and then get everything organized and investigate the litigation rights during the stay period and then put Spin (and JL) into bankruptcy" — and why Lubin did not himself cause Spin to file a petition, retain bankruptcy counsel for Spin, or take other protective steps for Spin before October 15, 2026, although no order then prevented him from doing so. (Ex. C-24.)

13B. The written instructions Lubin received in the first days of October 2026 pointed in different directions as to who could act for Spin. On October 1, 2026, at 12:36 PM, Ms. Staiano wrote to Spin's SDNY counsel, copying Lubin: "please do not file anything with the court in the interim." At 3:23 PM the same day she wrote to Lubin: "the Trustee takes no position on the filing you wish to make on Spin Capital's behalf. Keep us posted." On October 2, 2026, at 5:14 PM, she wrote to Lubin, copying the Trustee and Mr. Moloshok: "Spin, although owned by you, is a separate entity that is not in bankruptcy. ... [U]ntil such time as

the requested relief is granted (if the Court does grant the relief in its discretion), Ben cannot act or speak on behalf of Spin." (Ex. C-24.) Lubin does not allege that these instructions caused any particular filing to be lost.

14. While telling Lubin he had no authority, the Trustee's counsel wrote — to Lubin on October 2, 2026, and on October 9, 2026 to a broader audience that included Teton Life's New York counsel, a Florida lawyer and the Office of the United States Trustee — that the Trustee had none either. October 2: "Spin, although owned by you, is a separate entity that is not in bankruptcy. ... [U]ntil such time as the requested relief is granted ..., Ben cannot act or speak on behalf of Spin." October 9: "the Trustee does not have that authority at the present. ... You currently have autonomy over your entities and maintain that you want that in the future. How that is resolved is up to Judge O'Hagan." (Ex. C-24.) The October 9 email answered Lubin's demand for clarification of the Trustee's claimed authority over Teton Life's litigation, on a thread with Teton Life's lawyers, who had paused Teton Life's filings after speaking with Ms. Staiano (Part D ¶ 32). Lubin did not understand these statements to mean that he could act for Spin: read together with the Trustee's "You have no authority" and Ms. Staiano's statements on the telephone, Lubin understood that neither he nor the Trustee could act for Spin until the Court ruled, and that only the Trustee could bring that about. (Lubin Cert. ¶ 13A.)

15. On October 6 and 7, 2026, Ms. Staiano wrote that the Trustee would "file a complaint and order to show cause to bring Spin and JL into bankruptcy" and, when Lubin objected to the timing, that "your wish list is not realistic. The point of the extension proceeding is to afford Mr. Stanziale the authority to act on Spin's behalf and have the stay apply. We must proceed on this course." (Ex. C-24.) Six days later the Trustee applied ex parte for, and obtained, an order confirming his "sole authority" over the Subject Entities (¶ 16), and on October 21, 2026 the Trustee certified to the Court that "the Debtor (a non-attorney) has been improperly acting on behalf of Spin" (Supplemental Certification, ECF No. 18 ¶ 10) and that Lubin "continuously and relentlessly sends missives to me and my counsel, directing us to take positions and perform services on behalf of Spin" (id. ¶ 7) — the very requests Lubin had made because the Trustee had told him only the Trustee could act. On information and belief, the Trustee and his counsel gave Lubin one account of who held authority over Spin (that Lubin did not, and only the Trustee could act), gave others a different account (that the Trustee did not, and Lubin had "autonomy"), and then told the Court a third (that Lubin had been "improperly acting on behalf of Spin" and improperly "directing" the Trustee to act for Spin). On information and belief, the effect, and the purpose, of these inconsistent statements was to keep Lubin from acting for Spin in the weeks before October 15, 2026, while the Trustee prepared to obtain that authority without notice to him. (Basis: Exs. C-24, C-13; Lubin Cert. ¶ 13A; ¶¶ 13–15.)

15A. Mr. Moloshok took part in nearly every video call between Lubin and the Trustee's side in September and early October 2026. The one subject Lubin recalls Mr. Moloshok raising on those calls was the Trustee's plan to file a complaint to put Spin into its own bankruptcy: Mr. Moloshok said, in substance, that the Trustee would put FVP, Franklin and a number of others on notice, and that any party that believed it owned some of Spin's rights would have to object or would waive the right to claim those rights later by not objecting. Teton Life was not mentioned on that call. On more than one of those calls the Trustee's side also discussed working to have the Broward orders corrected, with the proviso that someone other than Spin, Teton Life or Lubin's other businesses would have to pay for that work (¶ 76). Neither the Trustee nor the Trustee's Counsel told Lubin, on any call or in any writing before October 15, 2026, that the complaint would ask the Court to extend Lubin's case to the Subject Entities on the strength of finding 6 of the May 15 Order, or would allege that the Subject Entities are Lubin's alter egos. The last of those calls was a Teams conference on October 13, 2026, beginning at 3:30 PM, which the Trustee's Counsel scheduled that afternoon at Lubin's request, with the Trustee, Ms. Staiano, Mr. Moloshok and Lubin. On October 15, 2026, at 12:51 AM — the day the Complaint was filed — Lubin wrote to Ms. Staiano, Mr. Moloshok and the Trustee, copying the Office of the United States Trustee: "On our October 13 call, I understood Matt to say that parties who do not object to the proposed entity proceeding could lose the ability to assert competing rights later. Please correct that understanding if necessary. Please provide the proposed complaint and order when available, identify which ownership issues they would adjudicate, explain how affected claimants would be named and served, and identify the legal basis and scope of any consequences of nonresponse. ... This email does not consent to entity bankruptcy filings or substantive consolidation." No one corrected that understanding, and the proposed complaint and order were not provided to Lubin before they were filed later that day. On October 16, 2026, at 12:37 AM, after receiving the entered order, Lubin wrote to Ms. Staiano: "It caught me off guard. To my knowledge, I received no advance notice of the application or a hearing before the order was entered." (Lubin Cert. ¶ 15; Ex. C-30.)

16. On October 15, 2026, the Trustee filed this adversary proceeding. In his certification, he stated that "it has not yet been judicially determined that I am authorized to act on behalf of the Subject Entities" (ECF No. 3-1 ¶ 23). The same day, the Court entered a temporary order (ECF No. 5).

