# EXHIBIT C-21

Excerpts of the certified transcript of trial, February 2, 2026 (Volume III), Adv. Pro. No. 23-01132-EPK (Bankr. S.D. Fla.) — testimony of Avrohom Yeshaya Baum (Wing Lake / Franklin) — pp. 501–502, 509–510, 512–513, 518–519, 521–524, 549–551, 597–598, 616–617, 621–622, 629–630

Do you swear under penalty of perjury that the testimony you're about to give before this Court will be the truth, the whole truth, and nothing but the truth?

(Inaudible.)

THE COURT: Thank you. Have a seat.

Thereupon,

AVROHOM YESHAYA BAUM,

having been first duly sworn, was examined and testified as follows:

THE COURT: You don't need to be right on top of the microphone. Just don't let it get too far away from you.

THE WITNESS: Okay.

THE COURT: You don't need to bend.

THE WITNESS: Yeah.

THE COURT: Be comfortable.

Go ahead.

DIRECT EXAMINATION

BY MR. CRANE:

Q. Okay. Can you please state your name for the record?

A. Avrohom Yeshaya Baum.

Q. And what's your position at Wing Lake Capital?

A. I'm the CEO.

Q. And what is the relationship between Wing Lake Capital and Franklin Capital Funding, LLC?
A. Wing Lake is a d/b/a for all the Franklin entities.
Q. Okay, and how long has Wing Lake -- I'm just going to call it Wing Lake, has been in business?
A. So there are various kind of variations of the Franklin entities. The original Franklin Advisors, which focused on distressed companies on the asset side, is probably somewhere near 20 years at this point, and then on the debt side, which was Franklin Capital Group Management Funding, that was 2017. So about eight, nine years.
Q. Okay. So can you describe the current, or the business -- Wing Lake's business model, and whatever the division is that would deal with the merchant cash advance industry?
A. Yeah. So, the Wing Lake business model is fairly straightforward. It focuses on companies that ended up in the MCA, the merchant cash advance space. We look for two general reasons. The first one would be kind of a one-off event that set a company back. So for example, a contractor in Las Vegas takes out a merchant cash advance because Caesars files bankruptcy and doesn't pay him on time, he's got to make payroll on Thursday,

receive it?
A. I assume we did if he said he sent it.
MR. CRANE: Okay, and Exhibit Number 167.
BY MR. CRANE:
Q. And this is another email, September 8th of 2021, that Mr. Zankl testified that he sent to Mr. Nelson, and it's --
MR. CRANE: You can go down.
BY MR. CRANE:
Q. This is the -- what we refer to as the first Spin contract. It's June 1st of 2021. You would have received that.
A. Yep.
Q. Okay. Next, there's a September 8th, 2021 email from Mr. Zankl to Mr. Nelson, and we go down, and this is the July 9th, 2021 revenue purchase agreement between Excell and Spin Capital. Did you receive --
A. Yes.
Q. Did you receive that?
And then Mr. Zankl said he did not send the third Spin contract. Do you have any independent, any independent recollection of whether you actually did receive the third Spin contract prior to you funding a loan with Mr. -- or with Excell Auto Group?
A. No, to the best of my knowledge, we never

received it.

Q. Who is Johnny from Diverse?

A. These guys --

Q. I think his last name is --

A. -- go by so many names, it's hard to keep track.

But Johnny, I guess, was the MCA that was also the broker on this deal.

Q. Okay, and you know which Johnny I'm talking about, I'm assuming?

A. I've never met him. I don't even recall if I personally spoke to him, but I may have.

But, yes, he's -- let me use the right word here, yes, I know who you're talking about.

Q. Okay, and do you have any knowledge as to whether or not Mr. -- or Johnny from Diverse, I think it's 11, sent you the third Spin contract?

A. To the best of my knowledge, we never received it from anybody.

In fact, if I recall correctly, at the time when we signed the assignment agreement with them, I think they had dated a week prior to the closing, there was a zero balance with Spin in total. So I'm not sure how they would have even had a third contract.

MR. CRANE: Let's go to 33, please.

company, that had anything to do with this MCA, so we know that they're gone forever.

Q. Okay. Now, a lot has been made of the fact that the, in the recitals, the revenue purchase -- it only refers to the revenue purchase agreement dated as of June 1st of 2021, and the revenue purchase dated as of July 9th of 2021, and so is it your understanding that the assignment was limited to just those two merchant cash advance agreements with Spin?

