# EXHIBIT C-22

Excerpts of the certified transcripts of trial, January 30, 2026 (pp. 251–252, 254–255, 297–298, 325–327, 334–336, 338, 340–341) and February 2, 2026 (pp. 455–456, 461, 464, 474–475), Adv. Pro. No. 23-01132-EPK (Bankr. S.D. Fla.) — testimony of Scott Zankl

the documentation over for the, like you said in the beginning, for the MCAs, Spin, Diverse and GetBackd, that was for the eight million.

When they went to six million, then there wasn't enough cash flow to do the Spin. So Johnny and -- and -- and Josh were trying to figure out how to do this because he wasn't going to get the proceeds out of it and he wouldn't give a payoff letter to Wing Lake.

So I said to Johnny to -- to -- so then I had said, can we move it over to one of my other entities so it's not with Excell, that's what that text message is, is the balance that was owed. Can we move it to another business of mine --

Q. What was that --

A. -- that's not going to tangle up with Excell and then be a bother for Wing Lake.

Q. Was that something that Wing Lake had suggested -- Wing Lake, not Mr. Allayev, was that something that Wing Lake had suggested for you to do?

A. No, no, no.

Q. 543 through 550, all on -- on the next day, October 22nd, you're asking -- you're wanting him to -- to get this done, and so you're pushing Mr. Lubin to get you a payoff and sign other documents; is that correct?

A. I don't know if it -- no, I don't believe it

was a payoff. I think it was to get the -- the documents to move the balance over to the other entity.

Q. Okay, and at Text 550, Mr. Lubin states that he received the documents from Wing Lake. So he received those documents on October 22nd of 2021?

A. Yes, that's what it says.

Q. And between 550 -- Text Message 554 and 558, you were talking to him about the urgency of needing this to be done, you know, and -- and to talk; is that correct?

A. Yes, yes.

Q. What was going on with Wing Lake at the time?

A. They just needed the documents -- I guess it was one document from each one of the MCA companies, they had to sign off on it.

Q. Okay, and then at 570 you're -- you're further trying to push him to get it done?

MR. RIGOLI: You said 570.

MR. CRANE: 570, sorry.

BY MR. CRANE:

Q. At 570, October 25, 2021; is that correct?

A. Yes, I am, yes. I think myself and Johnny, we were all putting -- everyone was putting pressure on everybody.

Q. Okay. At 583 and 580 -- 583 and 584, what's

documents are necessary?

A. Yes.

Q. And when he's asking for six months of bank statements and the previous year's tax return, that was for Excell Auto Sport and Service?

A. Yes.

Q. And at Text 590 and 591, he asked, he said -- stated he didn't get the stips and you sent Wing Lake updated UCC; correct?

A. Yes, yes.

Q. And then between 593 and 596, you're still talking to Mr. Lubin about stips -- stipulations for the repair shop, correct, and that would be Excell Auto Sport and Service?

A. Yes.

Q. Did Mr. Lubin agree to -- for Spin to transfer the balance to Excell Auto Sport and Service?

A. No, no, he didn't.

Q. What was the reason he gave you that he wouldn't do it?

A. He didn't really give me a reason. It was at the last -- it was at the last minute, too. He didn't really give me a reason.

Q. What would that have done to your -- if he didn't sign the payoff, what would that have done to your

deal with Wing Lake?
A. Well, that's when -- that's -- well, they wouldn't have funded it. Yeah, Wing Lake would not have funded it if he didn't sign the payoff letter.
Q. In your discussions with Wing Lake, did they make it clear to you that they didn't want Excell Auto Sport -- or excuse me, Excell to have any more MCA debt?
A. We just discussed the ones that were current, that was it.
Q. They wanted to make sure that you did not end up still owing MCA debt, isn't that pretty much their business model?
A. Correct, as long -- in different entities, no, but in that one, yes.
Q. For Excell?
A. Yes.
Q. They wanted to make sure Excell, they were -- the primary borrower from -- from Wing Lake was Excell.
A. Correct.
Q. And they -- and I've -- and they wanted to make sure that Excell did not have any more, you know, MCA debt going forward; correct?
A. Yes.
Q. And -- and any of the debt would have been satisfied?

understand, this is you speaking, that if Spin Capital, among other entities, were to receive any further payments from Excell Auto Group or its affiliates, those payments would have been paid to -- been paid promptly to Excell under the assignment agreement; is that correct?

