**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| Caption in Compliance with D.N.J. LBR 9004-1(b)<br>Avrumi Lubin, Defendant, pro se, individually<br>Mailing address: 1460 Arboretum Parkway<br>Lakewood, New Jersey 08701<br>Telephone: 732-608-4905<br>Email: josh@tetonfunding.com | Case No.: 26-17342-EJO<br>Chapter 11<br>Adv. Pro. No.: 26-01494-EJO<br>Hon. Eamonn J. O'Hagan<br>Hearing: December 10, 2026, 10:00 a.m. |
| In re: AVRUMI LUBIN a/k/a Josh Lubin, Debtor.<br>BENJAMIN A. STANZIALE, JR., as Chapter 11 Trustee, Plaintiff,<br>v.<br>AVRUMI LUBIN, SPIN CAPITAL, LLC, TETON LIFE, LLC, TETON FUNDING, LLC, TETON FUNDING GROUP, LLC, JL SPECIAL INVESTMENTS, LLC, Defendants. | |

# CERTIFICATION OF AVRUMI LUBIN

I, Avrumi Lubin, of full age, certify as follows:

1. I am the debtor in Case No. 26-17342-EJO and a defendant here. I submit this certification individually, not as counsel for any company.

2. Teton Life is a Delaware limited liability company. The November 12 order describes my 50% interest and Gavriel Yitzchakov's 50% interest. Before October 15, 2026 I took part in managing Teton Life and directing its New York lawsuit under the operating agreement. My requested role remains subject to the Court, the operating agreement and Mr. Yitzchakov's rights.

3. I continue trying to retain lawyers for the companies, including Teton Life. No lawyer has been retained to appear for Teton Life in this adversary proceeding, and I have no agreement from the Trustee extending the November 25 response deadline.

4. I will comply with the terms of any order the Court enters. I will obtain Court approval of the particular source and use before paying counsel from company or estate funds unless the Court orders otherwise. I do not assert that a receivable is due now or that the reserve is funded. I request no compensation.

5. Filing this motion grants no authority, suspends no order or stay, and extends no deadline. I will not appear as an entity's lawyer or act under the requested authority before the Court grants it.

6. I attended the November 10, 2026 hearing before Judge O'Hagan in New Jersey. My recollection is that Ms. Staiano said she would work with me on preserving the additional policies and seek any stay relief needed. I described that understanding and my same-evening follow-up in my filed November 12 certification, Main ECF No. 156, paragraph 16. This is my recollection, not a transcript quotation.

7. I also recall Ms. Staiano stating at that hearing that settlements would be noticed to creditors and handled under applicable bankruptcy procedures. My filed certification records counsel's settlement-notice assurance and statement that the Trustee had not entered a settlement. Id., paragraph 12. I ask that any disputed wording be checked against the hearing record; I do not assert that every safeguard requested here was already ordered.

8. I acknowledge the Trustee's steps described in Main ECF No. 156, paragraph 15. I request a defined process for working on the additional policies, with a contact, responsible counsel, target dates, and a way for me to provide relevant records. I seek written status and prospective protection, not a finding of misconduct based only on my recollection.

9. My primary request is full restoration of my lawful Teton Life management and litigation authority, subject to the operating agreement and Mr. Yitzchakov's existing rights. My first alternative is the same restoration with Court-enforced guardrails, not a Trustee veto or revocable agency. If both restoration requests are denied, I request a specific limited role only under a written plan approved by the Court, with no Trustee veto or unilateral revocation; then the independent-defense, funding and protective alternatives in Proposed Order B. I also request suspension of the affirmative sole-authority clause independently of restoration, understanding that suspension alone does not authorize me to act.

10. I participated in the August 13, 2025 Teton Life transaction and the email exchange reproduced in Composite Exhibit TL-1, Part A. I recognize the email communications and the transaction documents. Part A is a reformatted excerpt from the Outlook record of Gavriel Yitzchakov's (also known as Gabe Isaacov's) approval, received at 5:16 p.m. New York time, and its quoted same-day chain; it is not a screenshot or a native email-header export. It includes the preceding question and proposal. Earlier quoted messages are omitted as identified. I recognize the reproduced messages as communications in which I participated.