17. On October 23, 2026, the Court entered an order (ECF No. 21). Paragraph 2 provides that "the Trustee has the sole authority to act in the stead of the Debtor as to any management or litigation decisions regarding the Subject Entities." As to Teton Life, the Court described Lubin as owning "a 50% interest in Teton Life, LLC with contractual rights to manage the company subject to consultation with the co-owner" (ECF No. 21 at 2 n.1).

18. Lubin disputes paragraph 2 of ECF No. 21. He has appealed it (ECF Nos. 24, 26) and asked the Court to alter or amend it (ECF Nos. 25, 41). He has complied with it while those requests are pending.

19. On October 25, 2026, Ms. Staiano wrote: "neither the Trustee nor I work for you or the Subject Entities."

***Part A-1 — The participants in Spin's deals, and what the Trustee was told about them***

19A. Spin funded its merchant-cash-advance transactions with money from participants — investors who hold contractual shares of particular deals and of the recoveries on them. Lubin owns 100% of Spin's membership interests; he does not own the participants' shares. (Lubin Cert. ¶ 6.) No participant is named in this pleading.

19B. Lubin disclosed the participants to this Court before the Trustee was appointed. At the July 23, 2026 hearing on FVP's motions, he told the Court: "I own Spin 100 percent but on these deals ... I don't own these participants. ... [O]ther people that are in these deals," and that FVP was "trying to foreclose on an entity that I own 100 percent when its participants in those deals, they're going to take all the money and keep it" (July 23, 2026 Hr'g Tr. 21:18–22, 22:10–14; Lubin Cert. Ex. C-27). He raised the participants with the Trustee's Counsel in writing on October 1, 2026, and on October 7, 2026 sent the Trustee and his counsel a participation agreement identifying a participant by name. The Trustee's own October 15, 2026 certification quotes that email, attaches it as Exhibit F, and states that "it is likely that there are other 'participants' in other 'participation deals' with Spin" (ECF No. 3-1 ¶ 27). On October 26, 2026, at 5:05 PM, a participant's representative sent Ms. Staiano the Bridgelink participation interests by name and percentage. (Lubin Cert. ¶ 13B; Exs. C-13, C-27.)

19C. After the October 15 order, Ms. Staiano told Lubin on a call that he had concealed the participants and had misled them, and demanded that he amend his schedules (Lubin believes it was the first call after the order; his calendar shows a Teams call with the Trustee and Ms. Staiano on the morning of October 19, 2026). She then wrote the same: October 25, 2026 — "it is incumbent you to amend your schedules. You advised that you 'made a mistake', for example, in not listing participants in Spin deals. You claimed on your petition and schedules that you are the 100% owner of Spin and the Trustee and other parties in the case relied on your sworn statement that what you put down is true"; October 26, 2026, 9:59 PM — "despite repeated requests you refuse to tell us who those investors are ... It is you, not the Trustee, preventing them from being heard by the court"; October 27, 2026 — "We have been asking for information regarding the identity of the participants since October 24." (Ex. C-27; Lubin Cert. ¶ 13B.) Each statement was made after the Trustee had quoted Lubin's participant disclosure in his own certification (¶ 19B), and the October 26 email was sent less than five hours after the Bridgelink participant list reached Ms. Staiano's inbox. On the point at issue,

Lubin's schedules are accurate: he owns 100% of Spin's membership interests; the participants own contractual shares of Spin's deals, not of Spin. (Lubin has separately identified items in his schedules and statements that he intends to amend with counsel's advice; this paragraph is about ownership of Spin only.) What Lubin had said, in an October 23, 2026 email, was that "the ownership structure of spin is complicated, because of the investors have a say in the business transaction, I may need to list them as investors on my personal schedules" — a question about how to describe the participants' interests, raised with the Trustee's counsel, not an admission that they had been hidden. On October 27, 2026, Lubin answered: "The record is clear that right after you were appointed I disclosed the [participant] agreement on October 7th 2026 and clearly mentioned below in the same email that Spin has investors. I didn't withhold any information." (Ex. C-27.)

19D. Ms. Staiano also demanded, beginning October 9, 2026, that Lubin amend his schedules ("Truthfulness on your schedules is a priority. You signed your petition under penalty of perjury. Amend and provide truthful answers if you have not done so."). On October 9, 2026, Lubin answered in writing that his schedules were true when signed, that the value of Spin's claims was unknown and not yet determined, and that any amendment would be made with counsel. On October 27, 2026, Ms. Staiano asked, "Did you file the amendment?" and, when Lubin answered that he had disclosed everything, whether the participant was "an owner, or a creditor of Spin" — a characterization question on which Lubin, who is not a lawyer, is entitled to counsel's advice before swearing. Lubin's personal counsel, who was copied, wrote the same evening: "You need to be careful with this stuff." (Ex. C-27.) Lubin has not amended his schedules, and will amend them only with counsel's advice, for two reasons: the Trustee has used Lubin's sworn statements against him (¶ 19C), and the description of the participants' interests — whether a participant is "an owner, or a creditor of Spin," as Ms. Staiano put it — is a legal characterization on which Lubin, who is not a lawyer, is entitled to advice. The Trustee's counsel have repeatedly urged Lubin to retain his own counsel, and the October 23, 2026 order preserves his right to do so; but the Trustee's position is that any lawyer for Spin or the other Subject Entities acts under the Trustee's direction — the engagement letter goes to the Trustee "for the Trustee's review and signature," the Trustee must see pleadings before they are filed, and "the Trustee must be consulted on all litigation decisions" (Oct. 27, 2026 emails; Part G) — so that the question of who may advise Lubin about Spin's affairs, and on whose instructions, is itself unresolved. Lubin asked the Trustee on November 4, 2026 to support court-approved independent handling of Spin's conflict matters (¶ 36A) and has asked this Court for the same relief. Schedules may be amended as of right until the case is closed (Fed. R. Bankr. P. 1009(a)). (Lubin Cert. ¶ 13B; Ex. C-27.)

***Part B — The Texas involuntary cases***

20. Spin holds a judgment against Cole Wayne Johnson and Cord Henry Johnson. On August 20, 2026, before the Trustee was appointed, Lubin authorized Texas counsel John C. Leininger to place Lubin's electronic signature, for Spin, on the involuntary petitions. On September 4, 2026, Century Bank, Huntington National Bank, Hunt Guillot & Associates, LLC, Spin and, on one petition, a fifth creditor filed involuntary Chapter 7 petitions against the Johnsons in the Northern District of Texas, Case Nos. 26-43993-MXM-7 and 26-43995-ELM-7, now jointly administered under No. 26-43993 (the "Texas Cases").