A. No. I mean, specifically, that's why the next sentence says, any similar or related documents.

MR. CRANE: Okay. Can you go down for a second?

BY MR. CRANE:

Q. There's a representation made by Spin that the total amount of the outstanding obligations as of October 21st of 2021 is $1. Is that your understanding?

A. Yes.

Q. Did you have any knowledge that Spin, at that time, was alleging on September -- on October 21st, 2021 that it was actually owed substantially more money than $1?

A. No, or else why would they sign an agreement saying they're only owed $1?

Q. Okay. Had anyone from Spin contacted you,

and talked to you, and told you, hey, the amount is really more than the $1?

A. I don't recall speaking specifically with anyone from Spin until after the fact, when Josh sent me like a hundred messages. I had to block him multiple times, reported spam, so I still got them. He changed his phone number. He kept messaging me.

But other than that, I don't recall specifically communicating with them. I may have, but I don't recall.

MR. CRANE: And keep going down. Keep going. Okay. Go to 4.

BY MR. CRANE:

Q. Assignor represents and warrants to assignee that assignor's exact legal name and EIN are as set forth in the preamble above, the completed Form 9 provided to assignee by assignor, on or prior to the date hereof is true and accurate, and assignor has not sold, assigned, transferred, granted a participation in, or pledged the obligations, the merchant documents, or the third-party claims, and assignors -- and assignor owns the obligations, the merchant documents, and the third-party claims free and clear of any liens or encumbrances.

What does that mean to you?

A. I mean, basically as it's written. I think

what -- you know, the cash is fungible, right? So I don't know if it was from the revenue of other cars, or if it was the actual cash that came in and went straight to the MCA.

Q. Under the underlying agreement between Wing Lake and Excell, was Excell permitted to enter into additional cash advance agreements after the loan closed?

A. No, no one could take any debt without our written consent once we fund a deal. In fact, our UCC statement says that. It notices all creditors that prior -- that basically would be a violation of the loan documents for them to provide additional debt to the business.

MR. CRANE: Just give me one second. I'm almost done. Can I have one second just to confirm?

THE COURT: Go ahead, yeah. You don't need me to leave, I assume.

BY MR. CRANE:

Q. For the dollar regarding Spin, did Mr. Lubin provide you the wiring instructions for -- to pay the dollar?

A. I think it was in the assignment agreement. Typically, it's filled out at the time, yeah.

Q. Okay. Do you believe that Wing Lake authorized the dollar to be paid?

A. If it's in the closing statement, then typically that means that the wire was initiated on our end.

Q. Do you know whether or not the actual -- that $1 was actually truly paid?

A. To the best of my knowledge the wire was sent, so --

MR. CRANE: Okay. I think that's all I have. Thank you.

THE COURT: Anything else on this side?

(No verbal response.)

THE COURT: No?

Mr. Lubin.

CROSS-EXAMINATION

BY MR. LUBIN:

Q. Good afternoon, Mr. Baum. How are you today?

A. Great.

THE COURT: Oh, let me interrupt. Could you spell your entire name for the record? I don't think it was spelled.

THE WITNESS: Sure. My legal name is Avrohom, A-V-R-O-H-O-M, Yeshaya, Y-E-S-H-A-Y-A, and last name is Baum, B, like boy, A-U-M, like Mary.

THE COURT: Thank you.

have you ever had any communications with me or Spin Capital prior to November 1st, 2021?

A. Did I ever speak to you?

Q. Or any -- I'm the only principal but, yeah.

A. I don't recall.

Q. Okay. Did Mr. Zankl disclose the third Spin agreement to either you or any of the employees at Franklin that you're aware of?

A. To the best of my knowledge, no, we didn't know about it.

Q. Okay. Was a payoff letter for $2.1 million and change, that referenced the third Spin agreement, sent to Wing Lake and its affiliates from Zankl?

A. I don't recall.

If it was, it wasn't the one that was executed.