A. Yes.

Q. Okay, and then you said, Excell Auto Group and its affiliates had entered into merchant cash advance agreements with Spin Capital, among other merchant advance companies, prior to obtaining the loan from Franklin; is that correct?

A. Yes.

Q. And under the merchant cash -- this is now Paragraph 12. Under the merchant cash advance agreements between Excell Auto Group and its affiliates and Spin Capital, among other entities, Excell Auto Group had received funding in exchange for authorizing Spin Capital and other entities to make periodic withdrawals from a designated bank account or otherwise making payments to the merchant cash advance companies; is that accurate?

A. Yes.

Q. Okay, and 13, that I, being you, did not disclose these obligations to Franklin prior to closing on the loan because Spin Capital, among other entities, threatened me and advised me not to provide the

information to Franklin; is that correct?
A. Yes.
Q. And then 14, prior to closing on the loan with Franklin, I was concerned because I understood that I needed to show Franklin that the merchant cash advance from Spin Capital had been paid off as a condition of closing.
I expressed my -- this is you. I expressed my concerns to a representative of -- of Spin Capital on the telephone. Upon information and belief, I spoke to Josh Lubin, who offered to transfer Excell Auto Group's balance on the merchant cash advance to Hi Bar Capital, another merchant cash advance company in which Lubin stated he also had an interest.
Lubin then -- said, then Spin Capital could issue a payoff letter to represent to Franklin that the merchant cash advance had been paid off.
Lubin made these representations on behalf of both Spin Capital and Hi Bar Capital in an effort to induce me to enter into a more onerous agreement with Hi Bar Capital, and to deceive Franklin and avoid the obligations under the assignment agreement; is that correct?
A. That is correct, and it's also -- there's also Diverse Capital, both of them were pressuring me.

and then I got involved after the fact.

Q. Okay, and if I understood what you said earlier, you guys went to Franklin with a proposal for eight million. Franklin said we can't do that, we can do six; correct?

A. Yes.

Q. Six was a problem because it didn't cover all the Spin debt and all the Diverse Capital debt?

A. Right.

Q. And so you and Mr. Lubin separately agreed, okay, we'll take the Spin debt, we'll put it on Excell Auto Sport and Service, and that way Excell Auto Group, the primary obligor, can still get the Franklin loan?

A. No, it wasn't anything that Josh thought of. It was actually Johnny and I. Johnny's the one that thought of it and told me, why don't we do this, that'll help.

So then I called Josh and asked Josh if he would do that.

Q. And did Josh initially agree to this?

A. No, he just said, send over all the financials.

Q. Okay. So at what -- did there come a point in time where there was a decision not to transfer the Spin debt to Excell Auto Sport and Service?

A. Yes, he -- Josh had decided at the last minute he wouldn't do it.
Q. So what did he suggest as an alternative?
A. He wasn't going to do anything except just transfer it to Hi Bar the way it was originally from Excell.
Q. Transfer --
A. The current Spin to Hi Bar.
Q. Why would he do that?
A. Well, he had to do that -- we did that because of -- that was the only way that he was going to get money and Johnny was going to get his loan paid off.
Q. Why?
A. Because Franklin wouldn't have funded the deal.
Q. Okay. So there are a lot of moving pieces, I just want to make sure I understand this.
Franklin would not have funded the deal if it had known about Excell owing Spin money, so Spin transferred the balance to Hi Bar so Franklin wouldn't know about that and it would fund the deal?
A. Right. Well, they wouldn't fund the deal without Josh signing something that they sent out to the MCA guys showing -- I don't know, I never saw the document. I don't remember what it -- I might have seen

it, but I don't remember what it says. But Franklin was -- sent it out to Diverse and -- and -- and GetBackd and to Josh, and they had to sign that, stating that -- whether they were paid off or what the debt number was. I don't recall.