11. Wollmuth Maher & Deutsch represented me personally in the August 2025 transaction. Part B reproduces the relevant tracked-deletion text from the DOCX attached to WMD's August 13, 1:33 p.m. email, titled "Ex. A Amended Operating Agreement (8.12.25 Edit).docx." It deletes the separate all-member approval provision for retaining Lawsuit counsel and the corresponding exception in § 2.08(d). Part B is a labeled reformatted extract, not the signed agreement. Part C reproduces identified pages of the signed operating agreement, including relevant limitations and signatures. The complete agreement is also filed at ECF No. 3-5. These excerpts are not the complete transaction or closing binder.

12. I offer these materials to establish the contemporaneous agreed scope of my New York litigation authority, including counsel selection. I do not offer the email approval as proof that the Trustee's later asserted succession is legally ineffective, that all Member B rights disappeared, or that I may disregard existing orders. I can testify about my participation and the documents if their authenticity or context is disputed. My primary request remains full restoration of my own lawful authority, with full restoration subject to guardrails as the first alternative.

13. To my knowledge from my involvement in the Company, Teton Life's substantive assets consist of its asserted rights in the New York Lawsuit and related matters, including claimed policy interests, recoveries, proceeds and receiver-held funds. I am not identifying a separate unrelated operating business or asset. My reference to its only asset means that litigation-related collection of rights, not a claim that there is presently verified cash, that every policy belongs to Teton Life, or that a particular recovery is certain.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. 28 U.S.C. § 1746.

Dated: November 17, 2026

______________________________

Avrumi Lubin, individually, pro se
Mailing address: 1460 Arboretum Parkway, Lakewood, New Jersey 08701
732-608-4905 | josh@tetonfunding.com

## COMPOSITE EXHIBIT TL-1

### Approval of the August 13, 2025 authority amendment

Part A: Approval email of Gavriel Yitzchakov (Gabe Isaacov), with same-day quoted context, reformatted from Outlook. Earlier quoted messages omitted.

Part B: Labeled tracked-deletion extract from the original DOCX attachment to the 1:33 p.m. email of Wollmuth Maher & Deutsch LLP (WMD). Not a complete draft or the signed agreement.

Part C: Signed operating-agreement excerpts, source PDF pages 3, 6, 8-11, 27 and 30. These include the parties, bankruptcy clause, Member B consent provisions, the Lawsuit provision, management and compensation, legal-fee reserve, signatures and member schedule. The full agreement is also in the court record at ECF No. 3-5.

The signed source pages are reproduced without alteration. The excerpts do not adjudicate trustee succession, current authority, privilege, or the validity of any later transaction. These records predate the challenged injunctions. They are not offered as newly discovered evidence; they are submitted with a request for leave, as explained in the memorandum (Part II.G).

# COMPOSITE EXHIBIT TL-1

## August 13, 2025 approval and transaction records

### Part A - Reformatted Outlook excerpt

From: Gabe Isaacov <gabe@redstoneadvance.com>

To: Amanda Benincasa; cc: Gabriel Mendelberg, Adam Bialek, Josh Lubin

Subject: Re: Teton Call
Received: August 13, 2025, 5:16:12 p.m. New York time (21:16:12 UTC). Quoted message times below are as displayed in the email.

This is a reformatted text excerpt retrieved from Outlook, not a screenshot or native MIME export. The approval and same-day quoted chain are retained, including the question and proposed-edit description. Quoted messages dated August 12 and earlier, attachments and transport headers are not reproduced in this part. Part B identifies the original attached redline. The signed agreement controls over the draft.

Yes

Sent from my iPhone
On Aug 13, 2025, at 5:10 PM, Amanda Benincasa <ABenincasa@wmd-law.com>
wrote:

Gabe I,

Are you signed off on the new language that I circulated at 1:33?

Thanks,
Amanda

* * *
From: Gabe Isaacov <gabe@redstoneadvance.com>
Sent: Wednesday, August 13, 2025 4:40:38 PM
To: gabe@mendelberglaw.com <gabe@mendelberglaw.com>
Cc: Amanda Benincasa <ABenincasa@WMD-LAW.COM>; Adam Bialek <ABialek@WMD-LAW.COM>; Josh Lubin <josh@spincapital.com>
Subject: Re: Teton Call

CEO on both

On Aug 13, 2025, at 3:59 PM, gabe@mendelberglaw.com wrote:

This is fine with me. Gabe I.?