21. Mr. Leininger also represents Century Bank, another petitioning creditor.

22. On October 19, 2026, a "Statement Regarding Spin Capital, LLC" was filed in the Texas Cases (Doc. No. 24). It begins: "COMES NOW Spin Capital, LLC ("Spin") at the request of Benjamin A. Stanziale, Jr. in his capacity as Chapter 11 Trustee." It is signed by Mr. Leininger. The Texas docket describes it as "filed by Petitioning Creditor Century Bank."

23. On October 23, 2026, the petitioning creditors filed an omnibus response opposing the Johnsons' motions to dismiss (Texas Doc. No. 29). Mr. Leininger signed it as "Counsel for Century Bank and Spin Capital, LLC." It states: "The Lubin Trustee has authorized Spin Capital's joinder in this submission, subject to the Temporary Order" (¶ 14).

24. That response relies on Spin to make up the number of creditors the Bankruptcy Code requires: "If HGA qualifies, the Petitions need not depend on Spin Capital; if Spin Capital qualifies, the Court need not resolve HGA's eligibility to reach the required number" (¶ 41). It asks for collective administration, "including pro rata treatment within the applicable statutory categories," and says "the Petitioning Creditors seek a trustee who will act for the entire creditor body" (¶ 49).

25. The Johnsons have moved to require the petitioning creditors, including Spin, to post a bond (Texas Doc. Nos. 19, 22). Those motions are set for hearing on December 23, 2026 (Texas Doc. No. 28).

26. On October 29, 2026, Lubin wrote to the Trustee and the Trustee's Counsel: "Before October 15, while I still managed Spin, I never waived any conflict arising from Mr. Leininger's representation of Century Bank." He wrote: "I do not believe opposing dismissal is in the best interest of Spin or the investors who hold participations in the Bridgelink deal," and "I ask the Trustee to reconsider Spin's position before anything more is filed for Spin in the Johnson cases."

27. On information and belief, the Trustee has not obtained independent advice for Spin about whether staying in the Texas Cases serves Spin, has not obtained a written conflict waiver covering Mr. Leininger's joint representation, and has not changed Spin's position in the Texas Cases. (Basis: Part B.)

***Part C — Spin's Texas ranch claim***

28. On October 27, 2026, the Trustee filed Adv. Pro. No. 26-01532 in this Court in Spin's name against Johnson River Ranch, LLC, Bridgelink Investments, LLC and Red Leaf Investments, LLC (the "Ranch Action"). The complaint alleges that the challenged conveyance was recorded in Parker County, Texas on August 15, 2023 (Ranch Action Compl. ¶ 26).

29. The Ranch Action complaint asks the Court to "[c]onfirm that ... the Trustee may properly record a notice of lis pendens with the Parker County Clerk" (Ranch Action Compl. ¶ 45).

30. On October 21, 2026, at 11:10 AM, Lubin wrote to the Trustee, the Trustee's Counsel and Mr. Leininger, copying the Office of the United States Trustee, that the records he had provided "document five lot sales after Spin's judgment was affirmed, including July and August 2026 transactions, and additional financing," and that "[f]urther sales, encumbrances and dissipation of proceeds could materially impair recovery."

31. On information and belief, no notice of lis pendens has been recorded, the Ranch Action defendants have not been served, and the Trustee has no plan to protect Spin's Texas claims if the Ranch Action is dismissed before August 15, 2027. (Basis: Part C.)

***Part D — Teton Life's insurance policies and New York case***

32. Teton Life, as assignee of certain Spin rights, is the plaintiff in *Teton Life LLC v. Golden Foothill*, Index No. 650582/2022 (N.Y. Sup. Ct., N.Y. Cnty.) (the "New York Case"). Life insurance policies are the collateral at issue there. A temporary receiver (Fred Stevens) holds nine enumerated policies under the January 6, 2023 receivership order (NYSCEF No. 245). On August 31, 2026, Teton Life's New York counsel (Schlam Stone & Dolan) wrote to Justice Bannon that "at least 24 additional life insurance policies that may constitute Plaintiff's collateral" had been identified that are not within the receiver's enumerated authority, and that the relief "is time-sensitive because until the Receiver's authority over these policies is clear, they remain exposed to lapses, surrender, assignment, or change of beneficiary" (NYSCEF No. 1476 at 2–4; Lubin Cert. Ex. C-25). The same letter records that Spin advanced $1,409,439.56 to the receiver in 2023–2024 and that the receiver held about $9.38 million as of July 31, 2026 (id. at 3). Teton Life's New York counsel paused that motion on October 8–9, 2026, pending the Trustee's application, after communications with Ms. Staiano (Ex. C-24, § E).

32A. **The request to enforce a settlement against Teton Life.** At a settlement conference in the New York Case on November 25, 2025, Lubin signed, for Teton Life only, a one-page paper prepared that day. It states: "The parties have reached an agreement in principle. The following terms will govern the final agreement which will be drafted by plaintiff's counsel." It bears two signatures — "Avrumi (Josh) Lubin for TETON LIFE LLC" and "John Giardino