Q. If it was, it wasn't the one that was executed?

A. Correct, meaning it was not included in the assignment agreement.

Q. Why wasn't it included in the assignment agreement?

A. That's why I assume it wasn't sent, or else it would have been included.

Q. No, my question was, if a payoff letter

referencing specifically and only the third Spin contract, not even prior to, so I -- I sent Mr. Zankl information, nothing to do with the first two contracts, I sent him a payoff letter that specifically referenced only the third contract, not the first two contracts.

A. Okay.

Q. So, I don't know, where'd you get the details for the first two contracts from?

A. Is there a question?

Q. I believe I --

THE COURT: You made a statement, but you didn't ask him a question. It's okay to make a statement and say isn't that --

BY MR. LUBIN:

Q. Where'd you get the details for the first two Spin contracts dated, I believe, July 1st and August 31st?

A. I don't recall who sent them specifically to my underwriting team. I'm guessing it was either Scott or the broker on the deal.

Q. Okay. So you're saying under oath that you're confident that you, yourself, have not seen a payoff letter referencing specifically and only the third Spin contract, dated -- that one is dated, I believe, August 31st.

A. Yeah, I don't recall seeing a third Spin contract.
Q. You don't recall seeing a third Spin contract. Nothing can refresh your memory?
A. It's possible that I may have forgotten that there was an email sent. Clearly once we signed the assignment agreement, we didn't believe there was a third, or we would have referenced it in the agreement.
Q. I'm saying if you knew -- if you've seen -- specifically referencing a payoff letter, that specifically and only references the third Spin contract, it would be kind of strange to put the first two Spin contracts, right?
A. What's the question?
Q. Do you recall sending a -- do you recall that Franklin sent the DocuSign for -- multiple DocuSigns to josh@spincapital.com for -- hold on a second, my laptop turned back on.
Do you recall sending -- do you recall that an assignment for Spin Capital's UCC was sent for five hundred and eighty seven thousand dollars, two hundred -- $587,289?
A. Did you ask me if I sent that?
Q. Or someone in your company, do you recall that happening?

A. I don't remember a specific assignment that was sent. I think it's fairly typical in our deals that various versions of the assignment are sent. We can start underwriting a deal early on, because the MCAs, the terms are so aggressive, the numbers tend to change and come down as we get closer to a close. So generally speaking there will be various drafts circulated prior to closing.

Q. So that's not what I asked you. Yes, there were multiple drafts up to me, but I asked you if you recall a specific draft, or multiple drafts of $587,289?

A. Yeah, that's what I answered. I don't remember that specific dollar amount off the top of my head, I don't have it in front of me. I do know that it's typical for us to send various drafts of an assignment agreement.

MR. LUBIN: Let's go to Exhibit 33, Alan, if you can pull that up on the screen.

Okay. I'm going to have to go through this a little bit slowly, since I want to process it as you read this assignment.

BY MR. LUBIN:

Q. Can you read the recitals for me, please? Let's start from the assignment of obligation?

A. You want me to read the whole page?

Q. Yeah, but not in one -- not in 10 seconds.

Q. Okay. I don't know the exact date of this document, but on October 21st, Mr. Zankl sent a closing statement and authorization from Franklin, which purported a Spin Capital balance of $587,289. It also purports one point one million five hundred and fifty thousand dollars as a cash collateral reserve. What would that cash collateral reserve be for?

A. What would the cash collateral reserve be used for?

Q. Yeah.

A. It's fairly typical that when we close a deal, we have a cash collateral reserve to be used for various vendor payments for our borrowers.

Q. Has Franklin ever used that cash collateral reserve due to a CPLR statute in New York, to freeze junior creditors from collecting receivables, after taking assignment of a first position lien?

A. Can you repeat the question?

Q. Has Franklin or its affiliates ever used a cash collateral reserve due to a New York statute and filed a TRO against junior creditors?

MR. CRANE: Objection, relevance.

THE COURT: Yeah, what does that have to do with this lawsuit?

MR. LUBIN: It has -- because the cash

collateral reserve, and the Spin Capital balance come out to exactly the actual Spin Capital balance, which was two point (inaudible) million dollars and change.

THE WITNESS: I don't -- I didn't understand what you just said.

MR. LUBIN: In the -- there was -- Franklin sent documents that show a $587,289 purported Spin Capital balance --

THE COURT: Owing as of some date?