I don't think -- I may have seen the document, I don't remember what it says, but they wouldn't fund the deal without that document signed.

Q. And Mr. Lubin eventually signed an assignment agreement on behalf of Spin?

A. Yes.

Q. And the deal closed?

A. Yes.

Q. And Excell got the loan?

A. Yes.

Q. And were certain of those loan proceeds then used to pay the debt now held by Hi Bar?

A. Some of it was, not -- not -- yeah, some of it was.

MR. DORSEY: Jason, can you pull up Trustee's Exhibit 51, please?

Thank you, and scroll out a little bit. Okay.

BY MR. DORSEY:

Q. So, Mr. Zankl, this has been admitted into

Did I send you a payoff letter for just the third contract that did not reference the first two contracts?

A. I know I asked for it, I don't know if -- I don't know if you ever sent it. I can't recall. You may have, I don't know.

Q. Your lawyer uploaded it as an exhibit in -- in the New York case, so I would assume that he probably got it from you.

I did send it and yeah, it was about $2.1 million stated on the -- on the letter, and Franklin --

MR. DORSEY: Objection, he's not asking a question.

THE COURT: Well, let -- let's -- let's give Mr. Lubin a moment --

MR. LUBIN: I'm about to ask a question.

THE COURT: So hold on, hold on. It's okay to make a statement and then ask, is this true or is this not true --

MR. LUBIN: Okay.

THE COURT: -- okay. So but make sure that your goal is to get Mr. Zankl to answer a question.

You can testify later for yourself, someone else will probably call you as a witness, but you should

avoid making statements. Make sure there's a question, okay?

MR. LUBIN: Okay. You'll warn me, probably have to warn me a couple more times until I get that right.

THE COURT: That's okay.

BY MR. LUBIN:

Q. Did Franklin send Spin an assignment for, I believe, either five or $600,000 and change?

A. I don't remember. I don't recall what the exact dollar amount was.

Q. But there was a --

A. You would -- you would know because he sent it to you; right?

Q. Correct. It was about five, $600,000. A few of them had referenced other -- I almost signed one with -- with someone else's entity on there, but that's -- yeah.

Did you ask me to sign the assignment for -- the five, $600,000 assignment, and then said you're going to pay the rest of the balance from another company?

A. No, I don't recall that.

Q. From Excell Auto Sports and Service?

A. Well, I asked you to take the current MCA that I had with Excell and transfer that to Sport and

Service, yes, I did ask you to do that.
Q. Right, but you asked me to take some funds from Franklin and then remove Excell as a creditor and only have Excell -- Excell Auto Group as a creditor and put the body shop as -- as the creditor; correct?
A. Yeah, I asked you to take the -- I asked you to refinance the debt, like you did with Hi Bar, but I asked you to do it from --
Q. We're not talking about Hi Bar.
A. -- Excell to the Sport and Service Shop. Yes, I did ask you to do that.
Q. And I refused to do so; correct?
A. Not in the beginning. You did, though. Yes, you said --
Q. I said I'm going to consult with a lawyer.
A. No, you said let's send the financials, send the bank statements, send over everything.
Q. Correct, right.
A. And then I kept pressing you on it, Johnny was pressing you on it, and then at the last minute, you said no.
Q. You sent me bank statements -- no, you just refreshed my memory. Thank you.
You sent me bank statements for Excell -- the body shop, I don't know the exact name, and it was --