From: Amanda Benincasa <ABenincasa@WMD-LAW.COM>
Date: Wednesday, August 13, 2025 at 1:33 PM
To: gabe@mendelberglaw.com <gabe@mendelberglaw.com>, Adam Bialek <ABialek@WMD-LAW.COM>, Gabe Isaacov <gabe@redstoneadvance.com>, Josh Lubin <josh@spincapital.com>
Subject: RE: Teton Call

Gabe and Gabe,

Josh has requested that we edit section 2.08 of the operating agreement. Please see our proposed change in tracked changes.

If Gabe Y signs off on this edit then I can send around a DocuSign. I am still waiting on Gabe's title at both BMF and Redstone so that I can include it in the DocuSign package (otherwise he will have to execute multiple packages for each entity).

Thanks,
Amanda

Amanda Benincasa
Wollmuth Maher & Deutsch LLP
500 Fifth Avenue
New York, New York 10110
T: (212) 382-3300
F: (212) 382-0050
www.wmd-law.com

This electronic message contains privileged attorney-client communications from the law firm of Wollmuth Maher & Deutsch LLP. The information is intended to be for the use of the addressee only. If you are not the addressee, note that any disclosure, copying, distribution or use of the contents of this message is prohibited.

[End of August 13 excerpt. Earlier quoted messages are omitted.]

## EXHIBIT TL-1 - PART B

### Tracked-deletion extract from the original WMD attachment

Source: "Ex. A Amended Operating Agreement (8.12.25 Edit).docx," attached to Amanda Benincasa's August 13, 2025, 1:33 p.m. email. This is a reformatted extract from the DOCX tracked-change data, not a screenshot, a complete draft, or the executed agreement. Strike-through means text marked deleted in the source. Paragraph numbering and unrelated provisions are omitted. Part C contains the corresponding executed language.

### Deleted separate counsel-engagement approval provision:

~~Enter into any engagement or similar agreement or arrangement with a law firm in connection with the Lawsuit;~~

### Lawsuit provision with its counsel-retention exception deleted:

The Members acknowledge that an asset of the Company is the matter Spin Capital, LLC vs. Golden Foothill Insurance Services, LLC et al, pending in the New York Supreme Court at Index No. 650582/2022 and all related matters (the "Lawsuit"). Member Josh Lubin is the sole owner and authorized member of Spin Capital, LLC and, as and for his contribution (as more fully described in the Contribution Agreement) has assigned, or caused Spin Capital, LLC to assign, all of its rights to any recovery, including all proceeds from any source, arising out of or relating to the Lawsuit (or the insurance policies described therein) which rights and proceeds are now the property of the Company, provided that all decisions related to the Lawsuit~~, except for the retention of counsel in Section 2.08(d)(ix),~~ will be considered to be made in the ordinary course of business and shall not require the approval of Member B. Notwithstanding anything to the contrary in this Agreement, the Members agree to confer in good faith with regard to any settlement opportunity in the Lawsuit.

The source draft contains the cross-reference "2.08(d)(ix)" exactly as reproduced. This exhibit does not silently correct it. The executed agreement does not contain that deleted exception.

# AMENDED AND RESTATED LIMITED LIABILITY COMPANY OPERATING AGREEMENT

This Limited Liability Company Operating Agreement (this "**Agreement**") of TETON LIFE LLC, a Delaware limited liability company (the "**Company**"), is entered into this 13th day of August, 2025 by and among the Company, each Person executing this Agreement as a member on the date hereof (collectively, the "**Initial Members**"), and any other Person who, after the date hereof, becomes a Member in accordance with the terms of this Agreement (collectively, the "**Members**"). Unless otherwise noted or defined elsewhere in this Agreement, capitalized terms used in this Agreement have the meanings set forth in ARTICLE X.

## RECITALS

WHEREAS, the Company was formed under the laws of the State of Delaware by the filing of a Certificate of Formation with the Secretary of State of Delaware (the "**Secretary of State**") on February 7, 2023 (the "**Certificate of Formation**") for the purpose set forth in this Agreement;

WHEREAS, pursuant to a Contribution Agreement, dated February 7, 2023 by and among Avrumi (a/k/a Josh) Lubin ("**Member A**" which term includes Permitted Transferees), Gavriel Yitzchakov (a/k/a Gabe Isaacov) ("**Member B**" which term includes Permitted Transferees), and the Company (the "**Contribution Agreement**"), Member A and Member B each agreed to contribute, or cause to be contributed, to the Company at the Closing (as defined in the Contribution Agreement) certain assets in exchange for Membership Interests; and

WHEREAS, the Members wish to enter into this Agreement setting forth the terms and conditions governing the operation and management of the Company.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## Article I. Organizational Matters

**Section 1.01 Name.** The name of the Company is TETON LIFE LLC.

**Section 1.02 Principal Office.** The principal office of the Company is located at 605 Lincoln Road, Suite 501, Miami Beach, Florida 33139 or such other location as may from time to time be determined by the Members.