for CAP FACTOR LLC" — and no other (NYSCEF No. 1370). The New York court's order of the same day records that the parties "have reached and signed an agreement in principle and have requested a short adjournment to finalize the terms of the settlement" (NYSCEF No. 929). Teton Life's then-counsel prepared a draft "Confidential Settlement Agreement and Release" dated December 14, 2025, with signature blocks for Teton Life, Spin, the Leer parties, Cap Factor, the receiver and Zurich. By its terms it was to become effective only on the date the New York court so-ordered it, after Teton Life's counsel submitted it following delivery of specified policy documents (§ 1). The filed draft bears no signatures and, to Lubin's knowledge, no version of it was ever signed or submitted to be so-ordered (NYSCEF No. 1447). That draft also contains terms that are not in the November 25, 2025 paper, including a provision that, if Teton Life failed to fund a premium on a Zurich policy and Cap Factor paid it, the death-benefit split on that policy would shift to 65 percent for Cap Factor and 35 percent for Teton Life (id. ¶ 7); the paper provides a 65/35 split in Teton Life's favor with no such shift (NYSCEF No. 1370, item 4). On December 22, 2025, Lubin wrote to Teton Life's then-counsel and to Teton Life's other member, with the court-appointed receiver copied, that he was "not agreeing to any settlement," that the November 25 document "reflects an 'agreement in principle' that I am not proceeding with," and "[p]lease do not circulate the term sheet or draft settlement to opposing counsel" (Lubin Cert. ¶ 19C; Ex. C-32). On February 3, 2026, Teton Life's then-counsel wrote to Teton Life's other member, copying Lubin, that he needed to "engage with Josh and get him to come around as you're both members of Teton," and that "it's clearly not enough to say you want this settled" (NYSCEF No. 1407; see NYSCEF No. 1404 ¶ 9). Mr. Leer filed a Chapter 7 petition on January 14, 2026, and the New York court stayed the action the next day (NYSCEF No. 999). On May 1, 2026, Cap Factor and a group of intervenor-defendants — whose intervention was granted on December 15, 2025, after the November 25, 2025 paper was signed (NYSCEF No. 1509, finding (m)) — cross-moved to enforce that paper (NYSCEF Nos. 1368–1384). On May 3, 2026, Lubin directed Teton Life's then-counsel in writing to oppose; counsel did not, and instead moved to be relieved (NYSCEF Nos. 1393–1395); Lubin filed affirmations in opposition on May 3 and May 19, 2026 (NYSCEF Nos. 1385, 1404); and on June 3, 2026, Teton Life's new counsel moved for leave to file opposition papers, with Lubin's affirmation that "[i]t was never my intent, on behalf of plaintiff, that the Term Sheet would be binding or enforceable on its own" and that "an additional 'final agreement' would be prepared and executed before anyone was bound by anything" (NYSCEF Nos. 1419–1426; No. 1425 ¶¶ 8–9). On July 10, 2026, Cap Factor's counsel filed the unsigned December 14, 2025 draft, describing it as "the definitive Settlement Agreement drafted in accordance with the Settlement Term Sheet by attorney Jeffrey Chubak of Amini, counsel for Teton Life" (NYSCEF Nos. 1445, 1447). Cap Factor's counsel had earlier told the New York court, on

June 16, 2026, that "Teton Life submitted no opposition whatsoever to the cross-motions" and that Teton Life's then-counsel "did not oppose enforcement of the settlement, presumably given his client's execution of the settlement term sheet," and described the June 3, 2026 leave motion as "untimely" (NYSCEF No. 1427). The record shows that on May 19, 2026, before the argument, Lubin filed a notice that Teton Life's then-counsel had no actual authority from him "to consent to, approve, submit, join, or state non-objection to any proposed order, settlement-enforcement order, release, settlement document" (NYSCEF No. 1404 ¶ 5); that Teton Life's new counsel wrote on May 29, 2026 that the cross-motions "should be denied" because the November 25, 2025 paper "represented only an 'agreement in principle,' and contemplated the execution of a 'final agreement'" that "never occurred," so that it "is not independently enforceable" (NYSCEF No. 1415); and that the June 3, 2026 motion for leave to file opposition (Mot. Seq. No. 50) has not been decided. At the May 19, 2026 argument the court said that it would "put them all together and figure it out myself" and that a proposed order "may not come out as the order that you submit" (NYSCEF No. 1440, Tr. 38:17–24), and counsel for the intervenor-defendants said of the November 25, 2025 paper, "my clients were not parties at that time. I couldn't sign this agreement" (id., Tr. 27:11–13). On October 30, 2026, counsel for the intervenor-defendants asked Justice Bannon to sign Cap Factor's proposed "Order Directing Enforcement of Settlement Agreement," submitted May 29, 2026 (NYSCEF Nos. 1508, 1509). That order would declare the November 25, 2025 terms "an enforceable contract binding upon plaintiff Teton Life, LLC," direct the receiver to pay out the funds he holds within two days of service, transfer the policies, impose releases by Teton Life and Spin, and dismiss all causes of action other than those against Mr. Leer with prejudice (NYSCEF No. 1509 ¶¶ 3, 8–9, 16, 20; ECF No. 33-5, Ex. B). It recites that the November 25, 2025 memorandum "includes all terms necessary and sufficient to conclude a settlement of this action" (id., finding (i)), yet it includes the premium-default shift to "Cap Factor 65% and Teton 35%" that appears in the unsigned draft and not in the paper (id. ¶ 14), and it omits the paper's 70/30 division of the John Hancock claim (NYSCEF No. 1370, item 6). The October 30 letter states that "[n]o other party in this action has a claim to those funds" and that the investors "all wish to abide by the settlement"; it does not mention Teton Life's June 3, 2026 opposition papers or that the draft agreement filed on July 10, 2026 bears no signatures (NYSCEF No. 1508; ECF No. 33-5, Ex. A). To Lubin's knowledge, no paper has been filed for Teton Life in the New York Case since September 18, 2026 (NYSCEF No. 1501), and as of the date of this pleading no response to NYSCEF Nos. 1508–1509 has been filed for Teton Life or by the Trustee; the Trustee's Counsel's only submission in the New York Case is the November 3, 2026 letter described in ¶ 34, which was sent by email and does not appear on the docket. (Lubin Cert. ¶ 19C; Exs. C-31, C-32.)

33. On November 1, 2026, Lubin filed, in his own name, an order to show cause in the New York Case asking that court to modify its stay as to non-debtors and to preserve the policies (NYSCEF Nos. 1511–1529).

34. On November 3, 2026, Mr. Moloshok, for the Trustee's Counsel, wrote to Justice Bannon asking the New York court "not consider or act on Lubin's Order to Show Cause." The letter asserted that by filing it Lubin "directly violated the October 15 and 23 Bankruptcy Court Orders"; that "it is our understanding that all claims against Lubin were dismissed without prejudice and that he does not have a concrete personal interest (as opposed to an equity interest in one or more parties) at stake"; and that the Trustee "has spoken with numerous counsel to both Teton Life, LLC and other parties, as well as the Receiver, and is in the process of determining a path forward in this case in his business judgment." (Lubin Cert. Ex. C-28.) The letter did not say what the Trustee was doing to protect the policies.

35. Lubin asked the Trustee's Counsel in writing, repeatedly, for a preservation plan and written carrier status for the policies: on October 8 and 9, 2026 (Ex. C-24, § E); on October 29, 2026; on November 2, 2026, after Ms. Staiano answered "See you in court"; in his November 4, 2026 memorandum (request 1); and in his November 6, 2026 record-review request (request 2). (Lubin Cert. ¶¶ 19, 19A; Exs. C-12, C-26.) On October 29, 2026, Ms. Staiano wrote: "I am not responding until you identify the parties on this email ... we will not engage with you on substance. I will tell you that the Trustee and I spoke with the Receiver in NY today. He advises the policies are not at risk and I will engage with him to confirm in writing." (Ex. C-25.) No written confirmation has been provided, and nothing in the record shows that the receiver's assurance covered the 24 additional policies, which by Teton Life's own counsel's account lie outside his authority.