MR. LUBIN: October 21st, plus the cash collateral reserve of one point five million fifty thousand, comes out to exactly the actual balance of Spin Capital, and Franklin has used this tactic in a few dozen lawsuits in New York, where they take assignment of the first position lien, and they put in the cash collateral reserve, which under his CPLR you need to prevent the junior creditors from collecting on that deal.

How's it relevant over here? Because that is evidence that Franklin was aware of the third Spin contract.

THE COURT: Interesting.

MR. LUBIN: Yeah.

THE COURT: I don't think I understand anything that you just said, but I'll overrule the objection and let you ask the question so you can have a

record.

BY MR. LUBIN:

Q. Why does the cash collateral reserve from October 21st, and the purported Spin Capital balance, come out to the exact balance of the third Spin contract on October 21st?

MR. DORSEY: Objection, lack of foundation.

THE COURT: Sustained. Which means there's certain components of what you just asked that are not already in evidence, and so I have no way of evaluating the answer to the question, because part of your question that you just asked is unsupported already in the record.

Do you understand what I just said?

MR. LUBIN: Not fully, but okay.

THE COURT: Mr. Lubin, the document you're referring to, is it in evidence someplace, the payoff you referred to?

MR. LUBIN: I would assume likely, because all my emails are in evidence, and I think Alan uploaded everything but -- no, it will take hours, or days to find it. So I don't know the exhibit number for it, and it's probably in evidence, if I had to guess.

THE COURT: Does anyone know whether this, whatever he's referring to, is in evidence?

There's a friendlier side of the courtroom

October 21st is $1, which would mean that's the amount that is owed to Spin.

Q. Well, what did Franklin believe that the amount owed to Spin was at the time of this assignment?

A. The amount that's written on the assignment.

Q. Well, who prepared this assignment?

A. I'm guessing one of my attorneys.

Q. So Spin Capital never prepared this assignment, is that correct?

A. Like I said, I assume it was one of my attorneys. I don't know if sometimes they send it in a Word format, so the numbers can be changed by the recipient, but I'm not certain in this scenario. We do a lot of deals with assignments.

Q. But is it fair to say that Franklin wrote that the Spin obligations were $1 as of October 21st, 2021, and Spin didn't represent that?

A. They represented it by signing it.

Q. Well, do you have, do you have any proof that the dollar provided for was actually sent to Spin Capital?

A. I don't have anything with me showing it was sent. To the best of my knowledge, the wire was initiated, I think, at this time. This goes back to 2021, if I recall correctly. My attorneys were initiating the

wire. Since then the process has changed. So it would have come from my attorney's trust account, I think, in 2021. I don't remember exactly when we switched it.

Q. But you're not sure whether the dollar was actually sent?

A. I can't tell you with 100 percent certainty. I have no reason to assume that it was not sent. I'm fairly certain the wire was initiated.

Q. And I think you -- did you testify before that even if the dollar wasn't sent, you don't believe that it would have needed to have been.

A. Yeah, I mean, I'm not an attorney. However, I was told that there's a lot of case law that says if it's a nominal amount, it's not required to be sent, but I don't have a, kind of factual legal knowledge to that.

Q. And I think you testified before that you were not aware of the third Spin agreement, is that right, at the time, prior to your funding?

A. Yeah, to the best of my knowledge, we only knew about the two, which is why we only included the two in the agreement.

Q. And was it your understanding that the assignment would have prevented a prior refinance to Hi Bar Capital, for instance, from Spin?

A. I'm sorry, can you clarify the question?

Finance.

A. Oh, I didn't notice that, okay.

Q. Do you know why this $587,289 figure appears in this document?

A. No.

Q. Have you ever asked anybody at your company why there was a draft that had $587,289 being owed to Spin in this document?

A. No. It's fairly typical for us as the underwriting -- during our underwriting process, to have various different numbers. Again, I think I testified to this earlier also.

The MCA terms are so egregious that the balances tend to come down very quickly. So you may have a balance on a certain date, it changes, it comes -- they all have so many different entities and moving parts. Many times they'll forgive a balance, or let the borrower off the hook because they've paid so much. They have various, different -- early payoff agreements with their borrowers, they change names and numbers so quickly. So it's fairly standard for us to have a few different drafts before we get it signed, before we close.

Q. But despite the speculation as to why maybe things happened in this document, you don't know why $587,289 appears here?