Q. Okay. I refused to do it; right? That's a yes or no question.
A. Yes.
Q. Then at one point, I -- you mentioned to me that you're going to file bankruptcy if -- if this Franklin deal doesn't fund. And I told you that they can have my lien for free, the Spin lien for free, it only has a few months left, I don't -- I don't care whether they're senior or not; is that correct?
A. I don't think I ever said to you I was going to file bankruptcy, no. I never talked to you about bankruptcy, because this was going on in September --
Q. Right.
A. -- October.
Q. Yeah.
A. This -- this was in October. I never talked to you about bankruptcy in October of '21.
Q. Okay. That's your statement on the record.
Did I mention to you at one point that Franklin can -- after refusing to accept the five, $600,000 assignment, did I mention to you that I'll -- I'll give them the lien for free?
A. No, I don't remember that. Why would you give it to them for free? That doesn't make sense.
Q. I didn't -- am I allowed to answer his

A. No, that's what -- that's what we, you and I and Johnny had discussed, you were going to do a zero balance because that's what you ended up signing, right, is a zero -- you signed a zero balance letter to Wing Lake --

Q. No.

A. -- because you transferred it over to Hi Bar.

Q. No, it's in my testimony.

Did you request a zero balance letter for me, from -- or Spin?

A. No, I did not personally request that, no.

Q. You did, but okay. Did Spin provide a zero balance letter?

A. Yes.

Q. On paper? We're not talking about the Franklin assignments. Spin provided a zero balance letter?

A. No, I'm -- are you referring to the document that's -- that Wing Lake had you sign?

Q. No, no, we're not talking about that document, no.

A. Oh, no, no, I don't have a -- no, no.

Q. That's going to be for Monday.

A. No, no, I don't remember you ever sending a

zero balance letter to me, no, I don't believe so.
Q. I mean, Franklin alleges in four or five lawsuits in three states that Spin provided a zero balance letter.
So you're telling me that --
A. No, I'm saying I don't recall. I don't remember. You may have --
Q. Provide a --
A. -- but I don't remember.
Q. -- zero balance letter that said Spin's name on it, maybe, is that possible?
A. I don't -- that I do not recall. I'm not saying it didn't happen, I just don't recall that.
Q. Okay. But you don't -- you don't believe I sent -- Spin sent you a zero balance letter?
A. I don't remember if you did. I know you signed the Wing Lake Affidavit as a zero balance, I know that.
Q. I didn't sign any affidavit with Wing Lake.
Okay. From my recollection, I don't even know whether -- I saw the allegations. I don't know if that document --
THE COURT: Well, right now --
MR. LUBIN: Is questions, okay.
THE COURT: Thank you.

was around October 27th, is the date that it became effective, but I think you signed a few days later?

A. I believe so, yes.

Q. Tell us where you were when you signed that document.

A. Well, the first -- I think there was actually two different signings, if I remember correctly. The first time I got the contract from him, I was actually on the golf course with the gentlemen -- some of the guys from Wing Lake.

Q. And when you were with the gentlemen from Wing Lake on the golf course, and you received the Hi Bar MCA, did you tell the Franklin folks or the Wing Lake folks, hey, I'm about to sign this MCA agreement?

A. No, because at that point in time, I still, I still was under the impression that it was being moved over to the Excell Sport & Service Shop. I didn't find out that we weren't doing that until that day, until right then, just before it was sent.

Q. Okay, but then you saw it.

A. Well, I did. I was -- it's hard on my phone but, yes. I didn't, I didn't go through it line by line and read every inch of it, no.

Q. And you found out before you went onto the golf course that nothing was going to be transferred to

the Auto Service Shop?
A. Just before you sent the DocuSign. It wasn't before I got on the golf course.
Q. All right. Well, while you're on the golf course you figured this out?
A. Yes, that's what I was told, yes.
Q. And then you received the MCA agreement?
A. Yes.
Q. And you didn't tell the Wing Lake folks that you have this MCA agreement that you're going to sign?
A. No.
Q. Why?
A. Well, that's why I was also delayed. I just was under the pressure from Josh and from Johnny, from Diverse, because they wanted their money, and that was the only way that I was going to be able to get them paid, is if I did that deal with Wing Lake, especially Diverse, they got paid in full. There was no way for me to do it at that point in time.
Q. And that's why you didn't tell Wing Lake that you were going to sign another MCA agreement?
A. No, that's why I did sign it, was so they could get paid, so they could stop coming after me.
Q. But signing the Hi Bar MCA agreement was not going to get them paid.