**Section 1.03 Registered Office; Registered Agent.** The registered office of the Company and the registered agent for service of process on the Company in the State of Delaware shall be that office and Person named in the Certificate of Formation or such other office (which need not be a place of business of the Company) or such other Person or Persons as the Members may designate from time to time in the manner provided by the Delaware Act and Applicable Law.

**Section 1.04 Purpose; Powers.**

(b) In order for any Person not already a Member of the Company to be admitted as a Member, whether pursuant to an issuance or a Transfer (including a Permitted Transfer) of a Membership Interest or otherwise, such Person shall have (i) executed and delivered to the Company a written undertaking substantially in the form of the Joinder Agreement attached at **Exhibit A** ("**Joinder Agreement**") and, if such Person is an individual who has a Spouse, an executed written undertaking from such Spouse substantially in the form of the Spousal Consent (as defined herein) and (ii) provided to the Company any information required from such Person under Section 8.06. Upon the amendment of the Members Schedule and the satisfaction of any other applicable conditions, including, if applicable, the receipt by the Company of payment for the issuance of the applicable Membership Interest, such Person shall be admitted as a Member, shall become a party hereto, shall be deemed listed as such on the books and records of the Company, and, in the case of an issuance, thereupon shall be issued their Membership Interest. Further, (A) the Capital Accounts shall be adjusted as necessary in accordance with Section 2.02 and (B) the Interests of the Members and any Assignees shall be adjusted pro rata so that the aggregate Percentage Interests of all Holders equals 100%.

(c) No transfer, sale or assignment of an existing Membership Interest shall be permitted without the express written consent of the Members holding, in the aggregate, 100% of the membership interests existing as of the date of this Agreement as set forth above.

**Section 2.04 Withdrawal; Expulsion; Bankruptcy.**

(a) So long as a Member continues to hold a Membership Interest, such Member shall not have the ability to withdraw or resign as a Member prior to the dissolution and winding up of the Company and any such withdrawal or resignation or attempted withdrawal or resignation by a Member prior to the dissolution and winding up of the Company shall be null and void.

(b) No Member may be expelled from the Company.

(c) A Member that suffers an Event of Bankruptcy shall cease to be a Member and thereafter have only the rights of an Assignee with respect to their Economic Interest.

(d) As soon as any Person who is a Member ceases to hold any Membership Interest, such Person shall no longer be a Member.

**Section 2.05 Death of Member.** The death of a Member shall not cause the dissolution of the Company, except as otherwise provided by Section 9.01(d). In such event, the Company and its business shall be continued by the remaining Member or Members and the Interest owned by the deceased Member shall be automatically Transferred to such Member's executors, administrators, testamentary trustees, legatees, surviving Spouse, beneficiaries, or other legal representative, as applicable, as Permitted Transferees, *provided,* that any such Permitted Transferee shall only be an Assignee of such deceased Member's Economic Interest unless such Permitted Transferee is (a) a Member or (b) admitted as a Member in accordance with the provisions of this Agreement, including Section 2.03(b) and Section 2.08(b)(ii).

(e) The business to be conducted at such meeting need not be limited to the purpose described in the notice and can include other business to be conducted by the Members; provided, that the Members shall have been notified of the meeting in accordance with Section 2.07(b). Attendance of a Member at any meeting shall constitute a waiver of notice of such meeting, except where a Member attends a meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

(f) A quorum of any meeting of the Members shall require the presence of the Members holding 100% of the Membership Interests required to vote at such meeting. Subject to Section 2.08, no action may be taken by the Members unless the appropriate quorum is present at a meeting.

**Section 2.08 Action by Members.**

(a) Subject to Section 2.08(b), Section 11.11, and any other provision of this Agreement or the Delaware Act requiring the vote, consent, or approval of a different percentage of the Membership Interests, no action may be taken by the Members at any meeting at which a quorum is present without the affirmative vote of the Members holding at least a majority of the Membership Interests entitled to vote thereon. The Company shall maintain for Member inspection records of any action taken on the Company's behalf at any such meeting.