36. On information and belief, the Trustee has not obtained written carrier status for each policy, has no written preservation plan, has not caused Teton Life's counsel to resume the time-sensitive motion that counsel had described on August 31, 2026, and has not caused any response to be filed to the October 30, 2026 request that the New York court sign the enforcement order (¶ 32A). (Basis: Part D; Exs. C-24, C-25, C-26, C-31.)

36A. On November 4, 2026, Lubin sent the Trustee and the Trustee's Counsel a 16-page memorandum with Exhibits A–F identifying, court by court, Franklin's and FVP's claims to Spin's, Hi Bar's, Teton Life's and Teton Funding's rights, the adverse rulings, and the competing interests, and asking the Trustee to support an independent fiduciary for Spin, to settle or give up nothing of the Subject Entities until the Court rules, to keep Spin's recoveries separate, and to agree that no Subject Entity would be defaulted or bound by anyone's consent before counsel could answer. On November 6, 2026, Lubin sent a four-page record-review and preservation request with a 317-page indexed source binder, asking for the documents

reviewed before the Trustee relied on the May 15, 2026 order (Part I), the written receiver confirmation, and a preservation plan. On November 7, 2026, Lubin sent the Assignment, Spin's October and November 2021 bank statements and the June 11, 2025 and February 2, 2026 Kimball transcripts, and asked the Trustee to "obtain the actual bank confirmation identifying the remitter, payment date, amount and receiving account" for the $1.00 (Part H). (Lubin Cert. ¶ 19A; Ex. C-26.) The only substantive response was Ms. Staiano's November 6, 2026 email: "Since you have determined to copy the world demanding information, we assume you care nothing about privilege issues. The Trustee and I will report the status of our investigation to date in open court on Tuesday." (Ex. C-26.) Lubin acknowledges that his November 6, 12:10 PM email was copied to counsel for FVP, Franklin, the Excell trustee and others; his November 4 memorandum and November 6 request were sent only to the Trustee, his counsel and the Office of the United States Trustee.

***Part E — The collateral vehicles and FVP's and Franklin's claims***

37. On April 22, 2022, FVP's counsel told the Broward court that the Chapter 7 trustee of Excell Auto Group "agreed to undertake that action and collect and safeguard the vehicles" (Broward Hr'g Tr. 8:21–9:11, Apr. 22, 2022, CACE-22-005125).

38. FVP's December 16, 2025 Notice of Setoff in the Broward case states: "No payments have been received from any judgment debtors to date."

39. In or about July 2023, FVP's counsel told Hi Bar's then-counsel that the cars had been sold by Mr. Zankl and Mr. Farache. Lubin learned of that statement at the time, although he does not recall whether he was on the call. Hi Bar's then-counsel also told Lubin that Hi Bar had never authorized FVP to sell any of the vehicles, and Hi Bar's principal took the same position.

40. On October 7, 2026, Lubin sent the Trustee and his counsel a package listing the vehicle records to request and the car schedules. On October 31, 2026, Ms. Staiano offered to ask the Excell trustee for her records. Lubin answered the same day that he had already done that review and sent the results.

41. On information and belief, the Trustee has not obtained from the Excell trustee or from FVP the records showing what happened to the collateral vehicles and what credit is owed against FVP's and Franklin's claims. (Basis: Part E.)

***Part F — FVP's and Franklin's positions, and the Trustee's Counsel's communications with FVP's counsel***

42. Before the Trustee was appointed, FVP challenged the authority of counsel acting for a Subject Entity. On June 22, 2026, FVP filed a verified motion in Broward asking the court to require Teton Life to prove its counsel's authority, to strike filings made without it, and to

disqualify that counsel if authority was not established, and reserving "attorneys' fees, costs, and sanctions" (Filing # 250888524). The motion relied on Teton Life's operating agreement and on Lubin's June 3, 2026 affidavit; Lubin disputes its reading of both.

43. Franklin has stated in other courts that Spin assigned to Franklin "all Obligations, Merchant Documents, known and unknown claims, against the Debtor or This [sic] Parties" (Broward counterclaims ¶ 201, filed as Exhibit A to Dkt. 842 in Case No. 22-15627-EPK (Bankr. S.D. Fla.)). The scope of that 2021 assignment is disputed (Part H). This Court has not decided it.

44. On October 29, 2026, at 9:37 PM, Ms. Staiano added FVP's counsel, Jerry Breslin and Alan Karten, to an email thread with Lubin about Spin's Texas ranch claim. They were not on her 9:03 PM email on the same thread.

45. On November 2, 2026, at 5:09 PM, Ms. Staiano added Mr. Breslin and Mr. Karten to Lubin's email thread about his New York order to show cause. They were not on any earlier email in that thread.

46. At 5:34 PM, Mr. Karten wrote on that thread: "Avrumi Lubin is neither a plaintiff nor a defendant in the NY case. ... My research says that Lubin has no interest or standing in the NY litigation." He attached a petition from Lubin's landlord.

47. At 5:39 PM, Lubin asked Ms. Staiano to explain why she had added FVP's counsel. At 5:52 PM, Ms. Staiano wrote: "You are neither a plaintiff nor a defendant in the New York State case. ... How are you a party and what is your standing or interest in the NY state litigation?" At 5:53 PM she wrote: "I refer to Mr. Karten's email of today at 5:36 pm." She did not explain the additions. Lubin's 5:39 PM email had also asked: "Have FVP, Mr. Breslin, or Mr. Karten asserted any right to control, direct, or exercise my individual decision-making authority or the management or litigation authority of any Subject Entity?" None of Ms. Staiano's emails that evening answered that question.