A. No, other than the fact that it's fairly standard for us during underwriting for the numbers to change.

Q. And now with these assignments -- the assignment of obligation and merchant document form that we're seeing here --

A. Yes.

Q. -- is this something that is drafted by your lawyers?

A. Yes.

MR. LETO: And if we can go to the signed version, please, Charlie, which is Hi Bar Number 15.

BY MR. LETO:

Q. And this is the same one we were looking at before, this is the signed version.

All right, and there's a lot of back-and-forth with Mr. Lubin regarding the terms that are used, and what it means to be related. So I just want to focus on a couple of the terms that are in this document, okay?

A. Uh-huh.

Q. First of all, you agree with me that the only two revenue purchase agreements that are identified are of July 9th and June 1st of 2021, agreed?

A. That are identified in this agreement?

literally wrote it down as you said it.
A. Okay.
Q. So, are you fairly certain that the wire was initiated or are you not?
A. I'll repeat my answer, if my attorneys had a closing statement, and they had the money in their account, they've always sent out the wires. So I assume they did so in this scenario, too.
Q. Do you know one way or the other whether the dollar was paid to Spin Capital?
A. I can repeat my previous answer, but --
Q. I just want to know if you really know one way or the other whether it was sent?
A. I can't tell you definitively. I know that my attorneys should have followed the closing statement. So I'm fairly certain it was initiated, I'll use those terms.
Q. Fairly certain.
You remember I took your deposition on July 29th of this year, or of last year?
A. I don't remember now.
MR. LETO: Okay. If we could just pull up Mr. Baum's deposition, Page 41, Line 19.
BY MR. LETO:
Q. Sir, I asked you the following question, I

don't want you to assume anything for the purposes of this deposition. Do you know one way or the other whether this dollar was paid to Spin Capital?

Can you please read your answer?

A. Which question, do you have any evidence or ever seen --

Q. Nope, Line 22, please, that's the answer.

A. I'm sorry, I answered that before, I am not certain whether or not the actual dollar, which would have cost more to send, was actually sent.

Q. Thank you.

MR. LETO: Okay. You can take that down, Charlie.

Now if we could look at the closing statement, which is Plaintiff's 183?

BY MR. LETO:

Q. Okay. So this closing statement lists the payments that were made at closing by Franklin on behalf of Excell, correct?

A. Yes.

Q. All right. So it has the use of proceeds, $3.2 million to Diverse Capital, and there's the $2 there, and then Austin Business Finance, of $300,000 plus.

Now below that there are certain costs. What's this commitment fee of $165,000?

be truthful, too.
Q. When you know they exist?
A. Yeah. I mean, that's part of being truthful, is disclosing what you're owed.
Q. Understood, but in this particular case, you hadn't even heard of Hi Bar Capital at the time you initiated the funds from this loan, right?
A. Correct.
Q. Because Mr. Zankl didn't disclose to you the fact that he signed the MCA agreement while playing golf with individuals from your company?
A. And because Spin lied on the assignment agreement.
Q. But do you have any information to even suggest that Hi Bar knew that the assignment agreement was being discussed between your company and Spin?
A. I don't know, I don't know that Spin and Hi Bar had any conversations about the assignment.
Q. But you're not aware of any communications that exist showing that Hi Bar knew about this entire transaction between you and Spin?
A. No, I'm not aware of that. The only thing I know is, like, it was the exact dollar amount on the same day. It just seems like they conspired together to deceive me.

Q. But you have no facts to support that?
A. Just a lot of circumstantial evidence, like the exact dollar amount on the same day.
Q. Now in this particular case, did Franklin and the trustee enter into a common interest agreement?
A. In the Excell case, I think we did, yes.
MR. LETO: Can you pull up Hi Bar 19?
BY MR. LETO:
Q. And this is an agreement as of March of 2023. I'm sorry, I think I said the wrong date. March 7th, 2023.
A. Yes.
MR. LETO: Your Honor, I'd like to introduce the common interest agreement between Franklin and the trustee at this time.
MR. DORSEY: No objection.
THE COURT: That is 17?
MR. LETO: Hi Bar 19.
THE COURT: Oh, 19, I apologize.
Hi Bar 19 is admitted.
(Hi Bar Exhibit 19 was admitted into evidence.)
THE COURT: I think that leaves only 20, which you're not going to offer, right?
MR. LETO: That is correct, your Honor.