Q. Did anybody from Hi Bar -- and when I say anybody from Hi Bar, I mean did Mordechai Herbst, Yisroel Herbst, did Joel Getter ever pressure you in any way to sign any document?
A. Just Josh.
Q. Then you've never spoken to Yisroel Herbst?
A. No, I don't believe so.
Q. And you've never spoken to Mordechai Herbst?
A. No, I don't believe so.
Q. And when you were dealing with Wing Lake, I know you were on the golf course. You didn't tell them about this MCA agreement that you were going to sign with Hi Bar, right?
A. Yes.
Q. And you also didn't send them the third Spin contract either, right?
A. No.
Q. I'm right, you didn't send them --
A. Yes.
Q. Okay.
A. Yes, yes.
Q. Why not?
A. Well, like I said in the beginning, I had sent everything over to Johnny in the beginning, so he sent everything up to them, then I got involved after the

but it wasn't $2 million.

Q. Well, did you not send the third contract, because at that point Wing Lake had told you they were not going to give you $8 million, they were going to give you $6 million, and if you had sent the third contract, it would have been above the amount that they were willing to loan?

A. If I recall correctly, I didn't -- the third one wasn't sent, because that's what I was instructed from Johnny, the guy that was working the deal for me.

Q. Johnny told you not to send it to them?

A. Yes.

Q. Did you think there was anything wrong with not sending all the information necessary for Wing Lake?

A. No, because at that time, too, they had already talked about moving over to some -- the balance that was owed on that Spin Capital, it was already discussed about moving it over to one of my other entities, so --

Q. And that's the Auto Shop?

A. Correct.

Q. But after that fell through, again, you didn't want to tell them the truth?

A. I didn't -- yes, at that time, I was getting bombarded from both sides, and I did not tell them, yes.

that litigation.
A. I believe -- yes, I believe you're right, in New York, yes.
Q. I'm right about there's no finding of usury, correct?
A. Right. I think that's how the law is written up there, yes.
Q. Okay. We also looked, during your direct examination, at an affidavit that you signed. I guess you signed it at the behest of Wing Lake. Do you recall that?
A. The one from the other day, the affidavit?
Q. Yes.
A. Yes.
Q. Now, isn't it true -- it's true that you have told Mr. Lubin that that wasn't your signature on that document, correct?
A. Well, as I said -- testified the other day, when he sent me that on WhatsApp, I just -- he was texting all the time, and I just -- I don't know if I really opened what he sent me to look at, or I just was trying to get rid of him.
MR. LETO: We'll pull up for identification Hi Bar 17.
BY MR. LETO:
Q. And this is a text message between you and

Mr. Lubin, correct?
A. Yes, I see that.
Q. And just so it's clear, there's a document that's embedded in the text, which is attached, which is the affidavit that we were looking at the other day, right?
A. Right, I just said I don't know if I even opened it when he sent me the text, I don't recall.
MR. LETO: But if you'd scroll up, please, Charlie.
BY MR. LETO:
Q. Just so we're clear, when Mr. Lubin asked you about this document, you said, that's not my signature. And then he said, did you sign this? And you said, no, that's not my signature.
You said that, correct?
A. Yes, that's what I said, yes.
Q. So you were lying to Mr. Lubin?
A. Well, technically, you're correct, but like I said, I don't even know if I opened it, because it was me more of just trying to get rid of him, because there's many, many, many text messages from him to me. I think I blocked him after this as well.
Q. Well, he sent it to you at 1:40 p.m., and then you didn't respond until 8:58 p.m., a day later. So