(b) Notwithstanding anything herein to the contrary, without the approval of all Members, the Company shall not, and shall not enter into any commitment to:

(i) Amend, modify, or waive any provisions of the Certificate of Formation or this Agreement; *provided* that an amendment to the Members Schedule in accordance with the last sentence of Section 11.11 following any new issuance, redemption, repurchase, or Transfer of Membership Interests in accordance with this Agreement shall not require approval under this Section 2.08(b)(i); provided further, that an amendment to the Members Schedule in accordance with the Letter Agreement or the Redstone-Lubin Note shall not require approval under this Section 2.08(b)(i);

(ii) Issue any Equity Securities, accept any Capital Contributions (other than the Initial Capital Contributions), or admit any Person (other than the Initial Members) as a Member of the Company;

(iii) Authorize or pay any distribution, or purchase or redeem any Interest, other than distributions payable in cash in accordance with Section 5.01(a), Section 5.02 or pursuant to Section 9.03;

(iv) Incur any indebtedness, pledge or grant Liens on any assets, or guarantee, assume, endorse, or otherwise become responsible for the obligations of any other Person, in each case in excess of $50,000.00;

(v) Make any loan, advance, or capital contribution in or to any Person in excess of $50,000.00;

(vi) Enter into or effect any transaction or series of related transactions involving the purchase, lease, license, exchange, or other acquisition (including by merger, consolidation, sale of stock, or acquisition of assets) by the Company of any assets and/or equity interests of any Person other than in the ordinary course of business consistent with past practice;

(vii) Enter into or effect any transaction or series of related transactions involving the sale, lease, license, exchange, or other disposition (including by merger, consolidation, sale of stock, or sale of assets) by the Company of any assets other than in the ordinary course of business consistent with past practice;

(viii) Except as described in Section 2.08(d) below, initiate or settle any lawsuit, legal action, dispute, arbitration, or other similar judicial or administrative proceeding, other than in the ordinary course of business consistent with past practice, or agree to the provision of any equitable relief by the Company;

(ix) Initiate a bankruptcy or consent to any involuntary bankruptcy proceeding involving the Company or, except as provided in ARTICLE IX, dissolve, wind up, or liquidate the Company.

(c) The Percentage Interest of an Assignee shall not be considered in the voting requirements of the Company.

(d) The Members acknowledge that an asset of the Company is the matter Spin Capital, LLC vs. Golden Foothill Insurance Services, LLC et al, pending in the New York Supreme Court at Index No. 650582/2022 and all related matters (the "**Lawsuit**"). Member Josh Lubin is the sole owner and authorized member of Spin Capital, LLC and, as and for his contribution (as more fully described in the Contribution Agreement) has assigned, or caused Spin Capital, LLC to assign, all of its rights to any recovery, including all proceeds from any source, arising out of or relating to the Lawsuit (or the insurance policies described therein) which rights and proceeds are now the property of the Company, provided that all decisions related to the Lawsuit will be considered to be made in the ordinary course of business and shall not require the approval of Member B. Notwithstanding anything to the contrary in this Agreement, the Members agree to confer in good faith with regard to any settlement opportunity in the Lawsuit.

**Section 2.09 Action Without Meeting.** Notwithstanding the provisions of Section 2.07 and Section 2.08, any matter that is to be voted on, consented to, or approved by Members may be taken without a meeting, without prior notice, and without a vote if consented to, in writing or by Electronic Transmission, by Member or Members holding not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which each Member entitled to vote on the action is present and votes. A record shall be maintained by the Company of each such action taken by written consent of a Member or Members.

**Section 2.10 Other Activities; Business Opportunities.** Each Member may, subject to performing any of such Member's obligations set out in this Agreement or in any other agreement to which such Member is a party with the Company, engage in any other activities, ventures, or businesses, regardless of whether those activities, ventures, or businesses are similar to or competitive with the business of the Company; *provided* that such Member does not engage in such activity, venture, or business as a result of or using Confidential Information. None of the Members shall be obligated to account to the Company or to any other Holder for any profits or income earned or derived from such other activities, ventures, or businesses. None of the Members shall be obligated to inform the Company or the other Holders of any investment or business opportunity of any type or description.

## Article III. Management

**Section 3.01 Management of the Company.** Subject to the provisions of this Agreement, including Section 2.08(b), and except as otherwise provided by the Delaware Act, the business, property, and affairs of the Company shall be managed by the Members. The actions of any Member taken in accordance with the provisions of this Agreement shall bind the Company.