47A. Ms. Staiano's 5:52 PM email repeats, nearly word for word, the docket numbers (50, 261 and 262) and the April 30, 2024 date in Mr. Karten's 5:34 PM email, sent about 17 minutes earlier. Neither email said that the third-party counterclaims against Lubin were dismissed "without prejudice," with the stated intention that the third-party plaintiffs could seek discovery and "if appropriate, reassert counterclaims" (NYSCEF No. 466 at 2 (Jan. 5, 2024)); that the New York court's 2026 orders still caption him as a third-party defendant (NYSCEF Nos. 999 (Jan. 15, 2026), 1471 (July 28, 2026)); or that the proposed order filed at NYSCEF No. 1509 on October 30, 2026 — which, to Lubin's knowledge, remains unsigned — recites that Lubin signed the settlement memorandum for Teton Life, directs that the Southern District of New York action be dismissed as against him by name, and would dismiss "all causes of

action" in the New York action with prejudice, including any third-party claim against him (NYSCEF No. 1509, finding (j), ¶¶ 15, 20; filed in this proceeding at ECF No. 33-5, Ex. B; see ¶ 32A). Mr. Moloshok's November 3, 2026 letter to the New York court acknowledged that the claims against Lubin "were dismissed without prejudice" (Ex. C-28). Lubin does not allege that Mr. Karten's 5:34 PM email caused Ms. Staiano's 5:09 PM demand, which came first; he alleges that her 5:52 PM email adopted Mr. Karten's 5:34 PM email. (Lubin Cert. ¶ 19B; Ex. C-29.)

48. On November 3, 2026, Mr. Moloshok asked the New York court not to consider Lubin's order to show cause (¶ 34; Ex. C-28).

49. Upon information and belief, the Trustee's Counsel and FVP's counsel have communicated outside Lubin's presence about Lubin's standing, the Subject Entities' claims and the positions the Trustee would take. The November 2, 2026 emails show one instance (¶¶ 46–47A). Lubin expects discovery to show the extent of those communications, and alleges on that basis that the Trustee's Counsel and FVP's counsel acted in concert in the respects described in Parts F and I. (Basis: Parts F and I; Fed. R. Bankr. P. 9011(b)(3).)

***Part G — Lubin's efforts to obtain counsel***

50. Lubin has tried, before and after the Trustee's appointment, to retain counsel to protect his personal interests and the interests of the Subject Entities. Lawyers approached about Spin's claims have raised the question of who owns and controls Spin's rights (Part H).

51. On September 22, 2026, after his New Jersey bankruptcy counsel's representation ended, Lubin wrote to the Trustee, copying the Office of the United States Trustee: "Me not having the ability to retain counsel will cause significant damage to the estate."

52. On October 18, 2026, Lubin wrote to the Trustee and the Trustee's Counsel that he intended to retain attorneys "as soon as the records allows me too." On October 19, 2026, Ms. Staiano replied: "How do you propose to pay for the attorneys you plan to retain? You listed $67 on your petition. Have you made money post petition? Are you generating funds from the subject entities? If so, how much?"

53. On October 26, 2026, Ms. Staiano reported that a Texas lawyer who had been approached about Spin's Texas claims "will not interact with Mr. Lubin." On October 27, 2026, that lawyer was reported as unable to "take the case."

54. On information and belief, prospective counsel for Spin's Texas claims declined after speaking with the Trustee or the Trustee's Counsel. (Basis: Parts F and G.)

***Part H — The 2021 Franklin assignment, the Hi Bar refinance, and what FVP and Franklin told each court about Spin, Hi Bar and Lubin***

*The assignment and its $1 condition*

55. In October 2021, Spin and Franklin Capital Group, LLC signed an "Assignment of Obligations and Merchant Documents" (the "Assignment"). It covers Spin's rights under two agreements with Excell Auto Group, Inc. and related companies: "the Revenue Purchase Agreement, dated as of June 1, 2021," and "the Revenue Purchase Agreement, dated as of July 9, 2021." The purchase price is $1.00. (Lubin Cert. Ex. C-1, filed in *Mehdipour v. Hi Bar Capital, LLC*, Adv. Pro. No. 23-01132-EPK (Bankr. S.D. Fla.), ECF No. 292-5.)

56. The Assignment does not list the August 31, 2021 agreement between Spin and Excell (the "Third Spin Contract").

57. Paragraph 2 of the Assignment provides: "Effective upon receipt by Assignor of the Purchase Price, which Purchase Price must be paid by Assignee to Assignor by no later than November 3, 2021 (the "Deadline") by wire transfer of immediately available funds in accordance with wire instructions set forth below." Paragraph 11 gives the wire instructions: Spin's account at TD Bank, account number ending 6504.

57A. Lubin never spoke with anyone at Franklin before signing the Assignment; Excell's principal, Scott Zankl, pressed him to sign it. On October 18, 2021, Spin sent Excell a balance letter stating $2,264,312.50 owed "in reference to the merchant Agreement entered into on or about 08/31/2021" — the Third Spin Contract — with wire instructions for Spin's TD account ending 6504 (Lubin Cert. Exs. C-16, C-23; see Ex. C-4 ¶ 182). Excell paid $150,000 on October 20, leaving $2,114,312.50. Mr. Zankl himself later filed that letter in the New York action, *Hi Bar Capital LLC v. Excell Auto Group, Inc.*, Index No. 502846/2022 (Sup. Ct. Kings Cnty.), NYSCEF Doc. No. 32 (Mar. 18, 2022) (Ex. C-23). On October 21, 2021, Mr. Zankl sent Lubin Franklin's draft Closing Statement and Authorization for the $6,000,000 loan, which allocated "Spin Capital $587,289.00" under "Purchase of Cash Advance Obligations" and set a "Cash Collateral Reserve" of $1,550,000.00 — together $2,137,289, within about $23,000 of the $2,114,312.50 then owed under the Third Spin Contract (Lubin Cert. Ex. C-19). On October 22, 2021, Franklin's DocuSign system sent Lubin a draft Assignment, prepared by Franklin's counsel (Bodman PLC), reciting that "[t]he total amount of the outstanding Obligations as of October 21, 2021 is $587,289.00" under the two listed contracts, a purchase price of $587,289.00 payable by October 27, 2021, and naming as "Assignor" "Spin Capital ... (collectively with Austin Business Finance, LLC ...)" — a different funder (Lubin Cert. Ex. C-20; Hi Bar Trial Ex. 14 in Adv. 23-01132). Lubin refused to sign it, told Mr. Zankl the real balance was about $2.1 million under the Third Spin Contract, and asked that the document say so. Franklin voided that envelope on October 25 and sent new versions on October 26, October 28 and November 1, 2021; the version signed on November 1 recited $1.00. (Lubin Cert. ¶ 3A; Exs. C-1, C-18.)