**Section 3.02 Compensation of the Members.** The Members shall not be entitled to any salaries, fees, or other compensation for any services rendered to or on behalf of the Company or otherwise in connection with the Company's business, affairs, operations, or assets; *provided, however,* that the Company shall pay or reimburse the Members for any reasonable out-of-pocket expenses incurred by them on behalf of the Company in connection with conducting the Company's business in accordance with this Agreement.

**Section 3.03 Officers.** The Members may appoint one or more individuals as officers of the Company (the "**Officers**") as the Members deem necessary or desirable to carry on the business of the Company and may delegate to such Officers such power and authority as the Members deem advisable. An Officer is not required to be a Member of the Company. Any individual may hold two or more offices of the Company. Each Officer shall hold office until such Officer's successor is designated by the Members or until such Officer's earlier death, resignation, or removal. Any Officer may resign at any time upon written notice to the Company. Any Officer may be removed by the Members at any time, with or without cause. A vacancy in any office occurring because of death, resignation, removal, or otherwise may, but need not, be filled by the Members.

## Article IV. Allocations

**Section 4.01 Allocation of Profits and Losses.**

(a) Subject to the terms hereof, and Notes executed on same date, the Company's profits and losses for each Fiscal Year will be allocated among the Holders pro rata in accordance with their Percentage Interests.

(b) Notwithstanding any other provision of this Agreement, (i) "partner nonrecourse deductions" (as defined in Treasury Regulations Section 1.704-2(i)), if any, of the Company shall be allocated for each Fiscal Year to the Holder that bears the economic risk of loss within the meaning of Treasury Regulations Section 1.704-2(i) and "nonrecourse deductions" (as defined in Treasury Regulations Section 1.704-2(b)) and "excess nonrecourse liabilities" (as defined in Treasury Regulations Section 1.752-3(a)), if any, shall be allocated to and among the Holders in accordance with their Percentage Interests.

(c) This Agreement shall be deemed to include "qualified income offset," "minimum gain chargeback," and "partner nonrecourse debt minimum gain chargeback" provisions within the meaning of Treasury Regulations under Section 704(b) of the Code.

(d) All items of income, gain, loss, deduction, and credit of the Company shall be allocated among the Holders for federal, state, and local income tax purposes consistent with the manner that the corresponding items are allocated among the Holders pursuant to this section, except as may otherwise be provided herein or under the Code.

## Article V. Distributions

### Section 5.01 Distributions.

(a) Except for distributions being made in accordance with Section 5.02 below, all distributions of available cash shall be made to the Holders at the times and in the aggregate amounts determined by the Members holding a majority of the Membership Interests. Such distributions shall be paid: *first,* to the holders of the Redstone Loan, as repayment, and *second* to the Holders pro rata in accordance with their respective Percentage Interests.

(b) Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make any distribution: if such distribution would violate Section 18-607 of the Delaware Act or other Applicable Law.

(c) The Members further agree that the Company shall pay all reasonable and necessary expenses, including legal fees, associated with the Lawsuit and shall maintain a reserve (the "**Lawsuit Reserve**") in the Company's bank account of no less than $200,000.00 for such purpose.

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date first written above.

The Company:

Teton Life LLC, a Delaware limited liability company

DocuSigned by:

By: Josh Lubin

8C1F4BC2DA904D5...

Name: Avrumi (Josh) Lubin

Title: Member

The Members:

DocuSigned by:

Josh Lubin

8C1F4BC2DA904D5...

Name: Avrumi (Josh) Lubin

Signed by:

BB139DFDC7A848A...

Name: Gavriel Yitzchakov

## SCHEDULE I
## MEMBERS SCHEDULE

| Member Name, Address and Email | Capital Contribution | Percentage Interest |
|---|---|---|
| Avrumi (a/k/a Josh) Lubin<br>Address:<br>1460 Arboretum Parkway<br>Lakewood, NJ 08701 | Initial Capital Contribution:<br>As described in the Contribution Agreement<br><br>Lawsuit Reserve Contributions: | 50% |
| Gavriel Yitzchakov (a/k/a Gabe Isaacov)<br>Address:<br>4225 N. Meridian Ave.<br>Miami Beach, FL 33140 | Initial Capital Contribution:<br>$1,000<br>Other good and valuable consideration<br><br>Lawsuit Reserve Contributions: | 50% |