57B. Franklin's final Closing Statement and Authorization dated November 3, 2021 lists "Spin Capital $1.00" under the same heading, with the note "Remaining balances reported by Company as of 10/21/2021," and a "Cash Collateral Reserve" of $1,800,000.00. (Lubin Cert. Ex. C-17.)

57C. On information and belief, before November 3, 2021 Franklin knew of the Third Spin Contract and that Excell owed Spin about $2.1 million under it: Franklin's own draft closing statement allocated $587,289 to Spin and reserved $1,550,000 more; Franklin's own first draft of the Assignment recited $587,289 before Franklin substituted $1.00; and Spin's October 18, 2021 payoff letter was in Excell's hands. On information and belief, Franklin and Mr. Zankl sought to have Lubin sign an assignment reciting a balance that Lubin had told Mr. Zankl was wrong, so that Franklin could acquire Spin's senior position for a fraction of the balance, hold the remainder in reserve, and later contend that Lubin had misstated the balance. Lubin refused. (Basis: Part H; Lubin Cert. ¶¶ 3A–3C. Spin would not have accepted $587,289 for a balance of about $2.1 million; Lubin Cert. ¶ 3C.)

57D. Franklin has sued junior merchant-cash-advance funders of its borrowers before, seeking to stop their collections. In 2022 it sued two other funders of one of its borrowers in New York County, *Franklin Capital Funding, LLC v. Fora Fin. Advance LLC*, Index No. 153741/2022, 2022 N.Y. Slip Op. 33015(U) (Sup. Ct. N.Y. Cnty. Sept. 8, 2022) (preliminary injunction denied; one defendant dismissed for lack of personal jurisdiction), and it sued Hi Bar and Spin in Kings County over a different borrower's accounts, *Franklin Capital Funding, LLC v. Direct Equity LLC, AJ Equity Group LLC, Hi Bar Capital LLC and Spin Capital LLC*, Index No. 518279/2022 (Sup. Ct. Kings Cnty.) (complaint dismissed as against Hi Bar by decision filed Dec. 5, 2022, NYSCEF No. 39, and as against Spin on Feb. 16, 2023, NYSCEF No. 52). On information and belief, the $1,550,000 reserve in Franklin's October 21, 2021 draft closing statement was set aside against Spin's balance for use in the same way — to pay Spin a fraction, hold the rest, and litigate over the difference. (Basis: Part H; the court records cited in this paragraph.)

57E. Franklin's chief executive confirmed much of this under oath at the Excell adversary trial. Avrohom Yeshaya (Shaya) Baum testified that he is the CEO of Wing Lake Capital, "a d/b/a for all the Franklin entities" (Feb. 2, 2026 Trial Tr. 501:22–502:4); that Franklin's underwriters received the first two Spin contracts from Mr. Zankl in September 2021 but, "to the best of my knowledge, we never received" the third (Tr. 509:20–510:1, 510:18–19, 614:15–22); that he did not "recall speaking specifically with anyone from Spin until after the fact" (Tr. 513:3–4; 521:1–5; 600:17–18); that Franklin's counsel, Bodman, drafted the Assignment and "[y]ou sent those words to Spin Capital" (Tr. 618:23–619:3); that he did not know why the $587,289 figure appears in the unsigned October 22, 2021 draft and never asked anyone at his company

(Tr. 616:3–9, 616:23–617:3); that he could not say whether the $1.00 was ever paid ("I can't tell you definitively"; at deposition, "I am not certain whether or not the actual dollar, which would have cost more to send, was actually sent") (Tr. 597:19–598:8; 622:8–10); and that his basis for believing Spin and Hi Bar "conspired" was "[j]ust a lot of circumstantial evidence, like the exact dollar amount on the same day" (Tr. 629:22–630:3). (Lubin Cert. Ex. C-21.)

57F. Mr. Zankl testified that the proposal to move Spin's balance to his other business, Excell Auto Sport and Service, "wasn't anything that Josh thought of. It was actually Johnny and I" — "Johnny" being Jonathan Allayev of Diverse Capital, the broker on the Franklin loan who was paid a broker fee by Franklin — and that Lubin "at the last minute ... wouldn't do it" (Jan. 30, 2026 Trial Tr. 325:10–326:2; 251:9–20; 254:15–22); that Lubin "wouldn't give a payoff letter to Wing Lake" (Tr. 251:4–8) and that Mr. Zankl did not recall ever receiving a zero-balance letter from Spin (Tr. 340:10–341:1) — Spin never issued one, because Spin was a participant in the Hi Bar refinancing and Lubin would not represent to anyone that Excell owed Spin nothing (Lubin Cert. ¶ 3A-1); that he did not send Franklin the third Spin contract "because that's what I was instructed from Johnny" (Feb. 2, 2026 Trial Tr. 464:8–12) and "did not tell them" (Tr. 464:22–25); that he received the Hi Bar agreement while "on the golf course with ... some of the guys from Wing Lake" and did not tell them (Tr. 455:8–456:10; 461:10–14); that no one from Hi Bar ever pressured him and he had never spoken to Yisroel or Mordechai Herbst (Tr. 461:1–9); and that when he told Lubin the March 2022 Wing Lake affidavit was not his signature, "technically, you're correct," he was lying (Tr. 474:13–475:19). (Lubin Cert. Ex. C-22.)

57G. The record against Lubin on this subject is also disclosed here. On March 29, 2022, Mr. Zankl signed an affidavit prepared by Wing Lake stating that he "did not disclose these obligations to Franklin prior to closing on the loan because Spin Capital, among other entities, threatened me and advised me not to provide the information to Franklin," and that Lubin "offered to transfer" the balance to Hi Bar so that "Spin Capital could issue a payoff letter to represent to Franklin that the merchant cash advance had been paid off ... to deceive Franklin" (Excell Adv. Pl. Trial Ex. 118 ¶¶ 13–14, as read into the record and affirmed at Jan. 30, 2026 Trial Tr. 297:22–298:25). Lubin denies those statements. Mr. Zankl's own trial testimony (¶ 57F) attributes the transfer idea to himself and Mr. Allayev and the non-disclosure to Mr. Allayev's instruction; he admitted lying to Lubin about the same affidavit; and he was not a disinterested witness — he signed the affidavit for Franklin, his lender, after Franklin learned of the undisclosed debt (Feb. 2, 2026 Trial Tr. 517:9–15), and he testified under the Excell trustee's claims against him. The affidavit's statement that Spin would "issue a payoff letter to represent to Franklin that the merchant cash advance had been paid off" is contradicted by the record: no such letter was ever issued, as Mr. Zankl himself conceded (¶ 57F). The Michigan court's March 12, 2025 findings and the Broward jury's October 2025 verdict against Lubin on

Franklin's fraud count (¶¶ 61, 67) are also part of this record; Lubin disputes them and they are on appeal. Nothing in this pleading asks this Court to disturb those judgments; they are pleaded so that the Court has the whole record.

58. Spin's TD Bank statements for the account ending 6504 for October and November 2021 show no payment of any amount from Franklin Capital Group, Franklin Capital Funding or Wing Lake, and no payment of $1.00 from anyone. (Lubin Cert. Exs. C-2, C-3.) The same is true of Spin's statements for that account from May 2021 through January 2022. On information and belief, Franklin never paid the purchase price. (Basis: Part H.)

*The Hi Bar refinance*

59. The Third Spin Contract was refinanced by Hi Bar Capital, LLC ("Hi Bar"). On November 1, 2021, Hi Bar wired $2,114,312.50 to Spin's account ending 6504 ("WIRE TRANSFER INCOMING, HI BAR CAPITAL LLC — 2,114,312.50"). That was the balance Excell owed Spin, as FVP itself has pleaded: Spin's October 18, 2021 balance notice stated $2,264,312.50, and Excell paid $150,000 on October 20, 2021. (Lubin Cert. Ex. C-3; Ex. C-4 ¶ 182.)

60. The same day, Spin wired $2,114,312.50 to Hi Bar, at 3:22 PM Eastern, and Hi Bar wired $2,114,312.50 to Spin at 4:06 PM. Lubin signed the Assignment for Spin at 4:13 PM Eastern that afternoon. (Lubin Cert. ¶ 6; Feb. 3, 2026 Trial Tr. 811–813, Adv. Pro. No. 23-01132-EPK.) Spin provided Hi Bar the funds with which Hi Bar paid off the balance Excell owed Spin; Excell's obligation then ran to Hi Bar under Hi Bar's own agreement with Excell; Lubin's understanding was that money recovered on that obligation would go to Hi Bar, then back to Spin, and then to the participants in Spin's transaction. It was a refinance: the Spin obligation was paid and satisfied. Hi Bar also paid Spin $90,000 on November 3, 2021 and $300,000 on November 15, 2021. (Lubin Cert. ¶ 6; Ex. C-3.)

61. The Michigan court in *Franklin Capital Group, LLC v. Spin Capital, LLC*, No. 22-193300-CB (Oakland Cnty. Cir. Ct.), found in its March 12, 2025 findings that about $2,114,312.50 was owed by Excell to Spin on October 21, 2021 and that the $1.00 statement in the Assignment was false. Lubin and Spin dispute those findings; Spin appealed (Mich. Ct. App. No. 379467). Spin was not represented at the summary-disposition stage of that case.

62. In the Excell adversary proceeding, Judge Kimball ruled on June 11, 2025 that the Assignment is ambiguous as to whether the Third Spin Contract was assigned, that parol evidence is required, and that the evidence then before him was "not sufficient to permit a ruling for either side," and denied summary judgment. (Adv. Pro. No. 23-01132-EPK, ECF No. 317, Tr. 7:14–20; ECF No. 319.) On September 17, 2026, after trial, the same court said on the record that it "likely will find that Hi Bar's payment to Spin to refinance the third Spin contract resulted in a valid refinancing of the third Spin contract by way of the Hi Bar

contract," and that what the court described as "[t]he fraud perpetrated by the parties on Wing Lake" "does not result in Wing Lake becoming the owner of the third Spin contract" (Sept. 17, 2026 Tr. 20:9–18). Lubin disputes that any fraud was perpetrated on Franklin. The court's post-trial findings are pending.

*What FVP and Franklin told each court*

63. FVP and Franklin have pursued Spin, Hi Bar and Lubin in at least five courts, and have told those courts different things.

64. In *Mehdipour* and the related Auto Wholesale of Boca adversary proceeding (Adv. Pro. No. 22-01218-EPK), FVP and "Wing Lake Partners f/k/a Franklin Capital Group, LLC" filed, on November 2, 2022, a proposed "Joint Adversary Complaint" (ECF No. 120) with a motion for leave (ECF No. 118). Lubin was not a party. The pleading called Spin a "Non-party" (¶ 130) and alleged, among other things, that Hi Bar and Spin "are controlled by Josh Lubin" (¶ 132, "on information and belief"); that "Spin and Hi Bar colluded and conspired to defraud Wing Lake" (¶ 143); that "at Lubin's direction Hi Bar refiled its UCC Financing Statement" "to finalize the fraud" (¶ 165); that "no money was paid by Hi Bar to Spin" (¶ 139); and that the balance transfer "was simply a fiction invented by Lubin and his associates" (¶ 193, "on information and belief"). In the same pleading, FVP and Franklin alleged that Spin had agreed that any payment from the borrowers "would be held in trust for the benefit to Wing Lake" (¶ 142), and that Lubin had described the Hi Bar transaction to Excell's principal as a "no net refi" (¶ 183). (Lubin Cert. Ex. C-4.)

65. On November 14, 2022, Judge Kimball acted on his own: "This matter comes before the Court sua sponte." He wrote that "parts of the proposed amended primary complaint appear to seek relief beyond the subject matter jurisdiction of this Court." (ECF No. 128.) At the November 16, 2022 hearing he said: "if you're seeking a judgment against another creditor, there is no jurisdiction at all on a subject matter basis over such claims" (Tr. 10:1–4); "Potential punitive damages under 768.72, this is one creditor against another, I have no jurisdiction over that at all under Section 1334" (Tr. 21:1–3); and "you need to file that in some other court" (Tr. 21:14–16). On November 17, 2022, he denied the motion for leave (ECF No. 132 ¶ 1). (Lubin Cert. Exs. C-5, C-6.)

66. In Michigan, Franklin moved for leave to amend to allege that Spin and Hi Bar are alter egos. On April 4, 2023, the court denied the motion: "The factual predicate for an alter ego theory is simply lacking." (Lubin Cert. Ex. C-7.)

67. In Broward County, Florida (Case No. CACE-22-005125), FVP and Franklin pleaded that "Lubin is the Alter Ego of Spin" and tried those claims to a jury in September and October 2025. On the verdict form for the Franklin claims, the jury answered "yes" to Question 1 ("Did